UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DARRYL L. HAWTHORNE,

                                    Plaintiff,

                                                              1:17-CV-00716

v.

                                                              (GTS/TWD)

CITY OF ALBANY, et al.,

                                    Defendants.
_____

APPEARANCES:

DARRYL L. HAWTHORNE
Plaintiff, pro se
40 Anne Street
New York, New York 10038

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

                    <u>**ORDER AND REPORT-RECOMMENDATION**</u>

        The Clerk has sent to the Court for initial review the complaint in this 42 U.S.C. §1983

civil rights action brought by Plaintiff Darryl L. Hawthorne against Defendants Albany Police

Officers Tyson Ruecker, Devin Anderson, Sean Perkins, Alex Cheban, and John Norris, and the

City of Albany.  (Dkt. No. 1.)  The officers have been sued in both their individual and official

capacities.  *Id*.  Also before the Court is Plaintiff's application for leave to proceed *in forma*

*pauperis* ("IFP Application").  (Dkt. No. 2.)

**I.      PLAINTIFF'S IFP APPLICATION**

        A court may grant *in forma pauperis* status if a party "is unable to pay" the standard fee

for commencing an action.  28 U.S.C. § 1915(a)(1) (2006).  After reviewing Plaintiff's IFP

Application (Dkt. No. 2), the Court finds that Plaintiff meets this standard.  Therefore, Plaintiff's

IFP Application (Dkt. No. 2) is granted.

## II.    LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

Even when a plaintiff meets the financial criteria for *in forma pauperis*, 28 U.S.C.

§ 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the

case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii)

fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a

defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the

complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325

(1989).  "An action is frivolous when either: (1) the factual contentions are clearly baseless such

as when the claims are the product of delusion or fantasy; or (2) the claim is based on an

indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437

(2d Cir. 1998) (citations and internal quotation marks omitted).  Although extreme caution

should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse

party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*,

700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not

frivolous before permitting a plaintiff to proceed.  *See, e.g., Thomas v. Scully*, 943 F.2d 259, 260

(2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua*

*sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to

state a claim that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*. In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836 (1994) (citation omitted).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Where a plaintiff proceeds *pro se*, the pleadings must be read liberally and construed to raise the strongest arguments they suggest.  *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted).  A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## III.    COMPLAINT

### A.    Defendants Anderson and Perkins with Plaintiff at Capitol Green

Plaintiff alleges that on March 16, 2015, he went to Capitol Green, an apartment building

located at 400 Central Avenue in Albany, New York, to visit a friend of his on the eleventh floor. (Dkt. No. 1 at 6-7.[1]) As Plaintiff entered the building, the security guard, who knew Plaintiff was a regular visitor in the building, waved, nodded his head, smiled, and said hello to Plaintiff. *Id*. at 6. The security guard did not stop Plaintiff, tell him he was doing something wrong, or tell him he had to sign a book at the desk when he went in between 3:30 and 4:30pm. *Id*. at 7.

Plaintiff rode the elevator to the eleventh floor, knocked on his friend's door, and went back to the elevator to leave the building when there was no answer. *Id*. As he was about to get on the elevator, Defendant Albany Police Officers Anderson and Perkins walked out of the elevator and told him he could not get on. They refused to answer when Plaintiff asked why and then engaged in communications with women from the rent/management office. *Id*.

When Plaintiff denied the Officers' request for consent to search his person, Anderson told Perkins to grab Plaintiff, and Perkins grabbed him, slammed him forcibly against the wall, and forcibly handcuffed him.[2] *Id*. Plaintiff was told to shut the fuck up when he asked what he was being arrested for, and Perkins held him while Anderson searched through Plaintiff's coat pockets. *Id*. When Plaintiff asked again why he was being arrested, Anderson told him for trespassing because he had not signed the book when he came in. *Id*. at 8. According to Plaintiff, he has known people in the building for over eight years, long before the women from the rent/maintenance office with whom the Officers spoke had begun working there. *Id*. at 13. Plaintiff claims he was not trespassing and that Anderson and Perkins lied about it to give them a

---

[1] Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.

[2] There is no indication in the complaint that Anderson and Perkins at any point acted under the authority of a warrant.

legitimate reason to stop him and violate his rights.  *Id*.

When Anderson asked Plaintiff whose apartment he had been seen exiting by the rent/management women a couple of weeks earlier, Plaintiff replied, "A friend.  And obviously if the ladies saw me exiting the apartment, then that show (sic) that I know people in the building, and proves I am not a trespasser."  *Id*. at 9.  Anderson was furious at Plaintiff's response and said "we'll show this porch monkey a lesson."  *Id*.  Perkins grabbed Plaintiff in a choke hold from behind, lifting him off his feet for a few seconds while he dangled by his neck.  *Id*.  Anderson then punched Plaintiff in the stomach, and he fell to the floor.  *Id*.  Anderson told Perkins to pick Plaintiff up and carry him towards the end of the hallway away from the elevators and cameras.  *Id*.  Anderson was carrying Plaintiff's upper body and Perkins his lower body and they slammed him to the ground when Plaintiff began squirming and moving to keep them from carrying him.  *Id*. at 10.

Eventually Plaintiff was carried down the hall and placed in a sitting position on the floor.  Anderson and Perkins searched Plaintiff's hat, sneakers, and socks.  *Id*.  They then took off his pants and searched them.  *Id*.  Anderson started saying "we need to check his ass."  *Id*.  When Plaintiff protested, Perkins pulled his gun from the holster, held it up to Plaintiff, and told him "if we have to tell you to shut the fuck up one more time, I will put a bullet in your head."  *Id*.  Plaintiff made no more protests for fear Perkins would kill him.  *Id*.  Anderson and Perkins rolled Plaintiff over on his stomach and put on surgical gloves."  *Id*. at 11.  Anderson pulled down Plaintiff's underwear and told Perkins to spread apart Plaintiff's butt cheeks while he probed Plaintiff's anus.  *Id*.  Anderson probed Plaintiff's anus four times shining a flashlight as he did it.  *Id*.  Nothing was found.  *Id*.

5

B.      **The Precinct**

Defendant Police Officer Cheban was contacted by Anderson and Perkins to transport Plaintiff to the precinct.  (Dkt. No. 1 at 11.)   Cheban patted Plaintiff down before putting him in the car, and when they arrived at the precinct, Plaintiff was handcuffed to a chair.  *Id*.  At the precinct, Perkins went through Plaintiff's cell phone, reading all of his text messages, and looking at his contacts, phone history, and photos and videos, including nude, intimate videos and pictures of Plaintiff with his girlfriend.  *Id*.  Anderson and possibly others forced Plaintiff to take off every item of clothes one-by-one until he was completely naked.  *Id*.  He was forced to squat and cough numerous times before another anal cavity search was performed.  *Id*.

An officer who had whispered something to Anderson and Perkins earlier returned two hours later with what they said was crack cocaine.  *Id*. at 12.  Plaintiff alleges that the whispering was about a plot to frame him for drug possession.  *Id*.  Plaintiff was charged with criminal trespass, criminal possession of a controlled substance, criminal possession with intent to sell, and false impersonation.  *Id*.

Plaintiff claims that they deliberately did not document his New York ID at the Albany Police Department so that they could say he had lied about his identity when he had not.  *Id*. at 13.  According to Plaintiff, when Perkins and Anderson had searched him in the hallway of the Capitol Green, they had found his ID and run it for outstanding warrants and to see if he was on parole or probation.  *Id*.  Anderson was surprised Plaintiff's name kept coming up clean.  *Id*.  Plaintiff has alleged that Anderson and Perkins falsified a police document by saying that they had found crack cocaine on Plaintiff as a result of the cavity search.  *Id*.  Months later, they changed their story and claimed they had found the crack cocaine in the police car.  *Id.*

6

Plaintiff has alleged that he had $4,000 with him when he was stopped by Anderson and Perkins. *Id*. at 13. The officers only documented $776 of it and marked it as evidence to make the drug charges seem more legitimate. *Id*. Plaintiff has no idea where the rest of the money went. *Id.*

Plaintiff has alleged, in conclusory fashion, that Defendant Tyson Ruecker was extremely negligent in not adequately training and supervising the officers he was using in connection with Plaintiff's arrest.[3] Plaintiff also claims that Ruecker falsified police documents in connection with Plaintiff's arrest by deliberately failing to fill out a form called a DD5 at the time he received a tip from a confidential informant because he wanted to wait to find out if they found drugs on Plaintiff. *Id*. at 14. Since they did not, Ruecker waited to fill out the form until the drugs had been planted on Plaintiff. According to Plaintiff, Ruecker is guilty of conspiring to plant drugs on him and failing to use proper protocol, of being very abusive, and of abusing his authority as a police officer. *Id*. at 14-15.

Plaintiff claims that as a result of the actions of Anderson and Perkins he was deathly afraid for his life and felt ashamed, degraded, like less of a man, and like his manhood was taken from him by being penetrated anally. *Id*. at 15. Plaintiff seeks monetary damages in the amount of $500,000,000. *Id*. at 5. There are no allegations in the complaint regarding whether Plaintiff was at any point incarcerated on the trespassing, drug, and false impersonation charges alleged in the complaint or the disposition of the charges.

---

[3] Plaintiff has identified Ruecker as a police officer in the Albany Police Department in his complaint. (Dkt. No. 1 at 1.) In *People v. Smith*, 26 N.Y.S.3d 401, 403 (3d Dep't 2016), Ruecker is identified as a detective assigned to the Community Response Unit of the Albany Police Department.

IV.    **ANALYSIS**

   A.    **Anderson and Perkins**

The Court construes Plaintiff's complaint as alleging Fourth Amendment claims against

Anderson and Perkins under § 1983 for: (1) unreasonable search and seizure of his person and

property; (2) excessive force; (3) false arrest/false imprisonment and planting evidence;[4] and (4)

malicious prosecution.  (Dkt. No 1 at 6.)  Liberally construed, Plaintiff's complaint might also be

read as asserting a claim for deprivation of property, i.e., the money Plaintiff claims was taken

but not listed as confiscated at the time of his arrest, without due process in violation of the

Fourteenth Amendment.

   1.    Fourth Amendment Unreasonable Search and Seizure and Fourteenth
          Amendment Deprivation of Property without Due Process

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures.'" *City of Los Angeles,*

*Cal. v. Patel*, ___ U.S. ___, 135 S.Ct. 2443, 2451-52 (2015) (quoting *Arizona v. Gant*, 556 U.S.

332, 338 (2009)).  "No right is held more sacred, or is more carefully guarded, by the common

law, than the right of every individual to the possession and control of his own person, free from

all restraint or interference of others, unless by clear and unquestionable authority of law."  *Terry*

*v. Ohio*, 392 U.S. 1 at 9 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251

(1891)).

Consistent with the Fourth Amendment, "the police can stop and briefly detain a person

---

[4] In New York, false arrest and false imprisonment "are two names for the same tort."
*Holland v. Poughkeepsie*, 935 N.Y.S.2d 583, 589 (2d Dep't 2011).  The Court will use the term
"false arrest" herein.

for investigative purposes." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Such detention

requires that "the officer [have] a reasonable suspicion supported by articulable facts that

criminal activity 'may be afoot,' even if the officer lacks probable cause." *Sokolow*, 490 U.S. at

7 (quoting *Terry*, 392 U.S. at 30)). Reasonable suspicion involves a mixed question of fact and

law. *See Hall v. City of White Plains*, 185 F.Supp. 2d 293, 301 (S.D.N.Y. 2002). "[A] person

has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the

circumstances surrounding the incident, a reasonable person would have believed he was not free

to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also Florida v. Bostick*,

501 U.S. 429, 434 (1991) (a seizure has occurred when "the officer, by means of physical force

or show of authority, has in some way restrained the liberty of a citizen").

Plaintiff has alleged there was no basis for Anderson and Perkins to have a reasonable

suspicion that he was engaged in criminal conduct because he knew people living at Capitol

Green and had frequented the apartment building for a number of years. Plaintiff has also set

forth facts plausibly showing the use of what arguably could constitute excessive physical force

by the officers, and that he was not free to leave. According to Plaintiff, he was told by

Anderson while still at Capitol Green that he was being arrested for trespassing, his clothing and

shoes were searched, and he was subjected to an anal cavity search by Anderson and Perkins.

(Dkt. No. 1 at 8, 10-11.) Plaintiff has alleged that he was subjected to a strip search and a second

anal cavity search at the precinct. *Id*. at 12.

Fourth Amendment protection includes "individual privacy against certain kinds of

government intrusion." *Katz v. United States*, 389 U.S. 347, 350 (1967). There are at least three

9

types of searches that implicate a person's Fourth Amendment right to privacy. *Harris v. Miller*, 818 F.3d 49, 58 (2d Cir. 2016). Those are:

> A "strip search," though an umbrella term[,] generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A "visual body cavity search" extends to visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities.

*Id*. The most invasive type of search is the manual body cavity search to which Plaintiff was allegedly subjected by Anderson and Perkins while at Capitol Green, after being told by Anderson he was under arrest for trespassing, and again at the precinct. *See U.S. v. Gonzalez*, 111 F.Supp. 3d 416, 431 (S.D.N.Y. 2015).

"The Fourth Amendment requires that an individualized 'reasonable suspicion that [a misdemeanor] arrestee is concealing weapons or other contraband based on the crime charged, the particular circumstances of the arrestee, and/or the circumstances of the arrest' before [he] may be lawfully subjected to a strip search [including a manual cavity search]."[5] *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008) (citing *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986)). "A reasonable suspicion of wrongdoing is something stronger than a mere hunch, but something weaker than probable cause." *Id*. (quoting *Varrone v. Bilotti*, 123 F.3d 75, 79 (2d Cir. 1997)). "To establish reasonable suspicion, [officers] must point to specific objective facts and rational inferences that they are entitled to draw from those facts in light of their experience. The

---

[5] According to Plaintiff, Anderson told him he was being arrested for trespass prior to the anal cavity search at Capitol Green. (Dkt. No. 1 at 8.) Criminal trespass in the second degree (Penal Law § 140.15), which provides in relevant part that "A person is guilty of criminal trespass in the second degree when: (1) he or she knowing enters or remains unlawfully in a dwelling[.]" Criminal trespass in the second degree is a class A misdemeanor. *Id*.

standard requires individualized suspicion, specifically directed to the person who is targeted for the strip search." *Id*. (quoting *Varrone*, 123 F.3d at 79).

Based upon the foregoing, the Court finds that the allegations in Plaintiff's complaint plausibly show a violation of his Fourth Amendment right against unreasonable search and seizure by Defendants Anderson and Perkins and recommends that the claim brought under § 1983 survive initial review, and Anderson and Perkins be directed to respond.

### 2.    Excessive Force

In *Graham v. Connor*, 490 U.S. 386, 395 (1989), the Supreme Court held that "*all* claims that law enforcement officers have used excessive force    deadly or not    in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard.'" (emphasis in original).  The Court explained in *Graham* that "[d]etermining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." *Id*. at 396 (citation and internal quotation marks omitted).  Recognizing that the '"[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," the Court cautioned that "its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. (citation and internal quotation marks omitted).

The Court finds that the facts alleged in Plaintiff's complaint, including that Anderson

and Perkins slammed him against the wall, held him off the ground in a choke hold, punched him in the stomach, slammed him to the floor as they were carrying him down the hall, and subjected him to an anal cavity search (Dkt. No. 1 at 9-11), plausibly show that Anderson and Perkins used what might be found to constitute excessive force under the Fourth Amendment. The Court therefore recommends that Plaintiff's § 1983 Fourth Amendment excessive force claim against Defendants Anderson and Perkins survive initial review and that Anderson and Perkins be directed to respond.

3.     <u>False Arrest</u>

Plaintiff was initially informed that he was being arrested for trespassing. (Dkt. No. 1 at 8.) However, according to Plaintiff, about two hours after he was taken to the precinct an unnamed officer returned to the precinct with what Anderson and Perkins said was cocaine. *Id*. at 12. Plaintiff has alleged that the drug charges added after he was taken to the precinct were part of a plot by Anderson and Perkins, who falsified police documents with regard to the drugs, to frame him for drug possession. *Id*. at 13.

The elements of a claim for false arrest under § 1983 are substantially derived from New York law. *See Marshall v. Sullivan*, 105 F.3d 47 (2d Cir 1996). A plaintiff claiming false arrest must establish that: (1) the defendant intended to confine him; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *Id*. Probable cause is a complete defense to a false arrest claim. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ("[t]he existence of probable cause . . . is a complete defense to an action for false arrest"). However, "[w]hen planted evidence is the basis for an arrest, officers accused of planting the evidence cannot assert probable cause as a reason to

dismiss a claim for false arrest." *Hill v. Melvin*, No. 05 Civ. 6645 (AJP), 2006 WL 1749520, at * 11 (S.D.N.Y. June 27, 2006), *aff'd*, 323 F. App'x 61 (2d Cir. 2009).

The Court finds that the facts alleged in the complaint support a § 1983 claim for false arrest in violation of Plaintiff's Fourth Amendment rights against Anderson and Perkins sufficient to survive initial review and recommends that they be directed to respond.

### 4.    Malicious Prosecution

The elements of a malicious prosecution claim under § 1983 are substantially the same as the elements under New York law. *Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003). To state a malicious prosecution claim under New York law, the plaintiff must allege facts plausibly showing: (1) the initiation of a criminal proceeding; (2) its termination favorably to plaintiff; (3) lack of probable cause; and (4) malice. *Manganiello v. City of N.Y.*, 612 F.3d 149, 161 (2d Cir. 2010). In addition, the Second Circuit requires that a plaintiff demonstrate that there was a "post arraignment seizure," since a § 1983 malicious prosecution claim is "grounded ultimately on the Fourth Amendment's prohibition of unreasonable seizures." *Swartz v. Insogna*, 704 F.3d 105, 112 (2d Cir. 2013).

Plaintiff has alleged he was arrested and charged with drug possession and intent to sell, as well as trespass and false impersonation. However, the complaint is devoid of allegations regarding arraignment on the charges, whether there was a post arraignment seizure, whether Plaintiff was ultimately prosecuted on the charges, and, if so, whether or not the outcome was favorable to him. Therefore, the Court finds that Plaintiff has failed to state a claim for malicious prosecution against Anderson and Perkins and recommends dismissal with leave to amend in

light of Plaintiff's *pro se* status.[6]

>    5.    Deprivation of Property

Plaintiff has alleged that he had $4,000 on his person when Anderson and Perkins stopped him, that the two officers documented $776 to support the drug charges, and that Plaintiff has no idea what happened to the rest of the money, none of which was returned to him. (Dkt. No. 1 at 13.)  The Due Process Clause of the Fourteenth Amendment prohibits states from taking property without due process.  U.S. CONST. amend XIV, § 1.  Where a state provides a post-deprivation remedy for the unauthorized taking, such a remedy constitutes due process and no violation of the Due Process Clause can occur.  *Parratt v. Taylor*, 451 U.S. 527, 543-44 (1981) (*overruled on other grounds*, *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986)).

Depending on how the facts develop in the litigation with regard to the allegedly missing $3224 and the confiscated $776, it may turn out that New York provides a post-deprivation remedy to recover the missing finds.  However, the Court finds at this juncture that Plaintiff has alleged facts sufficient to survive initial review of his Fourteenth Amendment deprivation of property without due process claim and recommends that Defendants Anderson and Perkins be directed to respond.

**B.    Tyson Ruecker**

Plaintiff has alleged in conclusory fashion that Ruecker was extremely negligent in not adequately training and supervising the officers he was using in connection with Plaintiff's arrest. (Dkt. No. 1 at 13.)  Personal involvement in alleged constitutional deprivations is a prerequisite

---

>    [6]  The Court is unable to determine the applicability, if any, of *Heck v. Humphrey*, 512 U.S. 477 (1994) at this point for the same reason.

to an award of damages under § 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). "Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of a subordinate employee will not suffice to establish the requisite personal involvement and support a finding of liability" on a § 1983 claim. *White v. Fischer*, No. 9:09-CV-240 (DNH/DEP), 2010 WL 624081, at * 6 (N.D.N.Y. Feb. 18, 2010) (citing *Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d. Cir. 2009). However, the Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995).[7]

Plaintiff has alleged in his complaint that Ruecker actively assisted Anderson and Perkins in framing Plaintiff, thereby participating directly in Plaintiff's false arrest, by deliberately delaying the filling out of form DD5 regarding a tip from a confidential informant until after Anderson and Perkins had planted the crack cocaine allegedly used to frame Plaintiff. *Id*. at 14. Plaintiff has also alleged in wholly conclusory fashion that Ruecker conspired to plant drugs on him. *Id*.

---

[7] The Second Circuit has expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

Wholly conclusory claims of conspiracy are properly dismissed *sua sponte* on initial review. *See Johnson v. Goord*, 12 F. App'x 22, 23 (2d Cir. 2000); *Smith v. Hochul*, No. 13-CV-1106A (MAT), 2015 WL 1432644, at * 1,7 (W.D.N.Y. March 26, 2015) (dismissal on initial review of wholly conclusory conspiracy claim). Therefore, the Court recommends that Plaintiff's conspiracy claim against Ruecker under § 1983 be dismissed for failure to state a claim with leave to amend in light of Plaintiff's *pro se* status.

Because Plaintiff has alleged facts in his complaint supporting his claim that Ruecker was directly involved in the alleged planting of evidence, thus satisfying one of the *Colon* factors, the Court recommends that Plaintiff's false arrest claim against Ruecker survive initial review and that Ruecker be directed to respond.

### C.    Cheban and Norris

Plaintiff has alleged in conclusory fashion that he is seeking damages from Defendants Cheban and Norris for "negligence, recklessness, and intentional conduct including assault and battery, excessive force, false arrest, false imprisonment, and malicious prosecution." (Dkt. No. 1 at 6.) However, the only factual allegations in the complaint regarding Cheban is that he was contacted by Anderson and Perkins to transport Plaintiff to the precinct, and that Cheban patted Plaintiff down before putting him in the car and then drove him to the precinct. *Id*. at 11. The complaint appears to be devoid of any factual allegations regarding Norris.

Because allegations of personal involvement in constitutional deprivations is a prerequisite to an award of damages under § 1983, *Wright*, 21 F.3d at 501, the Court recommends that Plaintiff's claims against Defendants Cheban and Norris be dismissed for failure to state a claim with leave to amend in light of Plaintiff's *pro* se status.

16

D.    **City of Albany**

Plaintiff has named the City of Albany as a Defendant in this action for negligent hiring,

retention, and training of its agent, servants, and employees, including the Defendant police

officers.  (Dkt. No. 1 at 6.)   "[M]unicipalities may be held liable under § 1983 only for acts for

which the municipality is actually responsible."  *City of St. Louis v. Praprotnik*, 485 U.S. 112,

123 (1988) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).

> A municipality may be liable under § 1983 based on: (1) an official
> promulgated policy sanctioned or ordered by the municipality, *see*
> *Pembaur*, 475 U.S. at 480; (2) a pervasive custom or practice of
> which the municipality is or should be aware, *see Praprotnik*, 485
> U.S. 112, 130 (1988); *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-
> 24 (1985); (3) a single act by a municipal employee who has final
> policy making authority with respect to the area in question, *see*
> *McMillian v. Monroe Cnty.*, 520 U.S. 781 (1997); or (4) the
> municipality fails to train its employees, where this rises to the
> level of deliberate indifference to the constitutional right of others,
> *see City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

*Naravez v. City of New York*, 16 Civ. 1980 (GBD), 2017 WL 1535386, at * 7 (S.D.N.Y. April

17, 2017).  In order to state a claim against a municipality regarding training deficiencies, a

plaintiff's allegations must specifically identify the training deficiencies that are "closely related

to" or "actually caused the plaintiff's injuries."  *Canton*, 489 U.S. at 391; *see also Triano v. Town*

*of Harrison, N.Y.*, 895 F.Supp. 2d 526, 539-40 (S.D.N.Y. 2012) (collecting cases and dismissing

a failure to train claim where plaintiff did "no more than make conclusory assertions" that the

defendant failed to train its employees properly, without "providing any supporting factual detail

about alleged deficiencies in the training program.").

Conclusory allegations of failure of a municipality to properly hire, train, and supervise

employees "without supporting factual allegations of, among other things, a policy or custom

pursuant to which the alleged action was undertaken, fail to state a claim against [a municipality] that is plausible on its face." *Gray-Davis v. New York*, No. 5:14-CV-1490 (GTS/TWD), 2015 WL 2120518, at * 6 (N.D.N.Y. May 5, 2015) (citing *Trombley*, 550 U.S. at 570); *Hall v. Smith*, 170 F. App'x 105, 108 (11th Cir. 2006) (affirming dismissal of § 1983 claim against a municipality where plaintiff alleged no factual support for his conclusory statement that a municipality had a policy of grossly inadequate supervision and training of its employees)).

Plaintiff's complaint is devoid of the requisite factual allegations to support his claim against the City of Albany for failure to properly hire, supervise, and train its employees, including the police officers named as defendants in this case. Therefore, the Court recommends that his claim against the City be dismissed for failure to state a claim with leave to amend in light of Plaintiff's *pro se* status.

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's IFP Application (Dkt. No. 2) is **GRANTED**; and it is

**RECOMMENDED** that Defendants Anderson and Perkins be required to respond to the Fourth Amendment claims for unreasonable search and seizure, excessive force, and false arrest; and his Fourteenth Amendment Due Process claim for deprivation of property alleged in Plaintiff's complaint (Dkt. No. 1); and it is further

**RECOMMENDED** that Plaintiff's claim for malicious prosecution against Defendants Anderson and Perkins be **DISMISSED** for failure to state a claim with leave to amend; and it is further

**RECOMMENDED** that Plaintiff's conspiracy claim against Ruecker be **DISMISSED** for failure to state a claim with leave to amend, and that Ruecker be required to respond to

18

Plaintiff's § 1983 false arrest claim against him; and it is further

**RECOMMENDED** that Plaintiff's claims against Defendants Cheban, Norris, and the City of Albany be **DISMISSED** for failure to state a claim with leave to amend; and it is further

**RECOMMENDED** that Plaintiff be instructed by the District Court that: (1) any amended complaint filed by him must be a complete document in and of itself and must include all of his claims against each of the Defendants, including both those claims in the original complaint with regard to which Defendants have been ordered to respond by the District Court, and claims with regard to which Plaintiff has been granted leave to amend by the District Court, with no incorporation of a prior pleading by reference; (2) an amended complaint will supersede Plaintiff's original complaint and become the operative pleading in the case; and (3) any amended complaint filed by Plaintiff must comply with the pleading requirements of Rule 10(b) of the Federal Rules of Civil Procedure that claims be set forth in separately numbered paragraphs, with each paragraph including a single set of circumstances to the extent practicable; and it is hereby

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[8] Such objections shall be filed with the Clerk of the

---

[8] If you are proceeding pro se and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 72.


Dated:   July 25, 2017
          Syracuse, New York

                                      Therese Wiley Dancks
                                      United States Magistrate Judge

---

the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2015 WL 2120518
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Lafrancis GRAY–DAVIS;
and Myrell Davis, Plaintiffs,
v.
State of NEW YORK; Paul Rigby, Senior Parole
Officer; Tammy Gronau, Parole Officer; Mr. Green,
Parole Officer; Mr. Maher, Parole Officer; Ms.
Delaney, Parole Officer; Mr. Fregoe, Parole Officer;
Ms. Montford, Supervisor Parole Officer; Robert
Butera, Parole Officer; Anthony I Annucci, Acting
Comm'r of Dep't of Corr. and Cmty. Supervision;
Tinam. Stanford, Chair of Bd. of Parole; Randy W.
Blume, Assist. Comm'r of Onondaga Cnty. Dep't
of Corr.; Timothy H. Cowin, Comm'r of Onondaga
Cnty. Dep't of Corr.; Cnty. of Onondaga; Onondaga
Cnty. Dep't of Corr.; City of Jamesville; City of
Syracuse; Syracuse City Police Dep't; John Doe
Nos. 1–4, Parole Officers; John Doe Nos. 5–
15, Syracuse City Police Officers; and John Doe
16, Chief of Syracuse City Police, Defendants.

No. 5:14–CV–1490 (GTS/TWD).
|
Signed May 5, 2015.

**Attorneys and Law Firms**

Lafrancis Gray–Davis, Syracuse, NY, pro se.

DeRoberts Law Firm, Jeffrey DeRoberts, Esq., of
Counsel, Syracuse, NY, for Plaintiff Myrell Davis.

### DECISION and ORDER

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this civil rights
action filed by LaFrancis Gray–Davis and her minor son
Myrell Davis ("Plaintiffs"), against the above-captioned
entities and individuals ("Defendants") arising from two
searches by police and the institution of special conditions
by parole officers between December 2013 and April
2014, is the Report–Recommendation of United States

Magistrate Thérèse Wiley Dancks recommending that
certain of Plaintiffs' claims be dismissed with prejudice,
certain of the claims be dismissed without prejudice (and
with leave to amend as authorized by the Court), and
certain of the claims survive the Court's initial review of
Plaintiffs' Complaint. (Dkt. No. 6.) Plaintiffs have not
filed an objection to the Report–Recommendation and
the deadline in which to do so has expired. (*See generally*
Docket Sheet.)

When *no* objection is made to a report-recommendation,
the Court subjects that report-recommendation to only
a *clear error* review. Fed.R.Civ.P. 72(b), Advisory
Committee Notes: 1983 Addition. When performing such
a "clear error" review, "the court need only satisfy itself
that there is no clear error on the face of the record in
order to accept the recommendation." *Id.: see also Batista
v. Walker,* 94–CV–2826, 1995 WL 453299, at \*1 (S.D.N.Y.
July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt
those sections of [a magistrate judge's] report to which no
specific objection is made, so long as those sections are
not facially erroneous.") (internal quotation marks and
citations omitted).

Here, based upon a review of this matter, the Court can
find no clear error in Magistrate Judge Dancks' thorough
Report–Recommendation. (Dkt. No. 6.) Magistrate
Judge Dancks employed the proper standards, accurately
recited the facts, and reasonably applied the law to those
facts. (*Id.*) As a result, the Report–Recommendation is
accepted and adopted in its entirety for the reasons stated
therein.

**ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–
Recommendation (Dkt. No. 6) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that the following claims are *DISMISSED*
**with prejudice** and **without leave to amend:**

(1) all claims against Defendant State of New York;

(2) all claims against Defendant Onondaga County
Department of Corrections;

(3) all claims against Defendant Syracuse City Police
Department;

(4) Plaintiffs' 42 U.S.C. § 1983 claims for money damages against Defendants Annucci, Stanford, Rigby, Gronau, Green, Maher, Delaney, Fregoe, Montford, Butera, and John Doe Nos. 1–4;

(5) Plaintiffs' claim for violation of their Fifth and Ninth Amendment rights; and it is further

**ORDERED** that the following claims **shall be DISMISSED with prejudice** and without further Order of this Court **UNLESS**, within **THIRTY (30) DAYS** of the date of this Decision and Order, Plaintiffs file an Amended Complaint correcting the pleading deficiencies referenced in Magistrate Judge Dancks' Report–Recommendation:

**\*2** (1) Plaintiffs' claims against Defendant County of Onondaga;

(2) Plaintiffs' claims against Defendant Hamlet of Jamesville (a/k/a City of Jamesville);

(3) Plaintiffs' claims against Defendant City of Syracuse;

(4) Plaintiffs' claims against Defendants Butera, Blume, Cowin and John Doe No. 16; and

(5) Plaintiffs' claims against Defendants Annucci and Stanford (**EXCEPT** for their 42 U.S.C. § 1983 claims for money damages against those two Defendants in their official capacities, which claims again are dismissed with prejudice and without leave to amend); and it is further

**ORDERED** that any Amended Complaint that Plaintiffs chose to file shall be a complete pleading, which will supersede their original Complaint in all respects, and may not incorporate any portion of the original Complaint by reference, in accordance with Local Rule 7.1(a)(4) of the District's Local Rules of Practice; and it is further

**ORDERED** that Plaintiffs' remaining claims—i.e., their claims against Defendants Rigby, Gronau, Green, Maher, Delaney, Fregoe, and Montford ("Remaining Defendants") for violation of Plaintiffs' First, Fourth and Fourteenth Amendment rights—**SURVIVE** the Court's initial review of the Complaint; and it is further

**ORDERED** that the District Court shall issue summonses, along with copies of the Complaint and

General Order 25, to the United States Marshal for service upon the remaining Defendants; and it is further

**ORDERED** that counsel for the Remaining Defendants shall file a formal response to the surviving claims in the Complaint in accordance with Federal Rules of Civil Procedure; and it is further

**ORDERED** that Plaintiffs shall take reasonable steps to identify Defendant John Doe Nos. 1–15 and, if necessary, make a motion seeking leave to amend her pleadings to add the proper party; and it is hereby

**ORDERED** that the Clerk of Court serve a copy of this Decision and Order upon Plaintiff LaFrancis Gray–Davis by regular mail.

### *ORDER AND REPORT–RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

The Complaint of *pro se* Plaintiff LaFrancis Gray–Davis, on her own and on behalf of her son, Myrell Davis, was received for filing in the Northern District of New York on December 11, 2014, along with an application to proceed *in forma pauperis*. (Dkt. Nos. 1 and 2.) By Order of December 18, 2014, the Court granted Plaintiff's application to proceed *in forma pauperis*. (Dkt. No. 4 at 2–3.) Because Plaintiff, who is not an attorney and not represented by counsel, may not appear on behalf of her minor child, Myrell, *see Cheung v. Youth Orchestra Found. of Buffalo, Inc.,* 906 F.2d 59, 61 (2d Cir.1990), the Court deferred the requisite initial review of the Complaint pursuant to 28 U.S.C. § 1915(e) and stayed the case for ninety days in order to give Plaintiff time to retain counsel, at least for her minor son. *Id.* at 3. Attorney Jeffrey DeRoberts, Esq. filed a Notice of Appearance on behalf of Myrell Davis on January 8, 2015, thereby removing the impediment to initial review of the Complaint. (Dkt. No. 5.)

### I. LEGAL STANDARD FOR INITIAL REVIEW OF COMPLAINT

**\*3** Even when a plaintiff meets the financial criteria for *in forma pauperis,* 28 U.S.C. § 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that ...

the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2) (B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). "An action is frivolous when either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy, or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998) (citations and internal quotation marks omitted). Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See, e.g., Thomas v. Scully,* 943 F.2d 259, 260 (2d Cir.1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me accusation." *Id.* In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Id.*

Where a plaintiff proceeds *pro se,* the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) (citation omitted). A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

## II. PLAINTIFF'S COMPLAINT

**\*4** Plaintiff met James D. Davis ("Davis") in July of 2009, when he was on parole supervision, and the couple had a child, Myrell Davis, in 2010. (Dkt. No. 1 ¶¶ at 5 and 6.) Davis was violated by parole supervision on September 22, 2011, and Defendant Senior Parole Officer Paul Rigby ("Rigby"), who allegedly had a vendetta against Plaintiff because of her association with Davis, acted to prevent Plaintiff and Davis from being married at the Onondaga County Justice Center in November of 2011. *Id.* at ¶¶ 7–8.

Plaintiff and Davis were married on November 12, 2012, while Davis was incarcerated, and on July 30, 2013, when Davis was about to be released, Plaintiff was informed by his parole officer, Defendant Ms. Montford ("Montford"), that she and her son and all family members were not permitted to have contact with Davis. *Id.* at ¶¶ 9–10. Included in the special conditions in the Certificate of Release to Parole Supervision signed by Davis on August 6, 2013, was the condition "17. I will not associate in any way or communicate by any means with ... Latesha Dexter and Lafrancis Gray without the permission of the P.O." *Id.* at p. 56. Included in a list of Special Conditions of Release to Parole Supervision in connection with Plaintiff's July 30, 2013, release, signed by Davis on February 24, 2014, were:

13(i): I will have no in person contact, or attempt to contact *Eric Roam, Latesha Dexter and/or LaFrancis Gray–Davis.* Either in person or members of their immediate family by means of letter, telephone, cell

phone, third party, electronic means or any other methods without the knowledge and written permission of my parole officer. Failure to follow this rule is a violation of my parole in an important respect.

13(q): I will have contact with any children in common with *LaFrancis Gray–Davis* if court ordered only.

*Id.* at pp. 58, 60. Depending on Davis' parole officer, Plaintiff and Davis have at times been able to have contact with one another and even share a home. Other times they have not. *Id.* at ¶ 12.

On Christmas Eve or Christmas day of 2013, Defendant parole officers John Doe Nos. 1 through 4 searched Plaintiff's home looking for Davis, whom they had reason to believe was there. *Id.* at ¶ 13. Davis was not in the house, and according to Plaintiff, because he was not paroled to her address and was not supposed to be there, the four Doe Defendants had no probable cause to invade her home and privacy and search her house. *Id.*

On March 11, 2014, at approximately 7:45 p.m., while Plaintiff, with Myrell in the car, was giving Davis a ride home, she was pulled over by Defendant Parole Officers Tammy Gronau ("Gronau"), Mr. Green ("Green"), Mr. Maher ("Maher"), Ms. Delaney ("Delaney"), and Mr. Fregoe ("Fregoe"), along with Defendant Syracuse Police Officers John Doe Nos. 5 though 15. *Id.* at ¶ 14. Defendants Gronau and Green searched Plaintiff's car and found several empty beer cans and a folding knife that Plaintiff claims belonged to her. Defendants also stated that Myrell was not in a child safety seat, which Plaintiff contends is untrue. *Id.* Davis was taken into custody. *Id.* According to Plaintiff, the only reason the vehicle was stopped was that she and her son were with Davis. *Id.*

**\*5** On April 1, 2014, Plaintiff received a letter from Defendant Randy W. Blume (Blume"), Assistant Commissioner of the Onondaga County Correctional Facility, stating that due to the special conditions prohibiting Davis from having contact with her and her son, he was restricting Plaintiff from visiting or communicating with Davis by telephone while he was at the facility unless or until the conditions of parole were removed. *Id.* at ¶ 17.

## III. ANALYSIS

Plaintiff's Complaint contains ten causes of action for violation of Plaintiff and her son's right to privacy and freedom of association under the First Amendment; illegal search and seizure in violation of the Fourth Amendment; violation of Plaintiff and her son's right to life, liberty, family, and privacy protected under the Fifth Amendment; violation of Plaintiff and her son's right to privacy and other rights protected under the Ninth Amendment; violation of Plaintiff and her son's right to life, liberty, family, and privacy protected under the Fourteenth Amendment; intentional infliction of emotional distress; negligent infliction of emotional distress; negligence; supervisory liability, including failure to train, supervise, and control employees, employers, agents and successors; and violation of 42 U.S.C. § 1983. [1] (Dkt. No. 1 at ¶¶ 19–101.) The allegations of wrongdoing by Defendants set forth in each of the causes of action appear to be virtually identical. *Id.*

### A. State of New York

Plaintiff has named the State of New York as a Defendant. The only allegations directed to the State in the Complaint are conclusory assertions of supervisory liability. (*See, e.g.,* Dkt. No. 1 at ¶ 23.) Plaintiff's claims against the State are barred by sovereign immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The bar precludes claims against the State for both monetary and equitable relief. *See Edelman v. Jordan,* 415 U.S. 651, 667–69, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Therefore, the Court recommends that the action be dismissed with prejudice as against the State of New York on sovereign immunity grounds.

### B. Municipal Defendants

Plaintiff has named as Defendants the County of Onondaga, City of Jamesville, [2] and the City of Syracuse. The Onondaga County Department of Corrections and Syracuse City Police Department have also been named as Defendants. However, as explained in *Baptista v. Onondaga County Dep. of Corrections,* No. 9:04–CV–0600 (LEK/GHL), 2007 WL 911854, at \* 5, 2007 U.S. Dist. LEXIS 20536, at \* 13 (N.D.N.Y. Mar.22, 2007), the County of Onondaga Department of Corrections and the County of Onondaga "are one in the same the County of Onondaga, a municipal corporation of the State of New York ." Furthermore, "[a] police department is an

administrative arm of [a] municipal corporation," and "cannot sue or be sued because it does not exist separate and apart from the municipality and does not have its own legal identity." *Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999) (citing *Loria v. Town of Irondequoit,* 775 F.Supp. 599, 606 (W.D.N.Y.1990); *see also Dexter v. City of Syracuse,* No. 5:14–CV–0363 (TJM/DEP), 2014 WL 2611384, at *4, 2014 U.S. Dist. LEXIS 80008, at *11 (N.D.N.Y. June 11, 2014). Therefore, any claims Plaintiff might have against the County of Onondaga Department of Corrections and City of Syracuse Police Department are properly asserted against the County of Onondaga and City of Syracuse, respectively.

**\*6** Pursuant to the standard for establishing municipality liability laid out in *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), in order to set forth a cognizable claim for municipal liability under § 1983, a plaintiff must plead and prove that a deprivation of his constitutional rights "was caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir.2012) (citing *Monell,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611), *cert. denied,* ––– U.S. ––––, 134 S.Ct. 125 (2013); *see also Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) ("The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer. Second, the plaintiff must establish a causal connection an 'affirmative link' between the policy and the deprivation of his constitutional rights.") (citing *Oklahoma v. Tuttle,* 471 U.S. 808, 824 n. 8, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)) (plurality opinion).

Plaintiff has failed to identify or allege any facts showing the existence of a municipal policy or custom of Onondaga County, the hamlet of Jamesville, or the City of Syracuse which resulted in the deprivation of her and her son's constitutional rights. A municipality may be liable for deprivation of constitutional rights under § 1983 with regard to policies or customs resulting in inadequate training, supervision, or hiring when the failure to train, supervise, or hire amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 388–89, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). However, Plaintiff's conclusory allegations that Onondaga County, Jamesville, and the City of Syracuse

failed to properly hire, supervise, and train subordinates, without supporting factual allegations of, among other things, a policy or custom pursuant to which the alleged action was undertaken, fails to state a claim against those municipalities that is plausible on its face. *See Trombley,* 550 U.S. at 570; *Hall v. Smith,* 170 F. App'x 105, 108 (11th Cir.2006) (affirming dismissal of § 1983 claim against a municipality where plaintiff alleged no factual support for his conclusory statement that the municipality had a policy or custom of grossly inadequate supervision and training of its employees.)

Given the foregoing, the Court recommends that Plaintiff's § 1983 claims be dismissed as against Defendants County of Onondaga, Jamesville, and the City of Syracuse without prejudice; and be dismissed with prejudice as against the Onondaga County Department of Corrections and the Syracuse City Police Department, given that any claims Plaintiff may be able to plead with regard to the two departments would be properly asserted against the County of Onondaga and City of Syracuse.

### C. Plaintiffs' Official Capacity Claims For Money Damages Against the State Official Defendants

**\*7** Plaintiffs have asserted official capacity claims for money damages under 42 U.S.C. § 1983 against all of the Defendants. (Dkt. No. 1 at p. 9.) The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state. (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006). The Eleventh Amendment bars all money damages claims against state officials acting in their official capacities. *Kentucky v. Graham,* 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985). The Eleventh Amendment has been found to bar official capacity claims for money damages against New York Department of Correctional and Community Supervision ("DOCCS") officials and parole officers. *See Tolliver v. New York State Corrections Officers,* No. 99CIV.9555(JGK), 2000 WL 1154311, at * 2, 2000 U.S. Dist. LEXIS 11531, at * 7 (S.D.N.Y. Aug.14, 2000) ("All of the defendants in this case are state officials because they are employees of the New York State Department of Correctional Services."); *James v. Suffolk County Correctional Facility,* No. 13–CV–2344 (JFB)(SIL), 2014 WL 4659300, at *4, 2014 U.S. Dist. LEXIS 131056, at * 10–11 (E.D.N.Y. Sept. 17, 2014) (official capacity claims for money damages against parole officers are barred by the Eleventh Amendment).

Therefore, the Court recommends that Plaintiff's § 1983 claims for money damages against Defendants Anthony J. Annucci ("Annucci"), Acting Director of DOCCS, Tina M. Stanford ("Stanford"), Chair of the Board of Parole, and all of the Defendant Parole Officers, including Defendants John Doe 1 through 4, in their official capacities be dismissed with prejudice on Eleventh Amendment grounds.

### D. Supervisory Liability

Defendants Annucci, Stanford, Tim Cowan ("Cowan"), Commissioner of the Onondaga County Department of Correction, and John Doe No. 16, Chief of the Syracuse City Police, have all been sued in their supervisory capacities by Plaintiff. [3] (*See, e.g.,* Dkt. No. 1 at ¶ 23.) [4] In the case of Defendants Annucci and Stanford, the subordinates include the Defendant Parole Officers, including Defendants John Doe 1 through 4. (Dkt. No. 1 at ¶ 23.) Blume is identified as Cowan's subordinate. *Id.* In the case of Defendant John Doe No. 16, the subordinates include Syracuse Police Officers Defendants John Doe Nos. 5 through 15. *Id.*

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" ). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV–1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections ... in a § 1983 claim") (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). Therefore, "a plaintiff must ... allege a tangible connection between the acts of a defendant and

the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*8** The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 maybe found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

Plaintiff has alleged that Defendants Annucci, Stanford, Cowan, and John Doe 16 failed to properly hire, oversee, supervise, train, and control their subordinates. (Dkt. No. 1 at ¶ 23.) Vague and conclusory claims that a supervisory official has failed to provide proper training and supervision or created a specific policy, without facts showing personal involvement, are legally insufficient to state a claim under any of the categories identified in *Colon. See Bridgewater v. Taylor,* 832 F.Supp.2d 337, 348 (S.D.N.Y.2011); *White v. Fischer,* No. 9:09–CV–240 (DNH/DEP), 2010 WL 624081, at *6, 2010 U.S. Dist. LEXIS 15492, at *19 (N.D.N.Y. Feb.18, 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."); *see also Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) (same).

Plaintiff has also parroted each of the *Colon* factors as grounds for supervisory liability. *Id.* "Conclusory statements and formulaic recitations of the Colon factors [that are] wholly unsupported by facts," present no factual support for a supervisory liability claim. *Eldridge v. Kenney,* No. 11–CV–6459–FPG, 2014 WL 2717982, at * 3, 2014 U.S. Dist. LEXIS 84437, at * 2–3 (W.D.N.Y. June 16, 2014).

In light of Plaintiff's failure to allege facts of a nonconlusory nature showing personal involvement by

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Annucci, Stanford, Cowan, and John Doe No. 16 in the alleged violations of Plaintiff and her son's constitutional rights, the Court recommends that Plaintiff's § 1983 claims be dismissed without prejudice as against those Defendants.

### E. Defendant Butera

Defendant Robert Butera (Butera”) is identified as a Parole Officer in Plaintiff's Complaint. (Dkt. No. 1 at p. 4.) With the exception of Plaintiff's inclusion of Butera's name in the conclusory claims of wrongdoing in each of her causes of action, *id.* at ¶ 23, the Complaint is devoid of factual allegations regarding Butera. As noted above, personal involvement in a constitutional deprivation is a prerequisite to an award of damages under § 1983.” *McKinnon,* 568 F.2d at 934; *see also Crichlow v. Fischer,* No. 12–cv–7774 (NSR), 2015 WL 678725, * 9, 2015 U.S. Dist. LEXIS 18812, at * 17 (S.D.N.Y. Feb. 17, 2015) (dismissing defendants from the case upon initial review under 28 U.S.C. § 1915(e) where the plaintiff made no factual allegations regarding personal involvement on their part in the violation of plaintiff's rights). The complete absence of factual allegations of wrongdoing by Bufera warrants dismissal of Plaintiff's state law claims as well. Therefore, the Court recommends that the case be dismissed without prejudice as against Defendant Butera.

### F. Defendant Blume

**\*9**  The sole factual allegation in the Complaint against Defendant Blume, the Assistant Director of the Onondaga County Department of Corrections is that he informed Plaintiff that he was restricting Plaintiff from visiting or communicating with Davis by telephone while he was at the facility due to the special conditions prohibiting Davis from having contact with her and her son unless and until the condition of parole was removed. *Id.* at ¶ 17. Inasmuch as there are no factual allegations indicating that Blume was doing anything more than complying with special conditions of release to parol supervision that had been imposed by DOCCS, the Court recommends that the case be dismissed without prejudice as against him.

### G. Plaintiff's Ninth Amendment Claim

Plaintiff claims that the Defendants violated her and her son's right to privacy and other rights guaranteed under the Ninth Amendment. (Dkt. No. 1 at ¶ ¶ 42–49.) The Ninth Amendment provides that “[t]he enumeration in the Constitution of certain rights, shall not be construed to deny or disparage others retained by the people.” U.S. Const. amend. IX. The Ninth Amendment is a “rule of construction” and does not give rise to “individual rights.” *Jenkins v. C.I.R.,* 483 F.3d 90, 92–93 (2d Cir.2007) (Ninth Amendment is not an independent source of individual rights but a rule of construction). Therefore, to the extent Plaintiff is asserting a § 1983 claim for an independent violation of the Ninth Amendment, the Court recommends that the claim be dismissed with prejudice as against all of the Defendants.

### H. Plaintiff's State Law Claims for Negligence and Intentional and Negligent Infliction of Emotional Distress

Plaintiff has included state law causes of action for intentional infliction of emotional distress, negligent infliction of emotional distress, and negligence against the Defendants for denying her and her son the benefits that arise from familial association, for subjecting them to the unreasonable search of her home and car, and, in the case of the municipal defendants and Annucci, Stanford, Cowin, and John Doe No. 16, for failing to properly supervise their subordinates.

### 1. *Intentional Infliction of Emotional Distress*

Under New York law, to state a claim for intentional infliction of emotional distress, a plaintiff must plead “(1) extreme and outrageous conduct; (2) intent to cause severe emotional distress; (3) a causal connection between the conduct and injury; and (4) severe emotional distress.” *Bender v. City of N.Y.,* 78 F.3d 787, 790 (2d Cir.1996). The conduct must be “so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.” *Conboy v. AT & T Corp.,* 241 F.3d 242, 258 (2d Cir.2001). The Court finds that the allegations in Plaintiff's Complaint do not show conduct making a plausible showing of intentional infliction of emotional distress by any of the Defendants and recommends that the claim be dismissed without prejudice as to all Defendants.

### 2. *Negligence and Negligent Infliction of Emotional Distress*

**\*10**  Although Plaintiff has alleged that the Parole Officer and Syracuse Police Department Defendants intentionally

and/or negligently denied her and her son's right to association and subjected them to unreasonable searches and seizures, the factual allegations in the Complaint reveal that Plaintiff's claims are premised on intentional not negligent conduct. A claim for negligent infliction of emotional distress maybe established under either (1) the "bystander theory" or (2) the "direct duty theory." *Baker v. Dorfman,* 239 F.3d 415, 421 (2d Cir.2000). Both theories require an act of negligence and physical injury or the threat of danger, either to the plaintiff or to a close family member. *Id.* To recover under the "bystander theory," the plaintiff must be "threatened with physical harm as a result of the defendant's negligence" and "consequently suffer[ ] emotional injury from witnessing the death or serious bodily injury of a member of [his or her] immediate family." *Mortise v. United States,* 102 F.3d 693, 696 (2d Cir.1966). To recover under the "direct duty" theory, a plaintiff must suffer an emotional injury from defendant's breach of a duty which unreasonably endangered [his or her] own physical safety." *Id.*

The Court finds that Plaintiff's Complaint fails to allege facts stating a plausible claim for either negligence or negligent infliction of emotional distress against Defendants and recommends that the claim be dismissed without prejudice as against all of the Defendants.

### I. Plaintiff's Surviving Claims

Plaintiff's Complaint asserts claims for violation of her and her son's First Amendment right of liberty in their family life and Fourteenth Amendment due process right to intimate association [5] as a result of the imposition and enforcement of the special conditions of release to parole supervision that prevent Plaintiff and her son from being with Davis, as well as her Fourth Amendment right to be free from unreasonable searches and seizures in connection with the search of her home in December of 2013 and the traffic stop and search of her car on March 11, 2014. (Dkt. No. 1 at pp. 13, 18, and 41.)

Mindful of the Second Circuit's instruction to liberally construe a *pro se* plaintiff's pleadings, *see Sealed Plaintiff,* 537 F.3d at 191, the Court recommends that Plaintiff be permitted to pursue her and her son's First, Fourth, and Fourteenth Amendment claims (first, second and fifth causes of action) against Defendants Rigby, Gronau, Green, Maher, Delaney, Fregoe, Montford, and John Doe Nos. 1–15.

The Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

**ACCORDINGLY,** it is hereby

**RECOMMENDED** that the case be dismissed with prejudice as against: (1) Defendant State of New York on sovereign immunity grounds; (2) Defendant Onondaga County Department of Corrections on the grounds it is one and the same with Defendant County of Onondaga; and (3) Defendant Syracuse City Police Department on the grounds that it is not an entity capable of being sued; and it is further

**\*11 RECOMMENDED** that the following claims be dismissed with prejudice: (1) Plaintiff's § 1983 claims for money damages against Defendants Annucci, Stanford, Rigby, Gronau, Green, Maher, Delaney, Fregoe, Montford, Butera, and John Doe Nos. 1–4 on Eleventh Amendment grounds; and (2) Plaintiff's claim for violation of her and her son's Fifth and Ninth Amendment rights for failure to state a claim; and it is further

**RECOMMENDED** that the case be dismissed for failure to state a claim, with leave to file an amended complaint as authorized by the District Court as against Defendants: (1) County of Onondaga; (2) Jamesville; (3) City of Syracuse; (4) Bufera; (5) Blume; (6) Cowin; (7) John Doe No. 16; and (8) Annucci and Stanford (except without leave to amend § 1983 official capacity claims for money damages); and it is further

**RECOMMENDED** that the District Court direct service on Defendants Rigby, Gronau, Green, Maher, Delaney, Fregoe, and Montford of the surviving claims for violation of Plaintiff and her son's First, Fourth, and Fourteenth Amendment rights; and it is further

**RECOMMENDED** that Defendants Rigby, Gronau, Green, Maher, Delaney, Fregoe, and Montford be required to file a formal response to the surviving claims as provided for in the Federal Rules of Civil Procedure subsequent to service of process; and it is further

**RECOMMENDED** that Plaintiff be directed to take reasonable steps to identify Defendants John Doe Nos. 1–

15, and, if necessary, make an appropriate motion seeking leave to amend her pleadings to add the proper party; and it is hereby

**ORDERED** that any paper sent by a party to the Court or the Clerk shall be accompanied by a certificate setting forth the date a true and correct copy of it was mailed to all opposing parties or their counsel. *Any letter or other document received by the Clerk or the Court which does not include a certificate of service which clearly states that an identical copy was served upon all opposing parties or their attorneys is to be returned, without processing, by the Clerk.* Plaintiff shall also comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All motions shall comply with the Local Rules of Practice of the Northern District; and it is further

**ORDERED** that the Clerk serve a copy of this Order and Report–Recommendation on Plaintiff, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

**\*12** Dated: March 27, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 2120518

---

Footnotes

1   42 U.S.C. § 1983 does not create any independent substantive rights, but rather serves as a vehicle to "redress ... the deprivation of [federal] rights established elsewhere." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999).

2   The Court takes judicial notice that Jamesville, New York is a hamlet located within the Town of DeWitt, not a city. (*See* http://www.townofdewitt.com/LivingDeWitt.aspx last visited on March 24, 2015.)

3   Plaintiff has recommended dismissal of Plaintiff's supervisory claims against the municipal Defendants under *Monell.*

4   Plaintiff has repeated the identical conclusory allegations of supervisory liability against the Defendants in each of her ten causes of action. (*See* Dkt. No. 1 at ¶¶ 23, 30, 38, 46, 54, 62, 69, 76, 83, 90.)

5   Plaintiff has also asserted a due process claim under the Fifth Amendment. (Dkt. No. 1 at p. 21.) However, the due process clause of the Fifth Amendment applies only to actions taken by the federal government, not state or local governments. *See Schweiker v. Wilson,* 450 U.S. 221, 227, 101 S.Ct. 1074, 67 L.Ed.2d 186 (1981); *see also Canfield v. Douglas County,* No. 14–cv–00461–KMT, 2014 WL 7186749, at * 5, 2014 U.S. Dist. LEXIS 173224, at * 12–13 (D.Col. Dec.16, 2014) (Fifth Amendment deprivations such as those challenging due process rights to familial association with no allegation of federal involvement are not actionable under the Fifth Amendment).

---

End of Document                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1749520
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Demetrius HILL, Plaintiff,
v.
Correction Officers A. MELVIN, V. Amir,
Ms. Wilson & Captain Eck, Defendants.

No. 05 Civ. 6645(AJP).
|
June 27, 2006.

**Attorneys and Law Firms**

Demetrius Hill, Dannemora, NY, pro se.

Basil Constantine Sitaras, New York City Law Depart.
Office Of The Corporation Counsel, New York, NY, for
Defendant.

#### *OPINION AND ORDER*

ANDREW J. PECK, United States Magistrate Judge.

**\*1** Pro se plaintiff Demetrius Hill brings this action
pursuant to 42 U.S.C. § 1983, alleging false arrest,
malicious prosecution, and denial of religious freedom.
(Dkt. No. 2: Compl.)

Presently before the Court is defendants' summary
judgment motion. (Dkt. No. 27: Defs. Notice of Motion,
Defs. Rule 56.1 Stmt. & Sitaras Aff.; Dkt. No. 28: Defs.
Br.; Dkt. No. 36: Defs. Reply Br.) Hill has opposed the
motion. (Dkt. No. 35: Hill Rule 56.1 Stmt., Br. & Aff.)
The parties have consented to decision of this case by a
Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Dkt.
No. 16.)

For the reasons set forth below, defendants' summary
judgment motion is GRANTED as to the denial of
religious freedom claim as to all defendants, the malicious
prosecution claim as to all defendants, and the false arrest
claim as to Correction Officers Amir and Wilson, and
DENIED as to the false arrest claim against Correction
Officer Melvin and Captain Eck. [1]

FACTS

Processing at the Vernon C. Bain Center at Rikers Island
On July 28, 2001, Demetrius Hill was processed into the
Vernon C. Bain Center ("V.C.B.C.") on Rikers Island.
(Dkt. No. 35: Hill Rule 56.1 Stmt. Att.: Hill Aff. at 8; Dkt.
No. 27: Defs. Rule 56.1 Stmt. ¶ 8.) Captain Raymond Eck
was a supervisor at the V.C.B.C. Intake area. (Dkt. No.
14: Answer ¶ 5; Hill Aff. at 8-9.) [2]

According to Hill, he and other prisoners complained
about being held in the holding cells for hours without
food or a place to sit or sleep. (Hill Aff. at 8.) According
to Hill, Correction Officer Melvin threatened to confiscate
Hill's (and another inmate's) property, including religious
medallions, if they "did not 'shut up .' " (*Id.*) Hill
threatened to sue for mistreatment and requested to file a
grievance about his religious medallion. (*Id.; see* Hill Rule
56.1 Stmt. ¶ 14.) According to Hill, Correction Officers
Melvin, Amir and Wilson and Captain Eck "whispered"
amongst themselves, pointed at Hill and said, " '[Y]ou['re]
going to lose all your shit today and after an ass whipping
you'll have something to sue about.' " (Hill Aff. at 8.)

According to Hill, he was removed from the holding cell
to be strip searched. (Hill Aff. at 8.) Correction Officer
Wilson took Hill's boots, watch, and gold chain (the
"religious medallion"). (Defs. Rule 56.1 Stmt. ¶ 6; Dkt.
No. 27: Ex. S [3] : Hill Dep. at 75; Hill Aff. at 8.) Hill
was given a pink receipt and was told that his property
would be returned to him after his release. (Hill Dep. at
76.) [4] Boots, jewelry, watches over $50, and non-plastic
religious crosses are not permitted inside the V.C.B.C. (Ex.
R: Wilson: *People v. Hill,* Trial Transcript ["Tr."] 303.)
Inmates may obtain plastic religious crosses from the jail's
clergy. (*Id.*) According to Hill, when he complained to
Captain Eck about his medallion being taken, the Captain
responded, " '[D]o what you're told or get your ass kicked.'
" (Hill Aff. at 8.)

**\*2** At approximately 10:45 a.m. at Intake Area "B,"
Officer Melvin strip searched Hill. (Ex. G: Infraction
Rep.; Ex. H: Infraction Notice; Ex. I: Capt. Eck Rep.; Ex.
J: Incident Report Form; Hill Aff. at 8.) Posters on the
wall at the V.C.B.C. intake area informed prisoners that
possession of weapons will result in arrest. (Defs. Rule
56.1 Stmt. ¶ 7; Ex. R.: Melvin: Tr. 43-44.) Hill passed

naked through the metal detector and his clothes were passed through an x-ray machine. (Hill Aff. at 8; Ex. G: Infraction Rep.; Ex. H: Infraction Notice; Ex. J: Incident Report Form.) After Hill's clothes passed through the x-ray machine, Officer Melvin searched Hill's pants and produced a 1-1/4 inch single edge razor blade from the right-side pocket. (Defs. Rule 56.1 Stmt. ¶ 8; Ex. G: Infraction Rep.; Ex. H: Infraction Notice; Ex. I: Capt. Eck Rep.; Ex. J: Incident Report Form; Ex. K: Synopsis of Recovered Contraband; Hill Aff. at 8.)

According to Hill, C.O. Melvin planted the razor blade; Hill asserts that C.O. Melvin held the razor blade before searching Hill's pants and "reached into [Hill's] pocket and acted as if he withdrew a razor blade." (Hill Aff. at 8.)[5] Hill asserts that "the metal detector or x-ray machine made no indication that metal was in the pants and myself." (*Id.*) Hill also asserts that inmates Hareem Gillard and Derrick Felder looked at the x-ray machine monitor as Hill's clothes passed through and saw no weapons or "me[t]al outlines." (*Id.;* Ex. M: Hearing Report; Ex. N: Notice of Disciplinary Hearing Disposition.)[6] Officer Melvin, however, reported that he initially saw the razor blade on the x-ray machine as Hill's pants passed through. (Ex. G: Infraction Rep.; Ex. I: Capt. Eck Rep.; Ex. J: Incident Rep.)

Officer Melvin reported the infraction-that he had found a razor blade in Hill's pants pocket-to Captain Eck. (Defs. Rule 56.1 Stmt. ¶ 9; Ex. G: Infraction Rep.; Ex. I: Capt. Eck Rep.; Ex. J: Incident Rep.) On July 28, 2001, Hill was infracted for possession of contraband weapons, pursuant to Department of Correction Charge No. 103. 10, and referred to the Gang Intelligence Unit for re-arrest. (Defs. Rule 56.1 Stmt. ¶ 10; Ex. G: Infraction Rep.; Ex. H: Infraction Notice; Ex. K: Synopsis of Recovered Contraband; Hill Aff. at 9.) Captain Eck read Hill his legal rights. (Defs. Rule 56.1 Stmt. ¶ 11; Ex. L: Legal Rights Form Signed by Hill.)

On July 31, 2001, following a disciplinary hearing before Captain Edward Vinogroski, Hill received 90 days in punitive segregation. (Defs. Rule 56.1 Stmt. ¶ 12; Ex. M: Hearing Report; Ex. N: Hearing Disposition Notice; Hill Aff. at 7.) Hill was immediately placed on "Red I.D." status, an elevated prisoner classification. (Hill Rule 56.1 Stmt. ¶ 13; Hill Aff. at 9; Ex. N: Hearing Disposition Notice; Ex. O: Notice of Authorization for Initial Placement in Red ID Status; Ex. P: Notice of

Hearing Determination for Red ID and/or Enhanced Restraint Status.)[7]

**\*3** On July 31, 2001, Hill also was arrested on the possession of contraband charge. (Defs. Rule 56.1 Stmt. ¶ 14; Ex. B: Crim. Compl.; Hill Aff. at 9.) On August 23, 2001, Hill was indicted by a grand jury and charged with first degree promoting prison contraband pursuant to Penal Law § 205.25(2) and fourth degree criminal possession of a weapon, Penal Law § 265.01(2). (Defs. Rule 56.1 Stmt. ¶ 15; Ex. D: Grand Jury Indictment.)

Hill's Criminal Trial
Hill's criminal trial began on December 10, 2003 and concluded on December 19, 2003. (Defs. Rule 56.1 Stmt. ¶ 17; Ex. E: Exhibit Sheet; Ex. F: Verdict Sheet.) Captain Eck, Correction Officer Melvin, Correction Officer Maury Johnson, and Investigator Uriondo testified for the prosecution; Police Officer Scott Griczewicz, inmate Hareem Gillard, Correction Officer Amir, Correction Officer Wilson, Captain Eck, and Hill testified for the defense. ( *See* Defs. Rule 56.1 Stmt. ¶ 18; *see generally* Ex. R: Tr.)

Hill alleges, without supporting proof, that all four defendants perjured themselves at trial by stating that they did not recall the July 28, 2001 incident, that they did not recall other incidents that occurred that day, and that Officer Melvin found, as opposed to planted, the razor in Hill's pants. (Hill Rule 56.1 Stmt. ¶¶ 8, 12; Hill Aff. at 9; *see* Defs. Rule 56.1 Stmt. ¶ 20; Ex. R: Amir: Tr. 275, 286; Wilson: Tr. 298-99.)

At Hill's criminal trial, Correction Officers Amir and Wilson testified that they did not recall events occurring on July 28, 2001. (Defs. Rule 56.1 Stmt. ¶ 20; Hill Rule 56.1 Stmt. ¶ 8.)[8] The following are excerpts from C.O. Amir's and C.O. Wilson's testimony:

[MR. HIGGINS (Counsel for Hill) ]: Okay. Directing your attention to July 28th of 2001, did you work on that date?
[C.O. AMIR]: Well, like I told you earlier, I didn't recollect that information until you showed me the paperwork.

(Ex. R: Amir: Tr. 275.)

[MR. HIGGINS]: About how many incident reports have you written since July the 28th of 2001?

...

[C.O. AMIR]: Like I tell you, I work in a jail environment, okay. Anything could happen on any day. So, I can't specifically tell you how many or not.

(Ex. R: Amir: Tr. 286.)
[MR. HIGGINS]: You have no recollection of the incident that is written on the document?

[C.O. WILSON]: No, sir. I don't.

(Ex. R: Wilson: Tr. 303.)

On December 19, 2003, Hill was found not guilty. (Defs. Rule 56.1 Stmt. ¶ 17; Ex. F: Verdict; Hill Aff. at 9.)

Hill's Federal Complaint
On May 16, 2005, Hill signed his present federal § 1983 complaint asserting claims against Correction Officers Melvin, Amir and Wilson, and Captain Eck. (Dkt. No. 2: Compl., last page.) Hill's complaint was received by the Court's Pro Se Office on May 20, 2005. (Compl., 1st page.) The Court interprets Hill's pro se complaint as alleging three claims: (1) false arrest; (2) malicious prosecution; and (3) violation of Hill's religious freedom. (*See* Compl.) [9]

ANALYSIS

I. *SUMMARY JUDGMENT STANDARDS IN SECTION 1983 CASES* [10]

**\*4** Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10 (1986);

*Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991).

The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608 (1970); *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36 (2d Cir.1994); *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1223 (2d Cir.1994). The movant may discharge this burden by demonstrating to the Court that there is an absence of evidence to support the non-moving party's case on an issue on which the non-movant has the burden of proof. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. at 323, 106 S.Ct. at 2552-53.

To defeat a summary judgment motion, the non-moving party must do "more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986). Instead, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *accord, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. at 587, 106 S.Ct. at 1356.

In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. at 2513; *see also, e.g., Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 36; *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d at 1223. The Court draws all inferences in favor of the nonmoving party only after determining that such inferences are reasonable, considering all the evidence presented. *See, e.g., Apex Oil Co. v. DiMauro,* 822 F.2d 246, 252 (2d Cir.), *cert. denied,* 484 U.S. 977, 108 S.Ct. 489 (1987). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d at 37.

In considering a motion for summary judgment, the Court is not to resolve contested issues of fact, but rather is to determine whether there exists any disputed issue of material fact. *See, e.g., Donahue v. Windsor Locks Bd. of Fire Comm'rs,* 834 F.2d 54, 58 (2d Cir.1987);

*Knight v. United States Fire Ins. Co.,* 804 F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570 (1987). To evaluate a fact's materiality, the substantive law determines which facts are critical and which facts are irrelevant. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. While "disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment[,][f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248, 106 S.Ct. at 2510 (citations omitted); *see also, e.g., Knight v. United States Fire Ins. Co.,* 804 F.2d at 11-12.

**\*5** "The Court recognizes that it must 'extend extra consideration' to pro se plaintiffs" and that "pro se parties are to be given special latitude on summary judgment motions." *Salahuddin v. Coughlin,* 999 F.Supp. 526, 535 (S.D.N.Y.1998) (Rakoff, D.J. & Peck, M.J.) (citations & internal quotations omitted); *see, e.g., McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a pro se party's pleadings should be read liberally and interpreted " 'to raise the strongest arguments that they suggest' ").[11] Moreover, the pro se party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment. *See, e.e. Irby v. New York City Transit Auth.,* 262 F.3d 412, 413-14 (2d Cir.2001) ("[W]e remind the district courts of this circuit, as well as summary judgment movants, of the necessity that pro se litigants have actual notice, provided in an accessible manner, of the consequences of the pro se litigant's failure to comply with the requirements of Rule 56.... [E]ither the district court or the moving party is to supply the pro se litigant with notice of the requirements of Rule 56.... In the absence of such notice or a clear understanding by the pro se litigant of the consequences of failing to comply with Rule 56, vacatur of the summary judgment is virtually automatic."); *McPherson v. Coombe,* 174 F.3d at 280-81 (" 'The failure of a district court to apprise pro se litigants of the consequences of failing to respond to a motion for summary judgment is ordinarily grounds for reversal.' ") (citations omitted).[12] Defendants here served the appropriate notices on Hill. (Dkt. No. 27: Defs. Rule 56.2 Notice.)

"Nevertheless, proceeding pro se does not otherwise relieve a litigant from the usual requirements of summary judgment, and a pro se party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 93 Civ.

5981, 1999 WL 983876 at \*3 (S.D.N.Y. Oct. 28, 1999) (citing cases); *see also, e.g., Viruet v. Citizen Advice Bureau,* 01 Civ. 4594, 2002 WL 1880731 at \*9 (S.D.N.Y. Aug. 15, 2002) (Peck, M.J.); *Smith v. Planas,* 975 F.Supp. 303, 305 n. 2 (S.D.N.Y.1997).

## II. *HILL'S DENIAL OF RELIGIOUS FREEDOM CLAIM IS TIME BARRED*

The statute of limitations for a § 1983 action is three years. *See, e.g., Walker v. Jastremski,* 430 F.3d 560, 561 (2d Cir.2005), *cert. denied,* 127 S.Ct. 1887 (2006); *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2005); *Warren v. Altieri,* 59 Fed. Appx. 426, 427 (2d Cir.2003) (Plaintiff's " § 1983 action is governed by New York's three-year statute of limitations as set out in N.Y. C.P.L.R. § 214, the provision applicable to actions for personal injury."); *Pearl v. City of Long Beach,* 296 F.3d 76, 79 (2d Cir.2002), *cert. denied,* 538 U .S. 922, 123 S.Ct. 1574 (2003); *Paige v. Police Dep't,* 264 F.3d 197, 199 n. 2 (2d Cir.2001); *Connolly v. McCall,* 254 F.3d 36, 40-41 (2d Cir.2001).[13]

**\*6** Hill's complaint was received by the Court's Pro Se Office on May 20, 2005, but it was signed by Hill on May 16, 2005. (Dkt. No. 1: Compl. at 1st & last pages.) In the absence of any other indication, the Court assumes that Hill gave the complaint to prison officials on May 16, 2005, and thus under the prison mailbox rule, that date is deemed the date the complaint was filed. *See, e.g., Hardy v. Conway,* No. 04-0934, 2006 WL 93083 at \* 1 (2d Cir. Jan. 12, 2006) ("[I]n the absence of contrary evidence, district courts in this circuit have tended to assume that prisoners' papers were given to prison officials on the date of their signing.") (citing cases); *Walker v. Jastremski,* 430 F.3d at 562-63; *Denis v. N.Y .S. Dep't of Corr. Servs.,* 2006 WL 217926 at \*11; *Rosario v. Bennett,* 01 Civ. 7142, 2002 WL 31852827 at \*14 (S.D.N.Y. Dec. 20, 2002) (Peck, M.J.) (under the "federal 'prisoner mailbox rule,' " incarcerated pro se litigants are deemed to have filed their federal civil complaints and federal habeas petitions on the date the papers were handed to prison officials for mailing (citing *Houston v. Lack,* 487 U.S. 266, 276, 108 S.Ct. 2379, 2385 (1988)).[14]

Accordingly, because Hill's religious medallion was taken on July 28, 2001, more than three years before May 16, 2005, all defendants are granted summary judgment dismissing Hill's denial of religious freedom claim.

## III. *DEFENDANTS' SUMMARY JUDGMENT MOTION AS TO HILL'S FALSE ARREST CLAIM IS GRANTED IN PART AND DENIED IN PART*

A. *Hill's False Arrest Claim Is Not Time-Barred*
Defendants' summary judgment motion seeking dismissal of Hill's false arrest claim principally is based on statute of limitation grounds. (*See* Dkt. No. 28: Defs. Br. at 7-0; Dkt. No. 36: Defs. Reply Br. a 4-5.) The statute of limitations for a § 1983 action is three years. (*See* cases cited on page 13 above.) "Federal law governs the determination of the accrual date (that is, the date the statute of limitations begins to run) for purposes of the statute of limitations in a section 1983 action." *Ormiston v. Nelson,* 117 F.3d 69, 71 (2d Cir.1997); *accord, e.g., Eagleston v. Guido,* 41 F.3d 865, 871 (2d Cir.1994), *cert. denied,* 516 U.S. 808, 116 S.Ct. 53 (1995).

In general under federal law, "the time of accrual [is] that point in time when the plaintiff knows or has reason to know of the injury which is the basis of his action." *Covington v. City of New York,* 171 F.3d 117, 121 (2d Cir.) (quotations omitted), *cert. denied,* 528 U.S. 946, 120 S.Ct. 363 (1999). [15] As the Second Circuit noted in *Covington,* however, "in the case of some actions brought under § 1983, this general rule is subject to the Supreme Court's analysis in *Heck" v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364 (1994). *Covington v. City of New York,* 171 F.3d at 121. In Heck, the Supreme Court held as follows:

We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, *when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence;* if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

**\*7** But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

\* \* \*

Under our analysis the statute of limitations poses no difficulty while the state challenges are being pursued, since the § 1983 claim has not yet arisen. Just as a cause of action for malicious prosecution does not accrue until the criminal proceedings have terminated in the plaintiff's favor, so also a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated.

*Heck v. Humphrey,* 512 U.S. at 486-87, 489-90, 114 S.Ct. at 2372-73, 2374 (citations & fns. omitted, emphasis added); *see also, e.g., Muhammad v. Close,* 540 U.S. 749, 751, 124 S.Ct. 1303, 1304 (2004); *Jenkins v. Haubert,* 179 F.3d 19, 24-25 (2d Cir.1999); *Amaker v. Weiner,* 179 F.3d 48, 51, 52 (2d Cir.1999) ("[W]here the viability of the plaintiff's claims depends on his conviction being invalidated, the statute of limitations begins to run upon the invalidation, not the time of the alleged government misconduct."); *Duamutef v. Morris,* 956 F.Supp. 1112, 1115, 1117-18 (S.D.N.Y.1997).

The Second Circuit in *Covington* applied Heck to a false arrest claim:

[I]n order to determine whether [plaintiff's] false arrest claim accrued at the time of the arrest or only when the prosecution against him on the charges relating to that arrest was dismissed, the question is whether "a judgment in favor of [[plaintiff] in the § 1983 action] would necessarily imply the invalidity of" any conviction or sentence that might have resulted from the prosecution of [plaintiff] resulting from the arrest.

*Covington v. City of New York,* 171 F.3d at 122 (quoting *Heck v. Humphrey,* 512 U.S. at 487, 114 S.Ct. at 2372). [16]

The rationale for barring § 1983 false arrest claims while criminal proceedings are ongoing is to prevent inconsistency between the civil and criminal proceedings.

*See, e.g., Covington v. City of New York,* 171 F.3d at 124 ("So long as the criminal case remained pending ... a parallel § 1983 case based upon a false arrest and wrongful search claim would create the distinct possibility of an inconsistent result if the prosecutor's evidence was dependent upon a valid arrest. That is the reason why the § 1983 cause of action could not accrue during the pendency of the criminal case."); *see also, e.g., Heck v. Humphrey,* 512 U.S. at 484, 114 S.Ct. at 2371 ("This requirement [that the criminal proceeding terminate in favor of the accused] avoids parallel litigation over the issues of probable cause and guilt ... and it precludes the possibility of ... two conflicting resolutions arising out of the same or identical transaction.") (quotations omitted).

**\*8** *Covington* instructed how *Heck* applies to the accrual of a false arrest claim for statute of limitation purposes:

[T]he question in this case is when [plaintiff's] false arrest claim accrued so as to trigger the statute of limitations.

We hold that the answer to this question turns on whether a judgment in [plaintiff's] favor on the false arrest claim would have undermined the validity of any potential conviction in the criminal proceedings against him. If a favorable determination on the false arrest claim would in fact have undermined the validity of any potential conviction against [plaintiff] resulting from the state criminal proceedings, then [plaintiff's] false arrest claim would not accrue until those criminal proceedings terminated....

*Covington v. City of New York,* 171 F.3d at 119 (citations omitted).

Recovery in a § 1983 false arrest action clearly undermines the integrity of criminal proceedings when the prosecution's *"only* evidence for conviction was obtained pursuant to an arrest." *Covington v. City of New York,* 171 F.3d at 123 ("[I]n a case where the *only* evidence for conviction was obtained pursuant to an arrest, recovery in a civil case based on false arrest would necessarily impugn any conviction resulting from the use of that evidence."); *see, e.g., Stephenson v. Rosa,* 2006 WL 464081 at *1 ("[I]f a plaintiff's claim is grounded in an alleged Fourth Amendment violation, and the evidence obtained through the alleged violation is the *sine qua non* of the prosecution's case, then the statute of limitations begins to run on the date of dismissal of the conviction.... If, on the other hand, there is independent evidence supporting the conviction-

separate and apart from the evidence alleged to be the fruit of the poison tree-then the date of accrual is the date of arrest."); *Reid v. City of New York,* 2004 WL 626228 at *8 ("The date on which a false arrest claim accrues is determined by considering 'whether the prosecution could have obtained a conviction without using the evidence tainted by the false arrest. If so, the claim accrues at the time of arrest. If not, the [claim] accrues when the prosecution ends.' ... In other words, if evidence obtained as a result of the arrest was necessary for a conviction, then the cause of action for false arrest does not accrue until the prosecution is terminated. If the allegedly tainted evidence was not necessary, then the cause of action accrues at the time of arrest."). [17]

Defendants interpret *Heck, Covington* and *Stephenson* to require accrual of the claim for statute of limitation purposes from the date criminal prosecution is terminated *only* where the potential conviction is based on "evidence obtained and used against [plaintiff] *as a result* of his allegedly false arrest." (Dkt. No. 36: Defs. Reply Br. at 5, emphasis in original.) "Here, [Hill] was not convicted, nor was any evidence *actually obtained as a result of a false arrest."* (*Id.*) The Court disagrees. Heck and *Covington* suggest that the existence of evidence independent of the arrest is key to the inquiry. Here, there was no evidence to prosecute Hill for possession of contraband that was independent of the evidence obtained by C.O. Melvin which led to Hill's arrest-Officer Melvin's alleged finding of a razor blade in Hill's pants. Had Hill brought a successful § 1983 false arrest action prior to the conclusion of his criminal trial, a civil verdict for Hill, finding that C.O. Melvin planted the razor blade, would necessarily be inconsistent with a criminal conviction for possession of the razor blade, since both would hinge upon whether C .O. Melvin found or planted the razor blade in Hill's pants pocket.

**\*9** When allegedly planted evidence is the basis of an arrest and criminal prosecution, a successful judgment in a § 1983 false arrest claim would necessarily undermine the criminal proceedings, and the claim thus does not accrue until the prosecution ends favorably for the § 1983 plaintiff. *E.g., Wiley v. Chicago,* 361 F.3d 994, 996 (7th Cir.) ("If, as alleged, [plaintiff] was arrested and prosecuted solely on the basis of drugs planted by the arresting officers, then any attack on the arrest would necessarily challenge the legality of a prosecution premised on the planted drugs. Therefore, any civil suit

against [the officer] for a false arrest would necessarily imply the invalidity of the potential conviction, and Heck requires that [plaintiff's] Fourth Amendment claim would not begin to accrue until the charges were dismissed.") (citations omitted), *cert. denied,* 543 U.S. 819, 125 S.Ct. 68 (2004); *see, e.g., Henry v. Purvis,* 111 Fed. Appx. 622, 623-24 (2d Cir.2004) (§ 1983 claim for false arrest "assert[ing] that the defendants lied to obtain a search warrant, planted evidence [and] destroyed exculpatory evidence" had not yet accrued under *Heck* and *Covington* where § 1983 plaintiff's criminal proceeding was pending on appeal); *Woods v. Candela,* 47 F.3d 545, 546 (2d Cir.) (Plaintiff's "present Fourth and Fifth Amendment claims, which rest on the very same grounds [as the reversal of plaintiff's conviction], necessarily imply that his conviction was unlawful, and thus could not have been raised prior to the ... reversal of his conviction."), *cert. denied,* 516 U.S. 808, 116 S.Ct. 54 (1995); *Brown v. City of Milwaukee Police Dep't,* No. 05C390, 2005 WL 1923113 at *5 (W.D.Wis. Aug. 9, 2005) ("Because evidence seized during an unconstitutional search should be suppressed at trial, the validity of petitioner's potential conviction for forgery would necessarily be at issue if he were able to prove that respondents planted the evidence supporting that charge in his hotel room while conducting an unlawful search ... Thus, petitioner's [§ 1983] claims are barred under Heck" until criminal proceedings terminate in his favor.); *Walden v. City of Chicago,* 391 F.Supp.2d 660, 673 (N.D.Ill.2005) ("[I]f a plaintiff is arrested and prosecuted solely or perhaps principally on the basis of, for example, allegedly planted drugs ... 'a[n] attack on the arrest would necessarily challenge the legality of a prosecution premised on the [illegally gained evidence].' ") (brackets in original, quoting *Wiley); Quintana v. Gates,* No. CV0007166, 2004 WL 1661540 at *3, 7 (C.D.Cal. July 20, 2004) ("When the facts supporting the [arresting] officers' probable cause determination are the same as the facts supporting the plaintiff's conviction, a finding [in a § 1983 action] that the officers lacked probable cause would 'necessarily imply the invalidity' of the plaintiff's conviction." Civil plaintiff's § 1983 claim alleging police officers unlawfully arrested plaintiff and planted drug evidence was barred under Heck because parole revocation had not been overturned and success in the § 1983 action would imply the invalidity of the parole revocation.); *Hobley v. Burge,* No. 03 C 3678, 2004 WL 1243929 at *7 (N.D. Ill. June 3, 2004) ("[S]uccess on [§ 1983 plaintiff's] false arrest claim would imply the invalidity of his conviction [because] ... every piece

of evidence to which [defendants] point [as establishing plaintiff's guilt] has been alleged to be tainted or fabricated by Defendant Officers and allegedly stems from the initial illegal arrest ... As such, [plaintiff] could not have filed his false arrest claim until his pardon" and thus claim is now timely.); *McMillen v. Nunley,* No. 3:02-CV-2367, 2003 WL 22227863 at *2 (N.D.Tex. Sept. 25, 2003) ("If plaintiff can prove that defendant made false statements to secure the search warrant ... such success would necessarily call into question his conviction, because his conviction and the falsified search warrant allegedly resulted from the same series of events," and accordingly § 1983 plaintiff cannot proceed with § 1983 false arrest claim until his conviction is overturned.), *report & rec. adopted,* 2003 WL 22469080 (N.D.Tex. Oct. 22, 2003).

**\*10** Because *Heck* and *Covington* would have precluded Hill from bringing a § 1983 false arrest claim prior to the not guilty verdict in his criminal case, his false arrest claim did not accrue for statute of limitation purposes until that date. Hill's criminal trial ended on December 19, 2003, giving him until December 19, 2006 to commence a § 1983 false arrest action. Hill's § 1983 complaint was filed in May 2005. Thus, Hill's false arrest claim is not time-barred.

**B.** *Legal Standard Governing False Arrest Claims*
Defendants also moved for summary judgment against Hill's false arrest claim on qualified immunity grounds. To decide the qualified immunity issue, the Court must explore the requirements for a § 1983 false arrest claim and the factual allegations as to each defendant's alleged involvement in Hill's search and arrest. The Court turns to those issues.

To prevail in a § 1983 action, a plaintiff must demonstrate that he has been denied a constitutional or federal statutory right and that the deprivation occurred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254-55 (1988). "Section 1983 itself," however, "creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. ames,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749 (1994); *see also, e.g., Ramashwar v.. Espinoza,* 05 Civ.2021, 2006 WL 23481 at *6 (S.D.N.Y. Jan. 5, 2006) (Peck, M.J.).

"It is now far too late in our constitutional history to deny that a person has a clearly established right not to

be arrested without probable cause." *Cook v. Sheldon,* 41 F.3d 73, 78 (2d Cir.1994); *accord, e.g., Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997).

" 'A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law.' " *Covington v. City of New* York, 171 F.3d 117, 122 (2d Cir.) (quoting *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996)), cert. *denied,* 528 U.S. 946, 120 S.Ct. 363 (1999); *see also, e.g., Boyd v. City of New York,* 336 F.3d 72, 75 (2d Cir.2003); *Jocks v.. Tavernier,* 316 F.3d 128, 134 (2d Cir.2003); *Caldarola v. Calabrese,* 298 F.3d 156, 161 (2d Cir.2002); *Hygh v. Jacobs,* 961 F.2d 359, 366 (2d Cir.1992); *Chimurenga v. City of New York,* 45 F.Supp.2d 337, 341 (S.D.N.Y.1999).

"Under New York state law, to prevail on a claim of false arrest a plaintiff must show that '(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " *Jocks v. Tavernier,* 316 F.3d at 134-35 (quoting *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N .Y.S.2d 87, 93, cert. *denied,* 423 U.S. 929, 96 S.Ct. 277 (1975)); *see, e.g., Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004); *Covington v. City of New York,* 171 F.3d at 122 ("Under New York law, 'a plaintiff claiming false arrest must show, *inter alia,* that the defendant intentionally confined him without his consent and without justification.' ") (quoting *Weyant v. Okst,* 101 F.3d at 852); *Marshall v. Sullivan,* 105 F.3d 47, 50 (2d Cir.1996); *Singer v. Fulton County Sheriff,* 63 F .3d 110, 118 (2d Cir.1995), cert. *denied,* 517 U.S. 1189, 116 S.Ct. 1676 (1996).

**\*11** "Under New York law, the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006). [18] "[A] grand jury's decision of whether probable cause exists to indict is distinct from the probable cause determination of whether an arrest is privileged." *Jocks v. Tavernier,* 316 F.3d at 135. "Probable cause to arrest exists when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.' " *Escalera v. Lunn,* 361 F.3d at 743 (quoting *Weyant v..*

*Okst,* 101 F.3d at 852). [19] "Defenses which negate the existence of a crime should similarly negate probable cause [for an arrest]." *Jocks v. Tavernier,* 316 F.3d at 135.

When planted evidence is the basis for an arrest, officers accused of planting the evidence cannot assert probable cause as a reason to dismiss a claim for false arrest. *Chimurenga v. City of New York,* 45 F.Supp.2d at 342 ("As to the false arrest claims, the defendants argue that the claims must be dismissed because the discovery of a razor blade in plaintiff's belongings created probable cause for her arrest. This might exonerate other officers involved in the arrest, but it is irrelevant to defendants ... who are accused of 'planting' the blade.") [20] (citing *Dunn v. City of Syracuse,* 83 A.D.2d 783, 443 N.Y.S.2d 463, 464 (4th Dep't 1981) ("One who wrongfully accuses another of criminal conduct and induces or procures that person's arrest may be liable for false arrest.")); *see also Neal v. City of Harvey, Ill.,* 1 F.Supp.2d 849, 856, 857 (N.D.Ill.1998) (Summary judgment of § 1983 plaintiff's false arrest claim denied where there was "a genuine issue of fact as to whether the [controlled] substance was planted on [plaintiff]" and "a genuine issue of fact exist[ed] as to the probable cause to arrest [plaintiff].").

## C. *Summary Judgment On The False Arrest Claim Is Denied Officer Melvin and Captain Eck*

Summary judgment on Hill's false arrest claim against Correction Officer Melvin and Captain Eck is denied because there is a triable issue of fact as to whether Correction Officer Melvin planted the razor, as Hill alleges. *See, e.g., Chimurenga v. City of New York,* 45 F.Supp.2d 337, 342 (S.D.N.Y.1999) ( "While the proof of this allegation [that defendants planted a razor blade in plaintiff's property] is entirely circumstantial, it is not insufficient to create a jury issue as to whether [defendants] worked in concert to plant the blade and thereby falsely engineered plaintiff's arrest."). [21] While there is less evidence as to whether Captain Eck was involved in Officer Melvin's discovery or planting of the razor, because he signed the Infraction Report and the Infraction Notice as the "Investigating Officer" and "Supervisor" (Ex. G: Infraction Rep.; Ex. H: Infraction Notice), and because he did not move for summary judgment on the merits of the false arrest claim against him, Captain Eck is denied summary judgment on Hill's false arrest claim.

**\*12** The factual dispute concerning C.O. Melvin's discovery or planting of the razor blade (and Captain Eck's knowledge of same) also precludes summary judgment for Correction Officer Melvin and Captain Eck on qualified immunity grounds. *E.g., McClellan v. Smith, 439 F.3d 137, 148-49 (2d Cir.2006)* (reversing summary judgment because of factual disputes as to qualified immunity); *Curry v. Syracuse, 316 F.3d 324, 334-35, 337 (2d Cir.2003)* (same); *Marshall v. Sullivan, 105 F.3d 47, 54 (2d Cir.1996); Weyant v. Okst, 101 F.3d 845, 857-58 (2d Cir.1996)* (denying summary judgment for defendants on qualified immunity grounds where facts relevant to the reasonableness of officers' actions during an arrest were in dispute); *Oliveira v. Mayer, 23 F.3d 642, 648-50 (2d Cir.1994)* (district court's grant of summary judgment for plaintiffs on qualified immunity in a false arrest claim was inappropriate where facts relevant to the reasonableness of officers' actions were in dispute), *cert. denied, 513 U.S. 1076, 115 S.Ct. 721 (1995); Weaver v. Brenner, 40 F.3d 527, 533, 537 (2d Cir.1994)* ("Since defendants hotly dispute plaintiff's allegations, a factual determination of their conduct is needed to resolve the issue of qualified immunity."); *Warlick v. Cross, 969 F.2d 303, 305-06 (7th Cir.1992)* ("Whether Officer Cross planted the evidence was a disputed issue of fact. Obviously the question whether he was immune was very different if the evidence had been planted from the situation if the evidence had not been planted ..."); *Golino v. City of New Haven, 950 F.2d 864, 870-72 (2d Cir.1991), cert. denied, 505 U.S. 1221, 112 S.Ct. 3032 (1992).* [22]

D. *Summary Judgment On Hill's False Arrest Claim Is Granted To Correction Officers Amir and Wilson*

Hill has not presented any evidence or even alleged that defendants Correction Officers Amir and Wilson were involved directly in the alleged planting of a razor in Hill's pants. While Hill claims they conspired with C.O. Melvin (*e.g.,* Dkt. No. 35: Hill Rule 56.1 Stmt. ¶ 2), Hill has failed to provide *evidence* that Correction Officers Amir and Wilson conspired with Correction Officer Melvin to plant the razor. "Conclusory" allegations of conspiracy are insufficient to survive summary judgment on a claim of conspiracy under *§ 1983.* [23] *See, e.g., Tapp v. Champagne, 164 Fed. Appx. 106, 108 (2d Cir.2006); Wade v. Pataki, 75 Fed. Appx. 45, 46 (2d Cir.2003)* ("The district court's conclusion that the defendants were entitled to summary judgment on the conspiracy claim was also proper, as appellant presented no evidence, beyond bald assertions

and conclusory allegations, to establish a conspiracy among the defendants to deprive him of due process rights ."); *Silverman v. City of New York, 64 Fed. Appx. 799, 801 (2d Cir.2003)* ("The *§ 1983* conspiracy claim fails because [plaintiff]'s allegations are unspecific, conclusory and unsupported."); *Ciambriello v. County of Nassau,* 292 F.3d at 325; *Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir.1997); San Filippo v. U.S. Trust Co. of New York, Inc., 737 F.2d 246, 248, 256-57 (2d Cir.1984)* ("[P]laintiff s failure to allege any material facts to support his conclusory allegation of conspiracy warrants summary dismissal of his complaint under either Fed.R.Civ.P. 12(b)(6) or Fed .R.Civ.P. 56."), *cert. denied, 470 U.S. 1035, 105 S.Ct. 1408 (1985); Bussey v. Phillips, 419 F.Supp.2d 569, 586-87 (S.D.N.Y .2006)* (summary judgment); *Jones v. Nat'l Commc'n & Surveillance Networks, 409 F.Supp.2d 456, 471 (S.D.N.Y.2006); McLaurin v. New Rochelle Police Officers, 363 F.Supp.2d 574, 577 (S.D.N.Y.2005)* ("Complaints containing only conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights will be dismissed."); *Lewittes v. Lobis,* 04 Civ. 0155, 2004 WL 1854082 at \*12 n. 13 (S.D.N.Y. Aug. 19, 2004) (Peck, M.J.) ( & cases cited therein), *aff'd, 164 Fed. Appx. 97 (2d Cir.2006).* Thus, summary judgment is granted to Correction Officers Amir and Wilson on Hill's false arrest claim.

IV. *ALL DEFENDANTS ARE GRANTED SUMMARY JUDGMENT ON HILL'S § 1983 MALICIOUS PROSECUTION CLAIM*

A. *Legal Standard Governing Malicious Prosecution Claims* [24]

**\*13** "The Second Circuit has held that '[f]reedom from malicious prosecution is a constitutional right that has long been clearly established.' " *Winn v. McQuillan, 390 F.Supp.2d 385, 389-90 (S.D.N.Y.2005)* (quoting *Kinzer v. Jackson,* 316 F.3d 139, 143 (2d Cir.2003)). "Claims for ... malicious prosecution, brought under *§ 1983* to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for ... malicious prosecution under [New York] state law." *Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir.2003); see also, e.g., Winn v. McQuillan, 390 F.Supp.2d at 390; Savino v. City of New York, 331 F.3d 63, 72 (2d Cir.2003).* To state a claim for malicious prosecution under New York law, the plaintiff must show: (1) "the defendant initiated a criminal proceeding"; (2) the proceeding terminated in plaintiff's favor; (3) "there

was no probable cause for the criminal charge"; and (4) the defendant acted maliciously. *Rothstein v. Carriere,* 373 F.3d 275, 282 (2d Cir.2004). For a malicious prosecution claim to rise to a constitutional level under § 1983, there must also be a post-arraignment seizure. *Jocks v. Tavernier,* 316 F.3d at 136; *see also, e.g., Singer v. Fulton County Sheriff,* 63 F.3d 110, 116-17 (2d Cir.1995), cert. denied, 517 U.S. 1189, 116 S.Ct. 1676 (1996). New York law " 'places a heavy burden on malicious prosecution plaintiffs....' " *Rothstein v. Carriere,* 373 F.3d at 282.

B. *Hill's Malicious Prosecution Claim Fails Because Of The Grand Jury Determination Of Probable Cause*

Here, element two is satisfied because Hill prevailed at his criminal trial. (*See* page 7 above.) Defendants argue that no issue of material fact exists as to elements one, three and four of Hill's malicious prosecution claim: whether defendants initiated Hill's prosecution, whether there was probable cause to prosecute Hill, and whether defendants acted with malice. *(See* Dkt. No. 28: Defs. Br. at 2, 9-14; Dkt. No. 36: Defs. Reply Br. at 1-2, 6-8.) Because the Court agrees that defendants are entitled to summary judgment on the basis of the third prong, existence of probable cause, the Court need not examine the other elements of a malicious prosecution claim.

An indictment by a grand jury " 'creates a presumption of probable cause' " to prosecute that defendant.[25] *Rothstein v. Carriere,* 373 F.3d 275, 282-83 (2d Cir.2004).[26] " 'The presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.' " *Rothstein v.. Carriere,* 373 F.3d at 283 (quoting *Colon v. City of New York,* 60 N.Y.2d at 82-83, 468 N.Y.S.2d at 455-56).[27]

Thus, in order for a plaintiff to prove a malicious prosecution claim after having been indicted, " 'he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " *Rothstein v. Carriere,* 373 F.3d at 283 (quoting *Colon v. City of New York,* 60 N.Y.2d at 83, 468 N.Y.S.2d at 456); *accord, e.g., Savino v. City of New York,* 331 F.3d at 72; *Ramashwar v. Espinoza,* 2006 WL 23481 at *7. Alternatively, the

presumption " 'can be overcome by a showing by claimant that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures.' " *Williams v. City of New York,* 02 Civ. 3693, 2003 WL 22434151 at *6 (S.D.N.Y. Oct. 23, 2003) (Motley, D.J.), aff'd, 120 Fed. Appx. 388 (2d Cir.2005); *accord, e.g., Ramashwar v. Espinoza,* 2006 WL 23481 at *7.

**\*14** Here, Hill was indicted by a grand jury (*see* page 5 above), and thus must rebut the presumption that there was probable cause to prosecute him. Hill seems to contend that his possession of contraband infraction did not provide probable cause for his arrest because Correction Officer Melvin planted the razor in Hill's pants pocket.[28] Additionally, Hill argues that defendants perjured themselves before the grand jury. (Hill Rule 56.1 Stmt. ¶ 8.) However, Hill does not present the Court with the defendants' grand jury testimony. For all this Court knows, some of the defendants may not have testified before the grand jury and others may have testified before the grand jury, as at trial, that they did not recall the incident. (*See* pages 6-7 above.) Furthermore, Hill has not presented any admissible evidence beyond his own testimony that Correction Officer Melvin planted the razor. (*See* page 4 & n. 6 above.) Hill must present more than " 'mere conjecture' and 'surmise' that his indictment was procured as a result of conduct undertaken by the defendants in bad faith' " to rebut the presumption of probable cause. *Reid v. City of New York,* 2004 WL 626228 at *7 (quoting *Savino v. City of New York,* 331 F.3d at 72); *see also, e.g., Simmons v. New York City Police Dep't,* 97 Fed. Appx. 341, 343 (2d Cir.2004) ("Although [plaintiff] testified that the arresting officer ... told him that the officers would falsify evidence and manipulate line-ups in order to implicate him, this allegation is not, without more, sufficient to raise an inference that the indictment was procured by fraud or bad faith conduct."); *Ramashwar v. Espinoza,* 2006 WL 23481 at *8; *Scully v. City of Watertown,* No. 7:03 CV 846, 2005 WL 1244838 at *11 (N.D.N.Y. May 25, 2005) ("The simple assertion that [plaintiff] was acquitted and therefore the officers must have lied is insufficient to overcome the presumption created by the grand jury's indictment ..."); *Montes v. King,* 00 Civ. 4707, 2002 WL 1808209 at *3 n. 5 (S.D.N.Y. Aug. 6, 2002) ("[U]nsubstantiated speculation" that officer acted in bad faith is not enough to survive summary judgment.); *Jenkins v. City of New York,* 98 Civ. 7170, 98 Civ. 7338, 1999 WL 782509 at

*9, 11 (S.D.N.Y. Sept. 30, 1999) (despite later-discovered perjury by a civilian witness at the grand jury, plaintiff "failed to produce any evidence of intentional police misconduct and his allegations are contradicted by the affidavits and contemporaneous documentary record in support of the motion. [Plaintiff] has thus failed to rebut the presumption that probable cause to commence the proceeding existed."), aff'd, 216 F.3d 1072 (2d Cir.2000).

Hill's argument proves merely that there were two versions of the strip search incident-(1) Hill's and (2) the prosecution's witnesses' including the correction officers'. Conflicting testimony between the (civil) plaintiff and defendants is not sufficient to rebut the presumption of probable cause. See, e.g., Brogdon v. City of New Rochelle, 200 F.Supp.2d 411, 422 (S.D.N.Y.2002) ("The record is barren of evidence (as opposed to conclusory allegations) to overcome the presumption created by the indictment. [Plaintiff] asserts that [the defendant officer] perjured himself, but that conclusory allegation is insufficient to overcome this strong presumption.... [Moreover,] ' [t]he existence of a "swearing contest" between plaintiff as to his innocence and an eyewitness as to the events "cannot of itself render the issue of probable cause a jury question." ' "); DiMascio v. City of Albany, No. 93-CV-0452, 1999 WL 244648 at *3 (N.D.N.Y. Apr. 21, 1999) (contradictions between plaintiff's and defendant's trial testimony "is insufficient to give rise to an inference of fraud, perjury or the withholding of evidence and is probative of little more than a disagreement over the turn of events" on the date of plaintiff's arrest.), aff'd, 205 F.3d 1322 (2d Cir.2000).

**\*15** Even if Hill provided the Court with the criminal trial testimony of inmate witness Gillard, and even if Gillard's testimony substantiated Hill's allegation, such testimony would not rebut the presumption of probable cause.[29] "Conflicting testimony between witnesses at the criminal trial is not enough to rebut the presumption of probable cause." Ramashwar v. Espinoza, 2006 WL 23481 at *8; see, e.g., DiMascio v. City of Albany, 1999 WL 244648 at *3 ("A mere conflict between witness' trial testimony alone is insufficient to suggest fraud, perjury or the withholding of evidence."); Hathaway v. County of Essex, 995 F.Supp. 62, 69 (N.D.N.Y.1998) ("Reliance on variations in testimony ... as evidence of fraud, suppression of evidence, or perjury [is] insufficient to overcome the presumption of probable cause."), aff'd, 172 F.3d 37 (2d Cir.), cert. denied, 528 U.S. 894, 120 S.Ct. 222 (1999); see also, e.g., Colon v. City of New York, 60

N.Y.2d at 83, 468 N.Y.S.2d at 456 (Police's "failure to pursue the investigation is not the equivalent of fraud or the suppression of evidence. Nor do variations in the witnesses' testimony prove perjury. Rather, they appear to indicate only the witnesses' differing perceptions of the incidents they observed.").

The fact that Hill's version of the incident contradicts that of the officers is not enough to present an issue of fact as to the probable cause element of Hill's malicious prosecution claim.[30] (See cases cited above.) If it were, any time there were conflicting versions of an incident and the criminal trial resulted in a not guilty verdict, the arresting officers could be sued for malicious prosecution, despite a grand jury finding of probable cause. That is not the state of the law, nor should it be. See Ramashwar v. Espinoza, 2006 WL 23481 at *9. Similarly, if probable cause could be met by an unsupported allegation that an arrest was based on planted evidence, then any person found in possession of contraband could sue the searching officers for malicious prosecution merely by claiming the officers planted the contraband. After a grand jury indictment, the case law for malicious prosecution sets a higher standard, which cannot be met by speculation or self-serving statements.

Moreover, even if the allegation that an officer planted evidence and then lied about it to the grand jury could in some cases rebut the presumption of probable cause, in this case Hill's malicious prosecution claim fails because he has not supplied the Court with any grand jury testimony. The Court thus has no idea which defendants, if any, testified, nor what their grand jury testimony was. See e.g., Rothstein v. Carriere, 373 F.3d at 284 ("The burden of rebutting the presumption of probable cause requires the plaintiff to establish what occurred in the grand jury, and to further establish that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand Jury acts judicially[.]' Here, the content of [defendant's] grand jury testimony is unknown, as is the content of the rest of the government's presentation."); Scully v. City of Watertown, 2005 WL 1244838 at *11 (Plaintiff failed to overcome presumption of probable cause because "[p]laintiff merely assert[ed], in wholly conclusory fashion, that [defendants] must have lied before the grand jury because he was eventually acquitted. However, Plaintiff neither provides defendants' grand jury testimony, nor points to any specific trial testimony that is purportedly false.") (citation omitted). That certain of the defendants could not recall the incident at trial two

years later is not, as Hill asserts, evidence of malicious prosecution. It is not surprising that correction officers might not recall a minor incident like this two years later. Indeed, if as Hill asserts the correction officers were out to get him, one would expect them to have testified against Hill at his criminal trial rather than testifying to a lack of recollection.

CONCLUSION

**\*16** For the reasons discussed above, defendants' summary judgment motion is granted in part and denied in part. Specifically:

1. All defendants are entitled to summary judgment dismissing Hill's denial of religious freedom claim as time barred.

2. All defendants are entitled to summary judgment dismissing Hill's malicious prosecution claim because Hill has failed to allege facts to rebut the presumption of probable cause.

2. Defendants C.O. Amir and C.O. Wilson are entitled to summary judgment dismissing Hill's false arrest claim against them because there is no evidence that they were involved in C.O. Melvin's alleged planting of the razor blade that led to Hill's arrest.

Defendants C.O. Melvin and Captain Eck are denied summary judgment on Hill's false arrest claim against them because the claim is not time barred, there are material issues of disputed fact as to whether C.O. Melvin planted the razor blade (and whether Captain Eck knew that), and they are not entitled to qualified immunity because of the same disputed facts.

SCHEDULING ORDER

The parties are to file the Proposed Joint Pretrial Order by August 11, 2006. Defense counsel is to put the Proposed Joint Pretrial Order together; plaintiff Hill is to provide his material for the Pretrial Order to defense counsel by July 28, 2006. If plaintiff does not do so, defendants are to separately file their portions of the Pretrial Order.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1749520

Footnotes

1   It appears that, although Hill claims he gave the appropriate documents to the U.S. Marshal, defendants Amir and Melvin were not served. *(See* Dkt. No. 28: Defs. Br. at 1 n. 1; Dkt. No. 27: Defs. Rule 56.1 Stmt. at 1 n. 1.) The Court directs the Pro Se Office to provide an Amended Summons and apropriate paperwork directly to the Marshal's Office to now perfect service on C.O. Melvin.

2   Defendants' Brief states that Correction Officer Amir was assigned to Intake Area "A," Correction Officer Andre Melvin was assigned to Intake Area "B," and Correction Officer Dawn Wilson "was the property officer for intake" at V.C.B.C. (Dkt. No. 28: Defs. Br. at 4.) Defendants' evidentiary citations for this, however, do not support the statement as to C.O. Amir or C.O. Wilson.

3   Unless otherwise noted, references to "Ex." are to the exhibits to the Sitaras Affidavit (Dkt. No. 27).

4   Hill has since returned to Riker's Island and recovered all his property, including the religious medallion. (Hill Dep. at 76.)

5   According to Hill, he was subjected to five police searches prior to his arrival at the V.C.B.C., which made it impossible for him to possess a razor in the intake area. (Hill Rule 56.1 Stmt. ¶ 10.) Hill surmises that "defendants retaliated with malice against plaintiff for him requesting a grievance or threatening to file a lawsuit." (*Id.* ¶ 14.) Hill claims that "all defendants worked in collusion to fabricate, manufacture, and plant the razor on the plaintiff." (*Id.* ¶ 9.)

6   Inmate Gillard confirmed this in his testimony at Hill's prison disciplinary hearing. (*See* Ex. M: Hearing Rep.) Gillard testified at Hill's criminal trial as a witness for the defense, but the Court has not been provided with any relevant excerpts of his trial testimony. (Defs. Rule 56.1 Stmt. ¶ 18; Ex. R: Gillard: Tr. 213-14.) There is no non-hearsay evidence in the record as to what inmate Felder saw.

7   According to Hill, the Red I.D. classification required him "to wear 'red mittens hand cuffed with a waist chain behind his back' " when he was in transit to court and while in court. (Compl. "Claim Three.")

**8**  The Court's knowledge of defendants' testimony at Hill's criminal trial is limited to the excerpts submitted by defendants in Exhibit R. Hill has not submitted any trial transcript excerpts as support for his claims, despite having been instructed to do so and given time to do so by the Court. Excerpts of Officer Melvin and Captain Eck's testimony, as provided by defendants, do not include any statements concerning recollection of the events surrounding the July 28, 2001 incident.

**9**  Hill's complaint consists of seven "claims." (Compl.) Some of Hill's "claims" contain multiple legal causes of action while others consist solely of factual allegations that the Court does not construe as additional causes of action.

"Claim One" alleges that defendants (1) violated Hill's religious freedom, (2) caused Hill to be falsely arrested, (3) committed perjury at Hill's criminal trial and at the institutional hearing, and (4) conspired to commit perjury in order to get Hill convicted.

"Claim Two (A)" contains factual allegations about the events of July 28, 2001, including the fact that Hill's religious medallion was taken. "Claim Two (B)" describes the strip search and alleges that Officer Melvin planted the razor in Hill's pants.

"Claim Three" alleges that, as a result of the wrongful Red ID status, Hill sustained "severe pains to his shoulders repeated cuts & swelling of his wrists, stiffening of the joints, and pain when ever plaintiff had to sit down or lie down." The injuries allegedly occurred while Hill was being driven in a bus, without a seatbelt, and with his hands cuffed behind his back, and was knocked around from "pot holes or sharp turns."

"Claim Four" describes Hill's suicide attempts. "Claim Five" and "Claim Six" describe Hill's difficulty in making bail while locked up for the contraband charge. "Claim Seven" repeats the claim that defendants committed perjury.

Defendants identify six claims in Hill's complaint: "false arrest, malicious prosecution, conspiracy, an unconstitutional prisoner classification, perjury, and confiscation of [plaintiff's] religious effects." (Dkt. No. 28: Defs. Br. at 3.)

**10**  For additional decisions by this Judge discussing the summary judgment standards in Section 1983 cases, in language substantially similar to that in this entire section of this Report and Recommendation, *see, e.g., Denis v. N.Y.S. Dep't of Corr. Servs.,* 05 Civ. 4495, 2006 WL 217926 at *9-11 (S.D.N.Y. Jan. 30, 2006) (Peck, M.J.), *report & rec. adopted,* 2006 WL 406313 (S.D.N .Y. Feb. 22, 2006) (Kaplan, D.J.); *Ramashwar v. Espinoza,* 05 Civ.2021, 2006 WL 23481 at *5-6 (S.D.N.Y. Jan. 5, 2006) (Peck, M.J.); *Doe v. Goord,* 04 Civ. 0570, 2005 WL 3116413 at *8-10 (S.D.N.Y. Nov. 22, 2005) (Peck, M.J.); *Dawkins v. Jones,* No. 03 Civ. 0068, 2005 WL 196537 at *9-10 (S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); *Hall v. Perilli,* 03 Civ. 4635, 2004 WL 1068045 at *3 (S.D.N.Y. May 13, 2004) (Peck, M.J.); *Baker v. Welch,* 03 Civ. 2267, 2003 WL 22901051 at *4-6 (S.D.N.Y. Dec. 10, 2003) (Peck, M.J.); *Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *10-11 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.) (citing prior decisions).

**11**  *See also, e.g., Commer v. American Fed'n of State, County & Mun. Employees,* 272 F.Supp.2d 332, 335 (S.D.N.Y.2003) ("[T]he Court is mindful that the plaintiff is proceeding pro se and that his submissions should be held to 'less stringent standards than formal pleadings drafted by lawyers ....' "), *aff'd,* 390 F.3d 203 (2d Cir.2004); *Douglas v. Portuondo,* 232 F.Supp.2d 106, 113 (S.D.N.Y.2002).

**12**  *See also, e.g., Trammell v. Coombe,* No. 97-2622, 201 F.3d 432 (table), 1999 WL 1295856 at *2 (2d Cir. Dec. 23, 1999); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999); *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *see generally* S.D.N.Y. Local Civil Rule 56.2 (requiring service of notice explaining the requirements of Rule 56 on litigant proceeding pro se).

**13**  *See also, e.g., Denis v. N.Y. S. Dep't of Corr. Servs.,* 05 Civ. 4495, 2006 WL 217926 at *11 (S.D.N.Y. Jan 30, 2006) (Peck, M.J.), *report & rec. adopted,* 2006 WL 406313 (S.D.N.Y. Feb. 22, 2006) (Kaplan, D.J.); *Diallo v. Williams,* 04 Civ. 4556, 2006 WL 156158 at *2 (S.D.N.Y. Jan. 20, 2006); *Allan v. City of New York,* 386 F.Supp.2d 542, 548 (S.D.N.Y.2005); *Mitchell v. Home,* 377 F.Supp.2d 361, 371 (S.D.N.Y.2005); *Dawkins v. Jones,* 03 Civ. 0068, 2005 WL 196537 at *8 (S.D.N.Y. Jan. 31, 2005) (Peck, M.J.); *Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *18 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.); *Bristow v. Smith,* 03 Civ. 2663, 2003 WL 21437005 at *1 (S.D.N.Y. June 18, 2003) (Peck, M.J.); cf. *Noguera v. Hasty,* 99 Civ. 8786, 2000 WL 1011563 at *12 (S.D.N.Y. July 21, 2000) (Peck, M.J.) *report & rec. adopted in part,* 2001 WL 243535 (S.D.N.Y. Mar. 12, 2001) (Wood, D.J.).

**14**  *See also, e.g., United States v. Montoya,* 335 F.3d 73, 75-76 (2d Cir.2003); *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.), *cert. denied,* 534 U.S. 886, 122 S.Ct. 197 (2001); *Hill v. Senkowski,* 409 F.Supp.2d 222, 229 (W.D.N.Y.2006); *Bordas v. Greiner,* 04 Civ. 8904, 2005 WL 3071461 at *2 (S.D.N.Y. Nov. 14, 2005); *Shomo v. City of New York,* 03 Civ. 10213, 2005 WL 756834 at *3 (S.D.N.Y. Apr. 4, 2005); *Dawkins v. Jones,* 2005 WL 196537 at *8; *Coble v. Stinson,* No. 97-CV-0717, 2004 WL 1454392 at *1 n. 4 (W.D.N.Y. Jun. 23, 2004); *Moreno-Castillo v. United States,* 02 Civ. 2858, 2003 WL 23109747 at *1 n. 1 (S.D.N.Y. Dec. 31, 2003).

15    *See also, e.g., Washington v. County of Rockland,* 373 F.3d 310, 317 (2d Cir.2004); *Ormiston v. Nelson,* 117 F.3d at 71; *Eagleston v. Guido,* 41 F.3d at 871; *Singleton v. City of New York,* 632 F.2d 185, 191 (2d Cir.1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1368 (1981).

16    *Accord, e.g., Morris v. New York City Police Dep't,* 59 Fed. Appx. 421, 422 (2d Cir.2003) ("[I]f plaintiff can show that a conviction obtained against him would have depended upon a false arrest, a Section 1983 claim arising from the false arrest does not accrue until such a conviction is no longer a possibility."); *see also, e.g., Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996); *Woods v. Candela,* 47 F.3d 545, 546 (2d Cir.), *cert. denied,* 516 U.S. 808, 116 S.Ct. 54 (1995); *Stephenson v. Rosa,* 03 Civ. 8503, 2006 WL 464081 at *1 (S.D.N.Y. Feb. 24, 2006); *Reid v. City of New York,* 00 Civ. 5164, 2004 WL 626228 at *8-9 (S.D.N.Y. Mar. 29, 2004), *report & rec. adopted,* 2004 WL 1488194 (S.D.N.Y. July 1, 2004); *Lucas v. Novogratz,* 01 Civ. 5445, 2002 WL 31844913 at *3 (S.D.N.Y. Dec. 18, 2002); *McAllister v. New York City Police Dep't,* 49 F.Supp.2d 688, 700-3 (S.D.N.Y.1999) (Wood, D.J. & Peck, M.J.) ( & cases cited therein).

17    *See also, e.g., Lucas v. Novogratz,* 2002 WL 31844913 at *3 ("[T]he Second Circuit has made clear that *Heck* does not preclude a claim for false arrest under § 1983 unless the sole basis for the conviction was evidence seized as a result of the illegal arrest."); *compare, e.g., Warren v. Altieri,* 59 Fed. Appx. 426, 427 (2d Cir.2003) ("Plaintiff's allegations of assault [by police] are unrelated to the criminal charges underlying the warrant that prompted his arrest. Accordingly, *Covington* is inapplicable" and the statute of limitations began to run as of the time of the assault.).

18    *Accord, e.g., Escalera v. Lunn,* 361 F.3d at 743; *Caldarola v. Calabrese,* 298 F.3d at 161; *Kent v. Katz,* 312 F .3d 568, 573 (2d Cir.2002); *Covington v. City of New York,* 171 F.3d at 121; *Marshall v. Sullivan,* 105 F.3d at 50; *Weyant v. Okst,* 101 F.3d at 852; *Singer v. Fulton County Sheriff,* 63 F.3d at 118 ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."); *Bernard v. United States,* 25 F.3d 98, 102, 104 (2d Cir.1994) ("the existence of [probable cause] is a complete defense to an action for false arrest"); *Fox v. City of New York,* 03 Civ. 2268, 2004 WL 856299 at *4-5 (S.D.N.Y. Apr. 20, 2004); *Greenfield v. City of New York,* 99 Civ. 2330, 2000 WL 124992 at *5 (S.D.N.Y. Feb. 3, 2000) (Peck, M.J.); *Shaw v. City of New York,* 95 Civ. 9325, 1997 WL 187352 at *3 (S.D.N.Y. April 15, 1997) (Peck, M.J.); *Miloslavski v.. AES Eng'g Soc'y, Inc.,* 808 F.Supp. 351, 354 (S.D.N.Y.1992) ("under New York law, 'probable cause serves as a complete defense to the charges of false arrest and malicious prosecution' "), aff'd, 993 F.2d 1534 (2d Cir.), *cert. denied,* 510 U.S. 817, 114 S.Ct. 68 (1993).

19    *Accord, e.g., Jaegly v. Couch,* 439 F.3d at 152; *Boyd v. City of New York,* 336 F.3d at 75-76; *Caldarola v. Calabrese,* 298 F.3d at 162; *Curley v. Village of Suffern,* 268 F.3d 65, 70 (2d Cir.2001); *Marshall v. Sullivan,* 105 F.3d at 54.

20    *Chimurenga* held that, "drawing all reasonable inferences in favor of the plaintiff, there are triable issues of fact as to whether the razor blade was 'planted' in the box by the individual or concerted actions of [defendants]." *Chimurenga v. City of New York,* 45 F.Supp.2d at 342 (citation & fn. omitted).

21    In *Chimurenga,* the only evidence provided by the plaintiff of the alleged planting of the razor was as follows: "Among other things, plaintiff has testified not only that she never placed any razor blade in the box of books but also that there was no opportunity for anyone else besides [defendant] to do so, since she inspected the books for approximately forty minutes on the day before she brought them to the Detention Center, personally placed the books in the box shortly before she left her apartment for the facility on October 22, 1997, and kept the box in her sole and exclusive possession until it was surrendered for scanning. Furthermore, plaintiff testified that the blade was in plain view in the box when it was 'discovered' by [defendant], a location consistent with her theory that the blade was hastily planted." *Chimurenga v. City of New York,* 45 F.Supp.2d at 342 (citations omitted). Here, similarly, Hill asserts that the razor was planted and offers as further proof the fact that he underwent five searches by the police before being taken to Rikers. (*See* page 4 n. 5 above.)

22    *See, e.g., Lee v. McCue,* 410 F.Supp.2d 221, 225-26 (S.D.N.Y.2006) ("This is a classic example of a case in which qualified immunity cannot be given to the officer defendants because there are too many disputes about what actually happened."); *Jeanty v. County of Orange,* 379 F.Supp.2d 533, 542 (S.D.N.Y.2005) (denying summary judgment on qualified immunity because of genuine issues of material fact); *Atkins v. County of Orange,* 372 F.Supp.2d 377, 402 (S.D.N.Y.2005) (same); *Mack v. Town of Wallkill,* 253 F.Supp.2d 552, 559-60 (S.D.N.Y.2003) (same); *Greenfield v. City of New York,* 99 Civ. 2330, 2000 WL 124992 at *3 (S.D.N.Y. Feb. 3, 2000) (Peck, M.J.); *Sorensen v. City of New York,* 98 Civ. 3356, 1999 WL 511923 at *3 (S.D.N.Y. July 20, 1999) ("Where, as here, there are material factual issues to be resolved, the issue of qualified immunity must await trial."); *Yanez v. City of New York,* 29 F.Supp.2d 100, 109-10 (E.D.N.Y.1998) ("pre-trial resolution of the qualified immunity defense may be defeated by a factual dispute").
      The Court also believes that qualified immunity is an inappropriate defense in this case because the defense is unavailable where the allegedly violated right is "clearly established." *See, e.g., Koch v. Town of Brattleboro,* 287 F.3d 162, 165 (2d Cir.2002); *Martinez v. Simonetti,* 202 F.3d 625, 633-34 (2d Cir.2000); *Young v. County of Fulton,* 160 F.3d 899, 903 (2d. Cir.1998); *Muhammad v. Pico,* 02 Civ. 1052, 2003 WL 21792158 at *15 n. 38 (S.D.N.Y. Aug. 5, 2003) (Peck, M.J.);

*Espinal v. Goord,* 00 Civ. 2242, 2001 WL 476070 at *11 (S.D.N.Y. May 7, 2001) (Peck, M.J.); *Freeman v. Strack,* 99 Civ. 9878, 2000 WL 1459782 at *7 (S.D.N.Y. Sept. 29, 2000) (Peck, M.J.). The right to be free from false arrest was clearly established long before Hill's arrest, as was the right to not be falsely imprisoned based on planted evidence. *See, e.g., Zabrey v. Coffey,* 221 F.3d 342, 348-49, 355-57 (2d Cir.2000) ("[The] constitutional right ... not to be deprived of liberty on the basis of false evidence fabricated by a government officer ... was clearly established in 1996, when [defendant's] alleged act occurred ..."); *Henry v. City of New York,* 02 Civ. 4824, 2003 WL 22077469 at *4 (S.D.N.Y. Sept. 8, 2003) (following *Zabrey,* finds "constitutional violation if one is deprived of his liberty because of the fabrication" of evidence.).

23    "To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culberson,* 200 F.3d 65, 72 (2d Cir.1999); *see, e.g., Robbins v. Cloutier,* 121 Fed. Appx. 423, 425 (2d Cir.2005); *Ciambriello v. County of Nassau,* 292 F.3d 307, 324-25 (2d Cir. 2002); *Jones v. Nat'l Commc'n & Surveillance Networks,* 409 F.Supp.2d at 471-72; *Jessamy v. New Rochelle,* 292 F.Supp.2d 498, 513 (S.D.N.Y.2003); *Bullard v. City of New York,* 240 F.Supp.2d 292, 301 (S.D.N.Y.2003). The Second Circuit has "recognized that such 'conspiracies are by their very nature secretive operations,' and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn v. Culberson,* 200 F.3d at 72. Here, Hill has not provided the Court with direct or circumstantial evidence of conspiracy.

24    For additional decisions by this Judge discussing the summary judgment standards in Section 1983 cases, in language substantially similar to that in this entire section of this Opinion, *see, Ramashwar v. Espinoza,* 05 Civ.2021, 2006 WL 23481 at *7 (S.D.N.Y. Jan. 5, 2006) (Peck, M.J.).

25    This presumption of probable cause from the grand jury's indictment applies to malicious prosecution claims but not to false arrest claims. *McClellan v. Smith,* 439 F.3d 137, 145 (2d Cir.2006) ("[W]e look to New York law to determine whether a presumption of probable cause arising from a grand jury indictment can be a defense to these claims ... '[T]he New York Court of Appeals has expressly held that the presumption of probable cause arising from an indictment "applies only in causes of action for malicious prosecution and is totally misplaced when applied in false [arrest] actions." ' ") (internal citation omitted; quoting *Savino v. City of New York,* 331 F.3d 63, 75 (2d Cir.2003)) (quoting *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 92-93, *cert. denied,* 423 U.S. 929, 96 S.Ct. 277 (1975)); *accord, e.g., Reid v. City of New York,* 00 Civ. 5164, 2004 WL 626228 at *7 n. 4 (S.D.N.Y. Mar. 29, 2004), *report & rec. adopted,* 2004 WL 1488194 (S.D.N.Y. July 1, 2004).

26    *Accord, e.g., Boyd v. City of New York,* 336 F.3d 72, 77 (2d Cir.2003); *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003); *Colon v. City of New York,* 60 N.Y.2d 78, 82, 468 N.Y.S.2d 453, 455 (1983); *Ramashwar v. Espinoza,* 05 Civ.2021, 2006 WL 23481 at *7 (S.D.N.Y. Jan. 5, 2006) (Peck, M.J.).

27    *See also, e.g., Boyd v. City of New York,* 336 F.3d at 77; *Savino v. City of New York,* 331 F.3d at 72; *Ramashwar v. Espinoza,* 2006 WL 23481 at *7.

28    Hill asserts that the probable cause for his arrest on the possession of contraband charge was based on lies defendants made to the arresting officers. (Dkt. No. 35: Hill Rule 56.1 Stmt. ¶ 8.) The Court presumes that Hill is alleging that there was no probable cause to arrest him because the arrest was based on fraudulent evidence. *(See* Compl. ¶ "Claim Five": "Plaintiff on July 29, 2001 was charged criminally with a D. Felony of promoting prison contraband, as a result of being framed by the defendants.")

29    Gillard testified at Hill's infraction hearing that the razor did not appear on the x-ray machine monitor as Hill's pants passed through the machine. *(See* page 4 n. 6 above.) Conversely, C.O. Melvin reported that he initially saw the razor blade on the x-ray machine as Hill's pants passed through. *(See* pages 4-5 above.) That Gillard did not see the razor on the x-ray monitor is not necessarily inconsistent with C.O. Melvin, who is trained in using the equipment, seeing the razor. *(See* Ex. N: Hearing Disposition Notice, where hearing officer credited Gillard's testimony as consistent with the "staff" testimony that Hill possessed a weapon .)

30    This finding is not inconsistent with the Court's finding that there is a factual dispute as to Hill's false arrest claim. Although the existence of probable cause for Hill's arrest is disputed in both the malicious prosecution and false arrest claims, Hill's affidavit is not sufficient to rebut the presumption in a malicious prosecution claim. *(See* cases cited above.) Although the court in *Chimurenga v. City of New York,* 45 F.Supp.2d 337, 343 (S.D.N.Y.1999), denied summary judgment on both the false arrest and malicious prosecution claims, the criminal prosecution was dismissed by the district attorney, apparently before grand jury indictment. Thus the plaintiff in *Chimurenga,* unlike Hill, did not have to rebut a presumption of probable cause in order to survive summary judgment on a malicious prosecution claim.

---

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1535386
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Segundo NARVAEZ, Plaintiff,

v.

CITY OF NEW YORK; Commissioner Joseph Ponte;
Stetven Wettenstein, Warden Manhattan Detention
Center; Clayton Augustus, Warden Brooklyn
Detention Center; Monica Windley, Warden
North Infirmary Command; Angelo Jamieson,
Warden George Motchan Detention Center;
Achille Antonie, P.A.; Lynn Devivo, PA.; Rony
Joseph, P.A.; Brenda R. Harris, M.D.; David Viera,
P.A.; Rosemary Nwanne, P.A.; Frantz Medard,
M.D.; Myriam Blain, P.A.; Francisco Peguero,
P.A.; Ronald Schliftman; Vittorio Harris; Anne
Francois; Warden John Does; John Doe Doctors;
John Doe and Jane Doe Nurses, Defendants.

16 Civ. 1980 (GBD)
|
Signed April 17, 2017

**Attorneys and Law Firms**

Segundo Narvaez, Comstock, NY, pro se.

Alejandra Rosa Gil, Heidell, Pittoni, Murphy & Bach,
Daryl Paxson, Lord Day Lord, White Plains, NY, Charles
Thomas Gura, Marshall, Dennehey, Warner, Coleman
and Goggin, Rye Brook, NY, Andrew James Rauchberg,
New York City Law Department, New York, NY, for
Defendants.

MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, United States District Judge

**\*1** Plaintiff, currently in the custody of the New
York State Department of Corrections and Community
Supervision (DOCCS) at Washington Correctional
Facility in Comstock, New York, brings this *pro se* action
under 42 U.S.C. §§ 1983, 1985 and the Americans with
Disabilities Act.[1] He alleges that while he was in the
custody of the New York City Department of Correction

(DOC), he contracted tuberculosis (TB) and Hepatitis A.
Plaintiff also asserts that his medical and mental health
care in DOC custody failed to satisfy a constitutional
minimum.

Plaintiff brings suit against the City of New York; DOC
Commissioner Joseph Ponte; the Wardens of the GMDC,
NIC, BKDC, and MDC; and eleven individual medical
care providers, including mental health practitioner Anne
Francois; seven physician's assistants (Achille Antoine;
David Viera; Myriam Blain; Francisco Peguero; Vittorio
Harris; Rony Joseph; Rosemary Nwanne; and Lynn
Devivo); and three doctors, Brenda Harris, M.D., Frantz
Medard, M.D., and Ronald Schliftman, M.D.[2]

Defendants moved to dismiss the Complaint under
Federal Rule of Civil Procedure 12(b)(6). For the
reasons set forth below, Defendants' motion to dismiss is
DENIED as to Plaintiff's § 1983 due process claim against
the City of New York for deliberate indifference to a risk
of harm from the conditions of Plaintiff's confinement
with TB-positive inmates. Defendants' motion to dismiss
is GRANTED as to Plaintiff's remaining claims under §§
1983, 1985, and the ADA.

**LEGAL STANDARD**

To survive a motion to dismiss pursuant to Rule 12(b)(6),
a complaint must plead "enough facts to state a claim to
relief that is plausible on its face." *Brown v. Daikin Am.
Inc.*, 756 F.3d 219, 225 (2d Cir. 2014) (quoting *Bell Atl.
Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). "A claim has
facial plausibility when the plaintiff pleads factual content
that allows the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged."
*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation
omitted). While "the plausibility standard is not akin to
a probability requirement," *id.* (internal quotation marks
omitted), the plaintiff must "nudge[ ] [her] claims across
the line from conceivable to plausible...." *Twombly*, 550
U.S. at 570. A court must take "factual allegations [in the
complaint] to be true and draw[ ] all reasonable inferences
in the plaintiff's favor." *Harris v. Mills*, 572 F.3d 66,
71 (2d Cir. 2009) (citation omitted). Legal conclusions,
conversely, do not benefit from a presumption of truth.
*See Iqbal*, 556 U.S. at 678.

When the plaintiff is proceeding *pro se,* the Court must "construe [the] complaint liberally and interpret it to raise the strongest arguments that [it] suggest[s]." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir. 2010) (citation and internal quotation marks omitted); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972). Indeed, "if a *pro se* litigant pleads facts that would entitle him to relief, that petition should not be dismissed because the litigant did not correctly identify the statute or rule of law that provides the relief he seeks." *Thompson v. Choinski,* 525 F.3d 205, 209 (2d Cir. 2008). But "[e]ven in a *pro se* case ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Chavis,* 618 F.3d at 170 (internal quotation marks omitted). Thus, although the Court is "obligated to draw the most favorable inferences" that the complaint supports, it "cannot invent factual allegations that [the plaintiff] has not pled." *Id.*

**\*2** In its analysis, the Court is generally limited to facts presented "within the four corners of the complaint" but may consider documents that plaintiff references in the complaint, or matters of which the Court may take judicial notice. *See Taylor v. Vt. Dep't of Educ.,* 313 F.3d 768, 776 (2d Cir. 2002); *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir. 2002).

On September 14, 2016, Defendants moved to dismiss the Complaint. (ECF No. 38.)[3] The Court repeatedly extended the time for Plaintiff to oppose the September 14 2016 motion—first until October 31, 2016, then until December 27, 2016, and finally until February 10, 2017. (ECF Nos. 49, 51, 54.) Plaintiff failed to file an opposition to the motion, and the Court therefore deemed the motion fully briefed. (ECF No. 55.)

*A pro se* litigant's failure to oppose Defendants' motion does not by itself merit dismissal of his complaint. *See Goldberg v. Danaher,* 599 F.3d 181, 183-84 (2d Cir. 2010); *McCall v. Pataki,* 232 F.3d 321, 322-23 (2d Cir. 2000). When presented with an unopposed motion, the Court must determine whether there are sufficient bases for granting the motion. *McCall,* 232 F.3d at 322-23 ("[A]lthough a party is of course to be given a reasonable opportunity to respond to an opponent's motion, the sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law.").

## BACKGROUND

The Court accepts Plaintiff's factual allegations as true for the purposes of this motion to dismiss under Rule 12(b)(6). *See Harris,* 572 F.3d at 71. The facts summarized in this section are from Plaintiff's Complaint and the documents that he has attached thereto.

### A. Infection with Tuberculosis

On July 12, 2013, Plaintiff Segundo Narvaez entered into DOC custody on Rikers Island. (Compl., ECF No. 1, at 24.) During intake, Plaintiff's purified protein derivative screening test for TB was negative, reflecting that he "had no active or dormant tuberculosis." (*Id.* at 12.) In addition, Plaintiff tested negative for Hepatitis A. (*Id.* at 16.)

Even though Plaintiff "did not have TB, [he] was housed with multiple inmates who had been tested and found to be positive with *active* tuberculosis." (*Id.* at 14) (emphasis added). The DOC housed these contagious inmates together with healthy pretrial detainees in facilities with "poor air ventilation." (*Id.* at 26.) For his first month in custody, the DOC housed Plaintiff in the Robert N. Davoren Center (RNDC), building four. (*Id.* at 24.) The DOC then relocated Plaintiff to the George Motchan Detention Center (GMDC), in building three, one main, B side. He was housed with inmate Ramirez who "was diagnosed with positive to tuberculosis [but] medical staff were not sure if he really had T.B." (*Id.*) Ramirez was retested and again "found to be positive to T.B.," but Ramirez "refused to take any medication or treatment." (*Id.*)

**\*3** In 2014, "the whole house (block cells)," including Ramirez, was relocated to the GMDC's one upper, B-side cells. (*Id.*) The DOC then also housed two more detainees who had tested positive for TB in the one upper, B-side cells. "Medical staff ... permitted those infected inmates [to be] mixed with the healthier inmates." (*Id.* at 25.) In February 2015, the DOC removed one of the TB positive inmates, identified at T. Belmejo, from the housing block because Belmejo was involved in an altercation.

In March 2015, the DOC relocated the "whole house" to the Brooklyn Detention Complex (BKDC), and "serological[ ] examinations were performed." (*Id.* at 25.)

Inmates Ramirez and "Roys" again tested positive for TB and "showed [Plaintiff] their medical results from the clinic, but they refused to take the treatment." (*Id.*) The DOC then transferred Plaintiff, together with these TB positive inmates, to the North Infirmary Command (NIC). On May 9, 2015, Plaintiff tested positive for TB. (*Id.* at 32.) He was "devastated" because he had been free of TB when he entered Rikers Island. (*Id.* at 25.)

Plaintiff alleges that medical personnel claimed that he "had not only tuberculosis ... but that it was active [even though] an X-Ray indicated [that he] did not have TB active. Nor did [he have] any symptoms associated with active TB. No sputum or bronchoscope was used to support or dissuade this false positive" that his TB was active. "[A]s a result of this false positive, which did not indicate [active] miliary tuberculosis, [Plaintiff] was forced into direct observed therapy (DOT) and poisoned with variants of isoniazid, rifampin, pyrazinamide." (*Id.* at 13.) Defendant Ronald Schliftman and Vittorio Harris at some point allegedly "determined through x-ray" that Plaintiff did not have active tuberculosis yet recommended that he take TB medication. (*Id.* at 11.) [4] Plaintiff had an allergic reaction to the medication, including a painful red rash on his face and body. (*Id.* at 13-14.) Plaintiff also experienced nausea, vomiting, headaches, and chest and joint pain. (*Id.* at 14.) He asserts that because of the medication, his optic nerve and liver are damaged, and his hearing is impaired. (*Id.*)

Plaintiff asserts that the "New York City Jails are infested with contagious diseases" and that they "do not follow the New York City Health Code [or] the New York State Sanitary Code." (Compl. at 8.) Plaintiff "is yet another victim." (*Id.*) He further asserts that "medical staff did not do their job by mixing healthy inmates together with the infected inmates and exposing [them to] that easily contagious disease (T.B.) .... It has been approximately two years and the problem hasn't been resolved." (*Id.* at 26.) He alleges that the DOC "should screen better the inmates and categorize[ ] the inmates according[ ] to whatever disease they were found to have." (*Id.* at 27.)

**B. Medical Treatment for Tuberculosis and Hepatitis A**
**\*4** On June 29, 2015, the DOC relocated Plaintiff from NIC to MDC. (Compl. 1.1 at 8.) Plaintiff annexes to his Complaint grievances stating that medical staff at MDC failed to provide Plaintiff with his daily dose of TB

medication on June 4, 2015, June 29, 2015, and July 2, 2015. (*Id.*) In the same grievance, he asserts that "since [he] was diagnosed with TB, [he has] not received adequate care." (*Id.*) In another grievance, Plaintiff states that on July 27, 2015, he was not escorted to the location where he could receive his medication. (*Id.* 1.1 at 9.) In addition to Defendants' lapses in providing Plaintiff with doses of his prescribed medication for four days, Plaintiff states that medical personnel did not test his liver functioning every month. (*Id.* 1.1 at 16.) Medical personnel tested Plaintiff's liver function on May 21, 2015, and June 1, 2015. (Compl. 1.2 at 33-35.)

On July 6, 2015, Plaintiff learned that he had tested positive for Hepatitis A. (Compl. 1.1 at 11.) According to Plaintiff's grievance, doctors informed Plaintiff that he did not require any medication for Hepatitis A. (*Id.*)

**C. Mental Health Treatment**
Plaintiff suffers from, among other things, post-traumatic stress disorder from working at the September 11, 2001 World Trade Center site. (Compl. at 15.) When he was at BKDC and GMDC, Plaintiff saw a Spanish-speaking therapist. (Compl. 1.2 at 33.)

After he was transferred to the NIC, on May 6, 2015, Plaintiff was scheduled to meet with mental health clinician Anne Francois, LMSW, who does not speak Spanish. (*Id.*) Plaintiff annexes to his Complaint a letter dated June 22, 2015, which states that:

> [T]he mental health person did not speak Spanish so she made an intercom communication telephone [call.] I spoke to someone in Spanish but it wasn't satisfactory to me because I d[idn't] know to whom I was speaking ... Besides, I feel more comfortable [with] a person to person communication. Furthermore, the telephone volume is too high and everyone is listening to your communication.

(Compl. 1.2 at 19.) Francois's May 6, 2015 treatment notes, which are annexed to the Complaint, state that Plaintiff told her that he "speak[s] English but [is] more comfortable talking about [his] feelings in Spanish." (Compl. 1.3 at 19.) Francois's May 29, 2015

treatment notes reflect that Plaintiff stated that he didn't "like the [telephone] translation service because [he] felt that they didn't understand what [he] was saying to them or explain it correctly ... [He] had two workers before who spoke to [him] in Spanish." (*Id.* 1.3 at 5.) In Plaintiff's appeal of the response to his mental health services Complaint, Plaintiff writes that "there isn't anyone that speaks Spanish and I can communicate better in Spanish." (*Id.* 1.2 at 21.) He asserts that he was required to use an interpreter who "was not a translator in the field of mental health" and that the telephone interpreter service was merely a "time and cost saving devi[c]e." (Compl. at 20.)

### FAILURE TO STATE A CLAIM

Liberally construing the Complaint, Plaintiff asserts three claims against both the City of New York and the individual defendants, in their personal and official capacities. First, Plaintiff contends that he contracted TB and Hepatitis A because of the conditions of his confinement in DOC custody. Second, Plaintiff asserts that Defendants were deliberately indifferent to his serious medical needs in their treatment of these medical conditions.[5] Third, Plaintiff contends that for his mental health treatment Defendants provided only an interpreter by telephone rather than a Spanish-speaking mental health clinician, in violation of his rights under the Fourteenth Amendment and the Americans with Disabilities Act (ADA). Plaintiff also asserts a claim against the individual defendants under 42 U.S.C. § 1985 for conspiring to violate his civil rights.

### A. Conditions of Confinement: Tuberculosis

**\*5** According to public records, Plaintiff entered New York State DOCCS custody on September 8, 2015, to serve a sentence of ten years' incarceration.[6] The claims in Plaintiff's Complaint arose at the New York City DOC between July 2013 and August 2015, and the Court thus assumes for purposes of this motion that Plaintiff was a pretrial detainee for most or all of the events giving rise to his claims. As a pretrial detainee, Plaintiff's claims regarding the conditions of his confinement arise under the Due Process Clause of the Fourteenth Amendment.

To plead a Fourteenth Amendment claim for deliberate indifference to unconstitutional conditions of

confinement, a pretrial detainee must allege that: (1) "the challenged conditions were sufficiently serious to constitute an objective deprivation of the right to due process"; and (2) the defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell v. Pineiro*, No. 15-2870, 2017 WL 676521, at \*9, 14 (2d Cir. Feb. 21, 2017) (relying on *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), and overruling *Caiozzo v. Koreman*, 581 F.3d 63, 70 (2d Cir. 2009), to the extent that *Caiozzo* determined that the standard for deliberate indifference is the same under the Fourteenth Amendment as it is. under the Eighth Amendment).[7]

### 1. Objectively Serious Risk of Harm

The Court therefore first considers whether Plaintiff adequately pleads that the conditions of his confinement in DOC custody "were sufficiently serious to constitute an objective deprivation." *Darnell*, 2017 WL 676521, at \*9. Courts must analyze challenged conditions of confinement on a case-by-case basis. *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015) (holding that there is no "bright-line durational requirement" or "minimum level of grotesquerie required" for a conditions-of-confinement claim). Moreover, some conditions may rise to the level of a constitutional violation "in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Wilson v. Seller*, 501 U.S. 294, 304 (1994); *Darnell,* 2017 WL 676521, at \* 11 (relying on *Wilson*, 501 U.S. at 304). For example, an overcrowded cell may exacerbate unsanitary conditions and infestation may compound inadequate nutrition. *Darnell*, 2017 WL 676521, at \* 10; *see also Willey*, 801 F.3d at 55 (holding that poor air circulation and being naked exacerbated unsanitary conditions in feces-smeared cell); *Wilson*, 501 U.S. at 304 (1994) (noting synergy between cold temperatures and failure to provide blankets).

**\*6** Here, Plaintiff alleges that the DOC housed him with at least three different inmates with active tuberculosis in a location with "poor air ventilation." (Compl. at 26.) Moreover, he remained with TB-infected inmates through three moves to different areas or housing facilities

—notwithstanding that the inmates were retested and continued to test TB-positive while he tested TB-negative. (*Id.* at 24-25.) Although the dates are not entirely clear, Plaintiff appears to allege that he remained housed with inmates with active TB for approximately 21 months—from one month after his intake in July 2013 until May 2015, when he tested positive for TB for the first time.

In their moving papers, Defendants have not argued that housing TB-negative detainees together with inmates with active TB does not put detainees at serious risk of harm. Indeed, Defendants describe the City as having a policy of "separating inmates with tuberculosis from inmates without tuberculosis." (Def. Mem. (ECF No. 40) at 28.) Courts analyzing prison policies regarding TB have cited to evidence explaining that TB "exists in both dormant and active stages. During the dormant stage, the individual is not infectious and exhibits no symptoms.... If the infection becomes active and established in the lungs, however, the individual becomes infectious." *DeGidio v. Pung*, 920 F.2d 525, 527-28 (8th Cir. 1990) ("Tuberculosis can spread to other individuals who share air for prolonged periods with an individual infected with an active case of pulmonary tuberculosis"); *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996) (noting that "plaintiff does not have active TB and is therefore not contagious"). "Active cases of tuberculosis are treated with INH and other antibiotics and must be isolated until no longer infectious—generally one to two weeks after treatment begins." *DeGidio*, 920 F.2d at 527. Plaintiff's allegation that during his pretrial detention, the DOC housed him with inmates with active TB who were not taking medication suffices at the pleading stage to allege that he faced an objectively serious risk of harm, that is, of contracting TB.

## 2. Deliberate Indifference of Individual Defendants

Defendants—relying on *Caiozzo* for the proposition that the standards that apply to a convicted prisoner's Eighth Amendment claim also apply to a pretrial detainee's Fourteenth Amendment claim—contend that Plaintiff has failed to plead the mental element of a deliberate indifference claim. (Def. Mem. at 9-10.) After Defendants filed their motion to dismiss, however, the Second Circuit explicitly overruled this aspect of *Caiozzo*, holding that pretrial detainees asserting deliberate indifference claims need not plead or prove that an individual defendant

actually drew an inference that there was a serious risk of harm to the plaintiff. *Darnell*, 2017 WL 676521, at *14. For a pretrial detainee's deliberate indifference claim under the Due Process Clause, the "mental element" or *"mens rea"* prong is instead defined objectively: "[T]he Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." *Id.*[8]

Defendants characterize Plaintiff's placement with inmates who tested positive for TB as a "mistake" that would at most support an inference of negligence. (Def. Mem. at 20.) Even after *Darnell*, a pretrial detainee must plead that the "reckless or intentional action (or inaction) required to sustain a § 1983 deliberate indifference claim [is] the product of a voluntary act (or omission)." *Darnell*, 2017 WL 676521 at *15 n.16 (holding that "deliberate" is defined to mean acts that are "voluntary, not accidental"); *Castro*, 833 F.3d at 1070 (a pretrial detainee must show that the "defendant made an intentional decision"). Plaintiff alleges that inmates in his cell-block were repeatedly retested for TB, yet at least three times the DOC moved TB-positive and TB-negative inmates to be housed together. Allegations regarding these repeated decisions plausibly allege action that is more than accidental or negligent.

**\*7** Defendants also argue that Plaintiff does not state a claim against individual defendants because he fails to plead "which official placed him in inappropriate housing." (Def. Mem. at 21.) A § 1983 plaintiff must allege facts showing what each individual defendant personally did or failed to do that violated his rights. *See Spavone v. N. Y. State Dep't of Corr. Serv.*, 719 F.3d 127, 135 (2d Cir. 2013). Plaintiff alleges generally that "medical staff did not do their job by mixing healthy inmates together with the infected inmates and exposing [them to] that easily contagious disease (T.B.)." (*Id.* at 26.) Plaintiff names as defendants individual medical care providers involved in testing him and treating him but does not allege facts suggesting that any particular individual played a role in housing him with TB-active detainees. Because Plaintiff does not plead facts suggesting what any of the individual defendants personally did or failed to do that caused him to be housed with TB-active inmates, Plaintiff fails to state a claim against Defendants Achille Antoine; David Viera; Myriam Blain; Francisco Peguero; Vittorio Harris; Rony Joseph; Rosemary Nwanne; Brenda Harris, M.D., Frantz

Medard, M.D., or Ronald Schliftman, M.D., based on the conditions of Plaintiff's confinement.

Plaintiff also fails to state a claim against the supervisory defendants in their individual capacities, including Wardens and Commissioner Joseph Ponte, for personally causing his confinement with TB-active inmates. Plaintiff's vague and conclusory allegation that "wardens are liable because their administrative care requires them to have jails clean" (Compl. at 9) is insufficient to allow an inference that these defendants personally caused the violation of his rights. *Iqbal,* 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*"). He therefore fails to state a personal capacity claim against any of the Wardens or the DOC Commissioner arising from his infection with TB.

Any claim against the supervisory defendants in their official capacities is redundant of Plaintiff's claims against the City of New York. *See Castanza v. Town of Brookhaven,* 700 F. Supp. 2d 277, 284 (E.D.N.Y. 2010) ("Based upon the understanding that it is duplicative to name both a government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources."); *Emma v. Schenectady City Sch. Dist.,* 28 F. Supp. 2d 711, 725 (N.D.N.Y. 1998) ("[D]istrict courts have dismissed official-capacity claims against individuals as redundant or unnecessary where *Monell* claims were also asserted against the entity.").

Defendant's motion to dismiss Plaintiff's conditions-of-confinement claims against these supervisory defendants is granted.

### 3. City of New York

Defendants argue that Plaintiff has failed to plead that the City of New York, through its own customs or policies, violated his rights. "[M]unicipalities may be held liable under § 1983 only for acts for which the municipality itself is actually responsible.' " *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480 (1986)). A municipality may be liable under § 1983 based on: (1)

an officially promulgated policy sanctioned or ordered by the municipality, *see Pembaur,* 475 U.S. at 480; (2) a pervasive custom or practice of which the municipality is or should be aware, *see Praprotnik,* 485 U.S. 112, 130 (1988); *Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985); (3) a single act by a municipal employee who has final policymaking authority with respect to the area in question, *see McMillian v. Monroe Cnty.,* 520 U.S. 781 (1997); or (4) the municipality's failure to train its employees, where this rises to the level of deliberate indifference to the constitutional rights of others, *see City of Canton v. Harris,* 489 U.S. 378, 385 (1989).

Plaintiff's TB-related claim appears to rely on three theories of liability: the City of New York failed to train its employees, failed to supervise its employees, and has sanctioned unconstitutional customs or practices. To support a claim that a municipality's failure to train or supervise amounted to deliberate indifference, a plaintiff must show: "(1) that 'a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation'; (2) that 'the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation'; and (3) that 'the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights.' " *Nicholson v. Scoppetta,* 344 F.3d 154, 166-67 (2d Cir. 2003) (quoting *Walker v. City of New York,* 974 F.2d 293, 297-98 (2d Cir. 1992)). It will *not* "suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury." *City of Canton,* 489 U.S. 378 at 391. Instead, Plaintiff must plead facts suggesting "a likelihood that the failure to train or supervise will result in the officer making the wrong decision." *Walker*, 914 F.2d at 299.

**\*8** Plaintiff alleges that wardens of MDC, BKDC, NIC, and GMDC are liable for failing to have "properly trained and supervised staff." (Compl. at 9.) He states that if they "had done their supervising work, [he] would not have been injured." (*Id.*) Such conclusory assertions, with no supporting facts about the alleged deficiencies in the training program or supervision, are insufficient to state a deliberate indifference claim under a failure-to-train or failure-to-supervise theory. Bare allegations that more (or better) training could have avoided plaintiff's injury are

precisely the type of allegations that the Supreme Court has deemed insufficient. *See City of* Canton, 489 U.S. 378 at 391.

The Court next considers whether Plaintiff adequately alleges that the City has a *de facto* custom or practice that is actionable under § 1983. A plaintiff may be able to plead and prove "the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.' " *Praotnik,* 485 U.S. at 127 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167-168 (1970)). The policy or custom requirement "is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir. 2007) (relying on *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 125 (2d Cir. 2004)).

Defendants contend that the City cannot be liable for housing Plaintiff with inmates with active TB because Plaintiff's Complaint "can be interpreted as alleging that the City failed to follow its policy of separating inmates with tuberculosis from inmates without tuberculosis" and that "the City made a mistake when they improperly housed him with other inmates who had tested positive for tuberculosis." (Def. Mem. at 21.) But interpreting the Complaint in this manner would be inconsistent with the Court's duty on a motion to dismiss to construe the facts in the light most favorable to the plaintiff. *Chavis,* 618 F.3d at 170. Moreover, while it is true that a plaintiff cannot show that the City has a custom or practice based on a single incident, a "series of decisions by a subordinate official" may "manifest[ ] a 'custom or usage' of which the supervisor must have been aware." *Praotnik,* 485 U.S. at 130. Thus, a plaintiff may state a claim of municipal liability where the plaintiff alleges facts sufficient to suggest that defendants' noncompliance with a policy is widespread and therefore "that a municipality's *actual* policies were different from the ones that had been announced." *Praotnik,* 485 U.S. at 131 (Brennan, J., concurring) (emphasis added); *Davis v. City of N.Y.,* No. 86-CV-6345 (SWK), 1990 WL 165763, at *13 (S.D.N.Y. Oct. 22, 1990) ("[W]ide-spread refusals to comply with the City's ... policies might tend to demonstrate either a municipal custom or that a municipality's actual policies differ from those it has promulgated.").

Here, Plaintiff alleges that the "New York City Jails are infested with contagious diseases," that Defendants "do not follow the New York City Health Code [or] the New York State Sanitary Code," and that he is "yet another victim." (Compl. at 8.) He alleges that the DOC continued to re-test detainees in his cell block for TB, finding that two or three inmates had active TB and finding him TB-negative, yet on three different occasions when they were moved, decided to continue to house them together. (*Id.* at 25.) He also alleges that these prisoners with active TB declined treatment (*id.*), which suggests that they may have been contagious.

**\*9** Plaintiff's allegations, that Defendants decided each time that he was moved to continue to house detainees with active TB in his cell block after re-testing them all for TB, suffice at this stage to plead a "series of decisions" of which a supervisor must have been aware, *Praotnik,* 485 U.S. at 130, or a widespread pattern or custom. *Compare Davis v. City of N.Y.,* 228 F. Supp. 2d 327, 346 (S.D.N.Y 2002) (holding that the evidence did not support jury's verdict because "two incidents of unconstitutional conduct by low-level employees in a city agency with over 35,000 employees can never provide a reasonable basis for finding a widespread or well-settled custom"), *aff'd,* 75 Fed.Appx. 827 (2d Cir. 2003), *with Ferrari v. City of Suffolk,* 790 F. Supp. 2d 34, 46 (E.D.N.Y. 2011) ("Three instances (including Plaintiff's own claim) might not suffice to overcome summary judgment. But [on a 12(b)(6) motion], they do permit a plausible inference of a widespread practice or informal custom"). Defendants' motion to dismiss Plaintiff's claim that the City of New York violated Plaintiff's rights under the Due Process Clause by repeatedly deciding to continue housing him with inmates with active-TB is denied.

### B. Conditions of Confinement: Hepatitis A

To state a claim of unconstitutional conditions of confinement, a plaintiff must allege facts sufficient to suggest "a causal relation between the harm [he] suffered and the defendant's action or inaction." *Barnes v. Anderson,* 202 F.3d 150, 158 (2d Cir. 1999); *Castro,* 833 F.3d at 1070 (a pretrial detainee must plead, among other things, that "the defendant caused the plaintiff's injuries").

Here, Plaintiff fails to plead facts showing that any action or inaction on the part of Defendants caused him to contract Hepatitis A. *See, e.g., Mabry v. N.Y. City Dep't of*

*Corr.,* 465 Fed.Appx. 31, 32 (2d Cir. 2012). Plaintiff's bare allegations that the jail is not "clean" (Compl. at 9), or that Defendants did not take unspecified "precautions" (*id.* at 20) are insufficient to state a claim that any action or omission on the part of the City of New York or any individual Defendant caused his infection with Hepatitis A. In contrast to Plaintiff's claims that the City of New York caused his TB infection by continuing to house him with contagious inmates, Plaintiff has not alleged that Defendants made any departure from protocol that resulted in his Hepatitis A infection. The Court therefore grants Defendants' motion to dismiss Plaintiff's claims that Defendants are liable for his infection with Hepatitis A.

## C. Medical Care Claims

### 1. Medication and Testing Delays

Plaintiff's allegations regarding his medical care are contradictory. He alleges both that Defendants were "not providing [him] with medical care once exposed to T.B" (Compl. at 16), and that he was "forced into direct observed therapy" and treated with various antituberculosis medications (*id.* at 13), in other words, that he was compelled to accept medication.

For pretrial detainees, the standards articulated in *Darnell* apply to *all types* of deliberate indifference claims, including claims for deliberate indifference to serious medical needs. *Darnell,* 2017 WL 676521, at *12 n.9 ("[D]eliberate indifference means the same thing for each type of claim under the Fourteenth Amendment."); *see also Castro v. County of Los Angeles,* 833 F.3d 1060, 1070 (9th Cir. 2016) (*en banc*) (overruling *Clouthier v. County of Contra Costa,* 591 F.3d 1232 (9th Cir. 2010), which held that a subjective test applied to due process claims for deliberate indifference to serious medical needs).

If a complaint alleges that defendants provided medical treatment, but the treatment was inadequate, the seriousness inquiry focuses on the alleged inadequacy. *See Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006). When the basis for a deliberate indifference claim is "a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition*

alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious.' " *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir. 2003).

**\*10** With respect to his treatment for TB, Plaintiff alleges that defendants caused him to miss doses of TB medication and failed to test him monthly for liver functioning. He annexes to his Complaint grievances stating that medical staff failed to provide Plaintiff his medication on June 4, 2015, June 29, 2015, and July 2, 2015. (Id. 1-1 at 8.) Plaintiff wrote a grievance stating that "since I was diagnosed with TB, I have not received adequate care." (*Id.*) In another grievance, Plaintiff stated that on July 27, 2015, he was not escorted to the location where he could receive his medication. (*Id.* 1-1 at 9.) Although TB is undoubtedly a serious medical condition, Plaintiff's allegations that he missed doses of medication on these few occasions are not objectively sufficiently serious to rise to the level of a constitutional violation.

Plaintiff also wrote in a grievance that medical personnel did not test his liver functioning each month after he tested TB-positive in May 2015. (*Id.* 1-1 at 16). He annexes to the Complaint medical records reflecting "liver profile" tests on May 19, 2015, and June 1, 2015. (*Id.* 1-1 at 32-33.) Notes from his June 10, 2015 appointment with Defendant Rony Joseph, P.A., state: "Liver function is normal. We continue to follow up liver function." (*Id.* at 21.) On August 5, 2015, Plaintiff filed a Complaint asserting, among other things, that "Corizon medical didn't call [him] for [his] blood test," which he was supposed to have on the first day of every month. (*Id.* 1-1 at 9.) The New York State DOCCS took custody of Plaintiff on September 8, 2015. The Court liberally construes Plaintiff's Complaint as asserting that medical staff failed to conduct liver tests in July and August 2015, after his normal liver tests at the end of June 2015. Without more, such allegations of a limited delay or interruption in treatment are insufficient to plead an objectively serious risk to Plaintiff's health rising to the level of a constitutional claim.

Plaintiff also alleges that DOC medical personnel informed him that no medication or treatment was necessary to treat the discovery of Hepatitis A antibodies in his blood. (Compl. 1.2 at 11.) Plaintiff has not alleged that doctors withheld some treatment that was available to him for Hepatitis A or that was medically necessary. He simply alleges that doctors informed him

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

that no medication or treatment was indicated for his condition. (*Id.*) Without further allegations suggesting that the treating physicians' proposed course of action posed a risk of harm to him that was in "objective terms, sufficiently serious," *Smith,* 316 F.3d at 185, Plaintiff fails to state a deliberate indifference claim based on the lack of medication or other active treatment for Hepatitis A. Defendants' motion to dismiss Plaintiff's claims under § 1983 based on a failure to provide adequate medical care is granted.

### 2. Compelled Medication

"Although the right of a prisoner to be free from unwanted medical treatment is protected under the Fourteenth Amendment, there are instances where a state's interest in providing a safe and secure prison environment outweighs the liberty interests of an individual." *Brown v. Ionescu,* No. 02-CV-1218 (LMM), 2004 WL 2101962, at *4 (S.D.N.Y. Sept. 21, 2004). Cases that have balanced these interests in favor of the government include instances where an inmate's refusal of treatment could impact the health of other inmates and prison personnel. *Brown,* 2004 WL 2101962, at *4. Thus, in *McCormick v. Stalder,* the Court held that a prison could, consistent with the Constitution, require an inmate who had tested positive for TB to be medicated as part of the treatment of his condition. 105 F.3d 1059, 1061-62 (5th Cir. 1997) ("In light of the contagious nature of TB, the prison had a legitimate interest in forcibly treating the prisoner to prevent the spread of an infectious disease for the benefit of both the prisoner himself as well as other prisoners and staff."); *see also Hasenmeier-McCarthy v. Rose,* 986 F. Supp. 464, 468 (S.D. Ohio 1998) (holding that "the critical need of the defendants to detect, control, and treat a highly contagious disease more than satisfies their burden under *Turner v. Safley*").

**\*11** Plaintiff does not specifically allege that Defendants compelled him to accept medical treatment, whether for latent or active tuberculosis. Plaintiff alleges that he was "forced into direct observed therapy (DOT) and poisoned with variants of Isoniazid, rifampin, pyrazinamide." (Compl. at 13.) But he also alleges that Defendant Antoine Achille recommended, rather than required, medication for TB: Achille "examine[d] [Plaintiff's] blood [and] determine[d that Plaintiff] was negative for [active] tuberculosis and recommended [that

he] be put on tuberculosis medication." (*Id.* at 10.) Plaintiff was also aware that some inmates had declined to take medication and does not suggest that this option was unavailable to him. (*Id.* at 25 ("Mr. Ramirez and Mr. Belmejo ... refused to take the treatment.").) Moreover, although Plaintiff alleges that he suffered some side effects from the medication, he nowhere suggests that he informed any Defendant of such side effects and was nevertheless required to continue with medications that caused the side effects.

Numerous courts, applying *Turner v. Safley,* have concluded that in some instances, the critical need to detect, control, and treat a highly contagious disease can justify an infringement on any constitutional right that a prisoner may have to refuse medication.[9] *See Brown,* 2004 WL 2101962; *McCormick,* 105 F.3d at 1061-62; *Hasenmeier-McCarthy,* 986 F. Supp. at 468. Indeed, Plaintiff himself argues that the DOC should "categorize the inmates according to whatever disease they were found to have ... [and] should make them take their medications or treatment constructively." (Compl. at 27.) Plaintiff's inconsistent and conflicting allegations are insufficient to state a claim that he has suffered any violation of his constitutional rights in connection with the TB medication that he received at DOC.

### D. Mental Health Treatment

Plaintiff alleges that he suffers from "stress, mental anguish, anxiety, mood disorder, and depression," as well as post-traumatic stress disorder attributable at least in part to his work on the September 11, 2001 World Trade Center site. (*Id.* at 15.) While in DOC custody, Plaintiff initially had mental health treatment with clinicians who spoke Spanish, but in May 2015, at the NIC, there were no Spanish-speaking clinicians. (*Id.* 1-3 at 7.) Plaintiff's allegation that the DOC is required to provide bilingual mental health counselors can be construed as either a claim that (1) the DOC was deliberately indifferent to his serious medical needs by providing constitutionally inadequate care; or (2) violated a right to privacy because medical information was conveyed to an interpreter outside the relationship between the medical provider and the patient. Plaintiff fails to adequately state a claim under either theory.

Case 1:17-cv-00716-GTS-TWD   Document 4   Filed 07/25/17   Page 55 of 74

## 1. Class Action

As an initial matter, Plaintiff indicates that he seeks to assert this claim regarding bilingual mental health care on behalf of similarly-situated inmates. He argues that because "this issue affects thousands of Hispanics, Plaintiff is entitled to class-action injunctive relief." (*Id.* at 20.) *A pro se* prisoner cannot prosecute a class action. *Rodriguez v. Eastman Kodak Co.,* 88 Fed.Appx. 470, 471 (2d Cir. 2004) ("[I]t is well established that *a pro se* class representative cannot adequately represent the interests of other class members.") (internal quotation marks omitted); *see also Iannaccone v. Law,* 142 F.3d 553, 558 (2d Cir. 1998). The Court therefore denies Plaintiff's request that he proceed as representative of a class.

## 2. Deliberate Indifference to Mental Health Needs

"[P]sychiatric or mental health care is an integral part of medical care," and prison authorities must provide a prisoner with "reasonably necessary medical care (including psychiatric or mental health care) which would be available to him or her if not incarcerated." *Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir. 1989); *Smith v. Grefinger,* 208 F.3d 203 (2d Cir. 2000) ("[P]rison officials must provide inmates with "reasonably necessary medical care.").

**\*12** Here, Plaintiff fails to allege that he suffered an interruption of mental health services that created an objectively serious risk of harm. As set forth previously, courts must "focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious.' " *Smith,* 316 F.3d at 185. The question is not whether Plaintiff's underlying mental health issues were serious but rather whether any interruption in care caused by the absence of Spanish-speaking clinicians posed a serious risk.

Plaintiff alleges that in May 2015, at the NIC, the "mental health person did not speak Spanish so she made a [telephone] call, [and he] spoke to someone in Spanish but it wasn't satisfactory to [him] because [he] d[idn't] know to whom [he] was speaking," and he feels "more comfortable [with] a person to person communication." (*Id.* 1-2 at

19.) [10] It thus appears from Plaintiff's Complaint and the documents that he annexes to it that no Spanish-speaking clinician was available to him but that an interpreter was available to him by telephone. (Compl. 1-3 at 7.)

The Court therefore understands Plaintiff to be alleging not that defendants denied him *any* mental health treatment, but rather that during this period, the only mental health treatment available to him was through a non-Spanish-speaking clinician assisted by an interpreter by phone. The Second Circuit has not specifically addressed whether inmates enjoy a constitutional right to medically-qualified interpreters.

At least one district court in this Circuit recognized that an interpreter may be necessary for "instances of medical care in which communication between the patient and medical personnel are essential to the efficacy of the treatment in question." *Clarkson v. Coughlin,* 898 F. Supp. 1019, 1049 (S.D.N.Y. 1995) (holding that disabled prisoners were entitled to an American Sign Language interpreter). The district court in *Clarkson* reasoned that an interpreter was necessary to obtain informed consent and was a corollary to the significant liberty interest in avoiding the unwanted administration of medical treatment. The district court noted that several class members had "experienced improper and possibly harmful treatment through the provision of medical treatment in the absence of qualified interpreters." *Id.* at 1049 ("Plaintiffs' protected liberty interest is implicated by Defendants' failure to provide the necessary information through a qualified interpreter even though the plaintiff in question may have 'voluntarily' ingested the proffered medication."); *see also Morales v. Fischer,* 46 F. Supp. 3d 239, 253 (W.D.N.Y. 2014) (concluding that even if DOCCS had failed to provide a Spanish interpreter for one medical appointment, this did not violate Plaintiff's Eighth Amendment rights where "there is nothing to suggest—and Plaintiff does not assert—that he was overall unable to effectively express his concerns in that treatment session").

Here, Plaintiff has not alleged that his mental health session with social worker Anne Francois implicates any interest in consent to particular medical treatment or even that he cannot speak English. Rather, Plaintiff alleges that he was "more comfortable" speaking in Spanish about his feelings. (Compl. 1.3 at 19; Compl. 1.2 at 21). The reasoning in *Clarkson* therefore is inapposite here. Plaintiff's allegations that Defendants provided only a

telephone interpreter for his mental health appointment with a social worker thus do not show that he faced an objectively serious risk of harm. Plaintiff therefore fails to state a claim that Defendants were deliberately indifferent to his serious mental health needs.

### 3. Confidentiality of Medical Information

**\*13** Plaintiff also fails to adequately plead that Defendants violated his right to privacy in his medical information. The Constitution does not provide prisoners with an unqualified right to complete confidentiality of medical records. *Cortes,* 114 F. Supp. 2d at 185. The Second Circuit has recognized that prisoners possess a right to maintain the confidentiality of certain previously undisclosed medical information, particularly where "disclosure [to other inmates] might lead to inmate-on-inmate violence. *Powell v. Schriver,* 175 F.3d 107, 112 (2d Cir. 1999) (recognizing a right to avoid disclosure of inmate's status as transsexual); *Doe v. City of New York,* 15 F.3d 264 (2d Cir. 2004) ("Individuals who are infected with the HIV virus clearly possess a constitutional right to privacy regarding their condition."). By contrast, "innocuous concerns" such as complaints of back and leg pain, "do not compel the same heightened confidentiality as information concerning an inmate's HIV positive status or transsexualism." *Cortes,* 114 F. Supp. 2d at 185. Even where a prisoner has some rights to medical confidentiality, prison officials can impinge on that right "to the extent that their actions are reasonably related to legitimate penological interests." *Powell,* 175 F.3d at 112.

In *Cortes,* where the inmate had "the luxury of determining whether he wanted a particular inmate or even a noninmate [staff counselor] to serve as his interpreter," the Court concluded that medical personnel had taken "reasonable steps to allow plaintiff to have the services of a translator while maintaining the confidentiality of his medical information." *Id.* at 186. Other district courts have likewise rejected privacy claims, in some cases even where inmates were used as translators. *See Franklin v. District of Columbia,* 163 F.3d 625, 638-39 (D.C. Cir. 1998) ("[P]risoners with limited proficiency in English do not have a privacy right, derived from the Constitution, to force the District to hire bilingual medical personnel so that the prisoners may communicate their medical information only to such employees.").

Here, using the telephone interpreter service for Plaintiff's meeting with a social worker for his post-traumatic stress disorder was a reasonable effort to allow plaintiff to have the services of an interpreter while maintaining the confidentiality of his medical information. He fails to plead facts showing that having only a telephone interpreter service impinged on any right to the confidentiality of sensitive medical information. Therefore, the Court grants Defendants' motion to dismiss Plaintiff's § 1983 claims arising from his mental health care in DOC custody.

### E. Americans with Disabilities Act

To state a claim under Title II of the Americans with Disabilities Act (ADA), a prisoner must show: "(1) he or she is a 'qualified individual with a disability'; (2) he or she is being excluded from participation in, or being denied the benefits of some service, program, or activity by reason of his or her disability; and (3) the entity [that] provides the service, program, or activity is a public entity." *Clarkson,* 898 F. Supp. at 1037. Plaintiff alleges that his "mental issue" was a recognized disability and that Defendants "took no steps to protect [his] rights under the ADA." (Compl. at 21.) As Defendants point out, Plaintiff's allegations do not suggest that Defendants denied him participation in any program or service *because of* his mental health issues or any other disability. (Def. Mem. at 3.) Plaintiff's allegation that Defendants denied him mental health care with a Spanish-speaking counselor does not suggest that they denied him mental health care by reason of his disability. Plaintiff's allegations thus fail to state a claim under Title II of the ADA. Defendants' motion to dismiss Plaintiff's ADA claim is granted.

### F. Conspiracy under 42 U.S.C. §§ 1983 and 1985(3)

A plaintiff asserting a conspiracy claim under § 1983 must allege "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999).

**\*14** In order to state a claim under § 1985(3), a plaintiff must allege facts that plausibly show that there exists: (1) a conspiracy (2) for the purpose of depriving the plaintiff of the equal protection of the laws, or the equal privileges or

Case 1:17-cv-00716-GTS-TWD    Document 4    Filed 07/25/17    Page 57 of 74

immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to his person or property, or a deprivation of his right or privilege as a citizen of the United States. *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir. 1999). "[T]he [§ 1985(3) ] conspiracy must also be motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Id.* (internal quotation marks and citation omitted). Vague and conclusory assertions of a conspiracy claim, either under § 1983 or under § 1985(3), will not suffice. *See, e.g., Webb v. Goord,* 340 F.3d 105, 110-11 (2d Cir. 2003); *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir. 1997).

Plaintiff alleges that unspecified Defendants are liable under § 1985 because they "transfer[red him], discontinued treatment, [and] ignore[d] it when [he] was positively diagnosed." (Compl. at 20.) He further asserts, without further factual elaboration, that "similarly situated inmates who spoke English were given medical care and not exposed to said diseases," (*id.* at 21), and that Defendants denied him medical care or exposed him to contagious diseases because he "was not of [defendants'] consanguinity and spoke only Spanish," (*id.* at 19). Plaintiff's allegations about a conspiracy are unsupported by any factual allegations and thus fail to state a claim on which relief can be granted. The Court therefore grants Defendants' motion to dismiss Plaintiff's claims of conspiracy under §§ 1983 and 1985(3).

## CONCLUSION

Defendants' motion to dismiss is DENIED as to Plaintiff's § 1983 due process claim against the City of New York for deliberate indifference to a risk of harm from the conditions of Plaintiff's confinement with TB-positive inmates. Defendants' motion to dismiss is GRANTED as to Plaintiff's remaining claims under §§ 1983, 1985, and the ADA.

The Clerk of the Court is instructed to close the motion at ECF No. 38.

SO ORDERED.

## All Citations

Slip Copy, 2017 WL 1535386

Footnotes

1    By order dated May 11, 2016, the Court granted Plaintiff's request to proceed *in forma pauperis.*

2    Plaintiff also named as Defendants John and Jane Doe nurses but no Doe defendants were ever identified, and Plaintiff never filed an amended complaint substituting true names.

3    The September 14, 2016 Motion to Dismiss was filed on behalf of the City Of New York, Archille Antione, Clayton Augusnus, Myriam Blain, Anne Francois, Brenda Harris, Vittorio Harris, Angelo Jamieson, Rony Joseph, Frantz Medard, Rose Mary Nwanne, Francisco Peguero, David Viera, Steven Wettenstein, and Monica Windley. On April 13, 2017, Defendant Ronald Schlifman filed a separate motion to dismiss on substantially similar grounds. (ECF No. 59.)

4    Plaintiff also alleges that medical personnel "administer[ed] tuberculosis medication when [he] did not have tuberculosis and when [he] acquired it, discontinued [the medication] and did not provide alternative treatment." (Compl. at 10.) It is unclear if Plaintiff means that Defendants: (1) administered medication when he did not have *active* TB and failed to administer medication later when he had active TB; or (2) administered medication when he tested negative for TB and failed to administer medication later when he tested positive. As Defendants point out, there is no suggestion in the medical records that Plaintiff annexes to his Complaint that medical personnel administered TB medication before he tested positive for latent TB. (Def. Mem. at 13.) The Court therefore assumes for purpose of this motion that Plaintiff is alleging the former.

5    Plaintiff also mentions in passing that Defendant Lynn Devivo "determine[d] that [he] had 9-11-2001 lung problems and did not treat it." (Compl. at 10.) He also mentions respiratory issues in a grievance. (Compl. 1.2 at 25) ("I was being treated for my lung disease.").

6    http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ3/WINQ130. "Courts in this district have taken judicial notice of information obtained from online inmate tracking services." *Tavares v. New York City Health & Hosps. Corp.,* No. 13-CV-3148 (PKC) (MHD), 2015 WL 158863, at *3 (S.D.N.Y. Jan. 13, 2015) (citing *Tribble v. City of N.Y.* No. 10-CV-8697(JMF), 2013 WL69229, at *1 n. 1 (S.D.N.Y. Jan. 3, 2013), and *Williams v. City of N.Y.,* No. 07-CV-3764 (RJS), 2008 WL 3247813, at *2 (S.D.N.Y. Aug. 7, 2008) (using DOCCS's tracking service)).

2017 WL 1535386

7    The Ninth Circuit recently held that in light of *Kingsley*, the elements of a pretrial detainee's deliberate indifference claim against an individual are: "(1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (2) Those conditions put the plaintiff at substantial risk of suffering serious harm; (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable [individual] in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (4) By not taking such measures, the defendant caused the plaintiff's injuries." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1070 (9th Cir. 2016) (*en banc*).

8    In contrast to a pretrial detainee, a convicted prisoner asserting claims under the Eighth Amendment must show that the defendant-official is both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [that he] also dr[e]w the inference." *See Farmer v. Brennan,* 511 U.S. 825, 836-37 (1994).

9    Plaintiff has not asserted any objection on religious grounds to the medication.

10    This letter indicates that it was written by "Joe Jimenez," for Plaintiff Segundo Narvaez. (Compl. 1-2 at 19.) Most or all of the other grievances and letters appear to have been written by Plaintiff himself in English.

---

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1432644
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Brian Avery SMITH, Plaintiff,

v.

William HOCHUL, Jr., et al., Defendants.

No. 13–CV–1106A.
|
Signed Feb. 23, 2015.
|
Filed March 26, 2015.

**Attorneys and Law Firms**

Brian Avery Smith, Youngstown, OH, pro se.

DECISION AND ORDER

MICHAEL A. TELESCA, District Judge.

### *INTRODUCTION*

**\*1** Plaintiff, Brian Avery Smith, a federal pre-trial currently charged with a number of criminal offenses under a Second Superseding Indictment filed in this Court, filed a complaint and application to proceed *in forma pauperis.* Upon granting of the application to proceed *in forma pauperis,* the Court screened the complaint, pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A, and dismissed a number of claims with prejudice, including but not limited to the claims against William Hochul, United States Attorney, Western District of New York, and Maura K. O'Donnell, Assistant United States Attorney, Western District of New York, and dismissed any remaining claims without prejudice and with leave to amend on the basis that the claims failed to state a claim upon which relief can be granted under 42 U.S.C. §§ 1983, 1985(3) and *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 398, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). (Docket No. 9, Decision and Order ("Decision and Order")).

Plaintiff has been charged in this Court with, *inter alia,* Bank Fraud, Wire Fraud and Identify Theft. (*United States v. Smith,* 13–CR–0084A, Docket No. 69, Second

Superseding Indictment.) His complaint alleged that following an investigation of the Federal Bureau of Investigation ("FBI"), the defendants, some of whom may have been acting under color of federal or state law and some who were private individuals, conspired to violate his civil rights in violation of 42 U.S.C. § 1983 and 1985(3). The Decision and Order summarized plaintiff's complaint, in part, as follows:

> [Plaintiff] allege[d] in wholly conclusory fashion that the FBI conducted an investigation of him that included a number of individuals, government agencies and private individuals, but the government has provided limited information as to its investigation and that '[t]he defendants conspired together to violate due process and other civil rights of the plaintiff and to charge him with a crime he did not commit and the defendants should have recognized he did not commit.' He allege[d] unspecified violations of the Fourth, Fifth, Sixth and Eighth Amendments to the United States Constitution.

Plaintiff alleged that as a result of defendants' actions he had been detained and suffered damage to his personal and business reputation, as well as emotional damages.

Upon review of the complaint, pursuant to 28 U.S.C. §§ 1915(e) (2)(B) and 1915A, the Court found that plaintiff's conspiracy claims under 42 U.S.C. §§ 1983 and 1985(3), brought against approximately 65 defendants, had to be dismissed because, in part, they were alleged in a wholly conclusory manner and failed to state an actionable claim of a conspiracy to violate plaintiff's constitutional rights. (Decision and Order, at 5–10.) The Court also found that any such conspiracy claims set forth against persons acting under color of federal law, including the United States Attorney for this District, Assistant United States Attorneys for both this District and the Eastern District of Missouri, FBI Agents, Federal Probation Officers and a Federal Public Defender, had to be construed as claims under *Bivens, supra.* As so construed, the *Bivens* conspiracy claims also were dismissed without prejudice for failure to state a claim. (Decision and Order, at 10–11.)

**\*2** The claims that were construed to be brought under *Bivens-viz.,* those against the United States Attorney for this District (Hochul), and Assistant United States Attorneys for this District (O'Donnell) and the Eastern District Missouri (Albus and Callahan)-were dismissed with prejudice under the doctrine of absolute prosecutorial immunity. *Id.,* at 11. The claims against

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

the Federal Probation Officers (Colley and Weeks), FBI Agents (Ramey, Cunningham, Petrelli, Donlan, Bifano and one unknown Agent) and three unknown United States Marshals were dismissed without prejudice for failure to state a claim upon which relief can be granted. *Id.,* at 11–14. The Court also noted that to the extent plaintiff may have been attempting to assert claims other than a conspiracy claim against these and other defendants-e.g., false arrest, malicious prosecution-and wished to re-assert such claims in an amended complaint, the amended complaint had to assert such claims in a factual, non-conclusory manner so that the Court and defendants, if required to answer the amended complaint, were on notice of what the claims were and the factual bases of the claims. *Id.,* at 14, n. 6, citing Fed.R.Civ.P. 8(a); *Simmons v. Abruzzo,* 49 F.3d 83, 86–87 (2d Cir.1995) (citations omitted).

Plaintiff has filed an amended complaint (Docket No. 10), and motions for reconsideration, to seal a document (motion for reconsideration) and for appointment of counsel (Docket No. 11–12). For the following reasons, the amended complaint is dismissed with prejudice, pursuant to 28 U.S.C. § § 1915(e)(2)(B)(ii) and 1915A, and plaintiff's motions for appointment of counsel, for reconsideration and to seal his motion for reconsideration are denied.

## DISCUSSION

### A. Amended Complaint

Plaintiff's amended complaint has trimmed significantly the number of defendants sued from 65 plus defendants to 14; but it asserts claims against a number of defendants whom the Court had dismissed previously with prejudice-Hochul, United States Attorney, WDNY, McDonnell, Assistant United States Attorney, WDNY, LoTempio, private counsel, and Sam Davis, private counsel (Docket No. 10, Third–Fourth, Eleventh Claims, at 12–13, 24–25). It also asserts claims against a number of "private," *i.e.,* non-government actors, individuals based solely on their testimony in the Grand Jury that led to the indictments and superseding indictments filed against plaintiff. *Id.,* Fifth–Eighth, and Tenth Claims, at 14–19, 23) and, therefore, as discussed below, the claims against these individuals must be dismissed because they are entitled to absolute immunity from suit. In effect, the Amended Complaint appears to have amended the conspiracy

claims to claims under 42 U.S.C. § 1983 and 1985(3)[1] against the private citizens sued herein based on their Grand Jury testimony. Each of plaintiff's claims are addressed separately below.

### B. Standard of Review

Section 1915(e)(2)(B) of 28 U.S.C. provides that the Court shall dismiss a case in which *in forma pauperis* status has been granted if the Court determines that the action (i) is frivolous or malicious; (ii) fails to state a claim upon which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. In addition, 28 U.S.C. § 1915A(a) requires the Court to conduct an initial screening of "a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" (*id.*), regardless of whether or not the inmate has sought *in forma pauperis* status under 28 U.S.C. § 1915.

**\*3** In evaluating the complaint, the Court must accept as true all of the factual allegations and must draw all inferences in plaintiff's favor. *See Larkin v. Savage,* 318 F.3d 138, 139 (2d Cir.2003) (per curiam); *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). Moreover, "a court is obliged to construe [*pro se* ] pleadings liberally, particularly when they allege civil rights violations." *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004); *and see Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). Nevertheless, even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon,* 360 F.3d 73 (2d Cir.2004). "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (internal quotation marks and citation omitted). The complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 663, 678 (2009). "A document filed *pro se* is to be liberally construed, ..., and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."

*Erickson,* 551 U.S. at 94 (internal quotation marks and citations omitted). "A pro se complaint should not [be] dismiss[ed] without [the Court's] granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010) (internal quotations and citation omitted).

### C. PLAINTIFF'S CLAIMS

1. *Claims Against Unknown Willoughby Hills Police Officer*

Plaintiff alleges that on September 30, 2011, he was pulled over by an Officer of the Willoughby Hills (Ohio) Police Department for what the Officer claimed was an unlawful lane change. (Amended Complaint, Section 5A., First Claim, at 8–9.) Plaintiff was detained in the Officer's patrol car while the "owner's car" was searched without consent or a warrant. Plaintiff claims he was further detained while a K–9 unit was called and searched the vehicle without consent or a warrant. After the search of the vehicle, the Officer confirmed that plaintiff was purchasing the vehicle and issued plaintiff a ticket for an improper lane change. Plaintiff alleges the search and seizure was a violation of the Fourth–Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. §§ 1983 and 1985(3).

Rule 20 of the Federal Rules of Civil Procedure permits joinder of defendants in action if "any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and [ ] any question of law or fact common to all defendants will arise in the action." Fed.R.Civ.P. 20(a)(2). In the event of misjoinder of parties, Rule 21 of the Federal Rules of Civil Procedure permits the Court to sever any claim against a party. *See* Fed.R.Civ.P. 21.

**\*4** In deciding whether to sever a claim, the Court should consider (1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims. *Morris v. Northrop Grumman Corp.,* 37 F.Supp.2d 556, 580 (E.D.N.Y.1999).

There can be no question that the claims against the Unknown Willoughby Police Officer that occurred in Ohio are separate and distinct from the claims involving the other defendants. The remaining factors also weigh in favor of severance of this claim. Accordingly, the Court finds that the claim against the Unknown Willoughby Hills Police Officer relating to a traffic stop in Ohio should be severed from the other claims alleged in the amended complaint and dismissed without prejudice. *See Deskovic v. City of Peekskill,* 673 F.Supp.2d 154, 159–60 (S.D.N.Y.2009) ("If a court concludes that defendants have been improperly joined under Rule 20, it has broad discretion under Rule 21 to sever parties or claims from the action."); Fed.R.Civ.P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party."); *New York v. Hen drickson Bros., Inc.,* 840 F.2d 1065, 1082 (2d Cir.1988) ("The decision whether to grant a severance motion is committed to the sound discretion of the trial court.").

The Court also notes that dismissal of this claim is appropriate because there are no allegations that would support a basis for finding that the Court has personal jurisdiction over the Unknown Willoughby Hills Police Officer. This Court must apply the law of New York-the state in which it sits-to determine if it has personal jurisdiction over this defendant. *See Bensuan Restaurant Corp. v. King,* 126 F.3d 25 27 (2d Cir.1997); *see also Omni Capital Int'l v. Rudolph Wolff & Co.,* 484 U.S. 97, 108 415, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987) (stating that in determining whether a federal district court has personal jurisdiction over a party in a federal question case, the law of the forum state applies unless the relevant statute(s) make specific provisions for service of process under the circumstances).

Under New York's long-arm statute, the Court has personal jurisdiction over a non-domicillairy if the defendant transacts business in New York or commits a tortious act within the state. N.Y.C.P.L.R. § 302(a). The basis of the claim against the Willoughby Hills Police Officer is that he pulled plaintiff over in Ohio based on a unlawful lane change. The defendant therefore did not commit any tortious act within the state nor did he transact any business within the state. The Court, therefore, would have no personal jurisdiction over this defendant.

*2. Claims Against Probation Officer and Supervisory Probation Officer*

**\*5** Plaintiff alleges that on February 24 and March 2, 2012, Melissa Colley, a United States Probation Officer, Western District of New York, filed a petition with the Court for both a summons and warrant, presumably for plaintiff's arrest, based on false allegations. He also alleges that the Supervising Probation Officer, Cleophus Weeks, approved the petition.[2] Plaintiff alleges that the petition led to his arrest and detention, presumably based on some violation of probation or supervised release. (Amended Complaint, Section 5A., Second Claim, at 10.) The amended complaint contains no further allegations against either Colley or Weeks.

The Court's initial Decision and Order noted that the allegations against Colley and Weeks were conclusory only and did not allege what actions these defendants took (or did not take). It also noted that whatever the actions were, "the[ ] actions could have been in [Colley's and Weeks's] roles as probations officers only and [as] 'arms of the court ... performing functions closely associated with the judicial process." (Docket No. 9, Decision and Order, at 12–13) (quoting *Dorman v. Higgins,* 821 F.2d 133, 137–38 (2d Cir.1987). If the actions taken were "closely associated with the judicial process," Colley and Weeks would be entitled to absolute quasi-judicial immunity. (*Id.* at 13.) The Court, however, provided plaintiff the opportunity to file an amended complaint and set forth the specific acts (or failures to act) which formed the basis of plaintiff's claims against them.

The allegations against Colley and Weeks appear to be based on the submission of a petition by Colley for a warrant for plaintiff's arrest based on a violation of the terms of a sentence of probation or the conditions of supervised release. In determining whether a government actor or official is entitled to absolute immunity, the courts take a a "functional approach ... which looks to the nature of the function performed, not the identity of the actor who performed it [.]" *Buckley v. Fitzsimmons,* 509 U.S. 259, 269, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993) (internal citations and quotation marks omitted). Generally, conduct "intimately associated with the judicial phase of the criminal process" is accorded absolute immunity. *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *see also Dorman,* 821 F.2d at

136 (federal probation officers accorded absolute judicial immunity when preparing pre-sentence reports because they are acting as "arms of the court.")

Absolute immunity, however, has not been extended to probation officers performing duties "functionally akin to the actions of a police officer who seeks an arrest warrant" or for those actions that are "more investigative than prosecutorial." *Pettus v. City of New York,* 2011 WL 4458963, at \*4–5 (E.D.N.Y.2011) (Report and Recommendation) (federal probation officer seeking an arrest warrant and cooperating in arrest by with state police officers not accorded absolute immunity) (citing *Scotto v. Almenas,* 143 F.3d 105, 112 13 (2d Cir.1998) (state parole officer who submitted a parole report not entitled to absolute immunity because function was more investigative, rather than prosecutorial)); *Wilson v. Kelkhoff,* 86 F.3d 1438, 1445–46 (7th Cir.1996) (state parole officer not entitled to absolute immunity for preparing a violation report recommending that plaintiffs supervised release be revoked); *Schiff v. Dorsey,* 877 F.Supp. 73, 79 n. 2 (D.Conn.1994) (conferring absolute immunity on federal probation officer for filing a petition for probation action, yet noting that had the officer sought an arrest warrant, the analysis might have been different). The Court need not decide, at this time, whether Colley and Weeks are entitled to absolute immunity because the allegations set forth in the amended complaint fail to state a claim upon which relief can be granted and must be dismissed.

**\*6** Construing plaintiff's claims liberally, as it must, *see Triestman v. Fed. Bur. of Prisons,* 470 F.3d 471, 474 (2d Cir.2006), the Court construes plaintiff's claims as alleging claims of false arrest and malicious prosecution based on Colley's filing of a petition with the Court for a warrant for his arrest based on some unknown probation or supervised release violation.[3] The false arrest claim fails to state a claim upon which relief can be granted because when an arrest occurs pursuant to a court-issued warrant, there can be no claim for false arrest. *See Williams v. Young,* 769 F.Supp.2d 594, 601 (S.D.N.Y.2011); *Jones v. Trump,* 971 F.Supp. 783, 788–89 (S.D.N.Y.1997) (citing *Singer v. Fulton County Sheriff,* 63 F.3d 110, 118–19 (2d Cir.1995)); *Coakley v. Jaffe,* 72 F.Supp.2d 362, 363–64 (S.D.N.Y.1999); *Little v. City of New York,* 487 F.Supp.2d 426, 439 (S.D.N.Y.2007).[4] "In such a circumstance, 'the plaintiff must rely on malicious prosecution,' as the proper cause of action." *Williams,* 769 F.Supp.2d at 602.

In order to state a claim of malicious prosecution under *Bivens,* plaintiff must show "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Murphy v. Lynn,* 118 F.3d 938, 947 (2d Cir.1997) (internal quotations and citations omitted). Again, plaintiff does not allege whether the violations proceedings terminated in his favor, but based on the allegation that the petition filed by Colley led to his "detention" the inescapable conclusion is that it did not. Moreover, there are no allegations of actual malice on the part of Colley in filing the petition. There are also no allegations that Weeks, other than in his role as supervisor, was personally involved in the alleged constitutional violations. *See Thomas v. Ashcroft,* 470 F.3d 491, 497 (2d Cir.2006) (citing *Wright v. Smith,* 21 F.3d 496, 501 (1994)); *see also Colon Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [5] Accordingly, plaintiff's amended complaint fails to state a claim upon which relief can be granted against Colley and Weeks and must be dismissed against them.

### 3. *Claims Against Plaintiff's Retained Criminal Defense Attorneys*

Plaintiff's claims against two of his former retained criminal defense attorneys,

Frank LoTempio, III, and Sam Davis (Amended Complaint, Third–Fourth Claims, at 12–13), were dismissed with prejudice previously on the basis that they were not persons acting under color of state or federal law and therefore could not be liable for any alleged constitutional violations under either 42 U.S.C. § 1983 or *Bivens.* (Docket No. 9, Decision and Order, at 11–12, n. 5.) Plaintiff's amended complaint again alleges that these defendants violated his constitutional rights under § 1983 or *Bivens* (Amended Complaint, at 12–13) and, as such, said allegations fail to state a claim. (*Id.*) The Court had also found that, to the extent, plaintiff was alleging that LoTempio and Davis had engaged in a conspiracy to violate his constitutional rights in violation of § § 1983 and 1985(3), said claims had to be dismissed without prejudice because the allegations were wholly conclusory and vague. (Decision and Order, at 11–12, n. 5.)

**\*7** To the extent plaintiff is requesting the Court to reconsider its prior Decision and Order dismissing the claims against these two defendants, it is denied.

### 4. *Claims Against Individual Defendants Based on their Grand Jury Testimony*

The next five of six claims set forth in the amended complaint (Fifth–Eight, and Tenth Claims, at 14–19, 23)-the claims that were pled in the complaint initially as a conspiracy to violate plaintiff's civil rights under 42 U.S.C. § § 1983 and 1985(3) among the "private" individuals and the "federal" defendants-are now pled as claims under § 1983 and 1985(3) against five individuals sued initially (Portis, Hennigan, T. Davis and J. and M. Burch) and one additional individual (Krollman). The claims are based on these individuals' testimony before the Grand Jury that indicted plaintiff. These claims must be dismissed with prejudice on the basis that individuals, including law enforcement officers, providing testimony before a grand jury are entitled to absolute immunity. *See Rehberg v. Paulk,* —— U.S. —— 132 S.Ct. 1497, 1506 (2012).

As recently summarized by the Second Circuit:

> In *Rehberg v. Paulk,* —— U.S. ——, ——, 132 S.Ct. 1497, 1506, 182 L.Ed.2d 593 (2012), the Supreme Court announced the bright line rule that a grand jury witness, including a law enforcement officer, "has absolute immunity from any § 1983 claim based on the witness' testimony," even if that testimony is perjurious. The *Rehberg* Court thereby expressly extended to grand jury witnesses, including police officers, the same immunity that had previously been enjoyed by witnesses at trial. *Id.* This holding was consistent with the understanding that, despite its broad terms, 42 U.S.C. § 1983 does not effect a radical departure from common law immunities. *Id.* at 1502.

*Coggins v. Buonara,* 776 F.3d 108, 2015 WL 148982, at \*3 (2d Cir. Jan.13, 2015) (citing *Pierson v. Ray,* 386 U.S. 547, 554–55, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967)). Accordingly, plaintiff's claims against defendants Portus, Hennigan, T. Davis, J. and M. Burch, and Krollman must be dismissed with prejudice.

### 5. *Claims Against FBI Agent Donlan*

Plaintiff alleges that FBI Agent Donlan provided false information in an application for a warrant and appeared

before the Grand Jury and provided false testimony. Plaintiff also alleges that Donlan participated in a conspiracy with some of the Grand Jury witnesses mentioned above when he obtained false statements from them and they perjured themselves in the Grand Jury. (Amended Complaint, Ninth Claim, at 20–21.)

To the extent the claims against Donlan are based on his Grand Jury testimony they are barred pursuant to the doctrine of absolute immunity. *Rehberg,* 132 U.S. at 1506. Like the claims against Probation Officers Colley and Weeks, plaintiffs claims that Donlan provided false information in a warrant application fail to set forth an actionable claim of either false arrest or malicious prosecution because (1) "when an arrest occurs pursuant to a court-issued warrant, there can be no claim for false arrest[,]" Discussion, Section 2, at 9, *supra* (citations omitted), and (2) the criminal proceedings have not terminated in plaintiff's favor and there are no allegations of actual malice on the part of Donlan, *id.,* at 9–10, *supra* (citations omitted). The conspiracy claims set forth in the amended complaint again are wholly conclusory and fail to state an actionable claim of a conspiracy against Donlan and the other individuals sued herein. (*See* Docket No. 9, Decision and Order, at 5–10, 13–14 (citations omitted) .)

### 6. *Claims Against United States Attorney and Assistant United States Attorney*

**\*8** Plaintiff's claims against the United States Attorney (Hochul) and Assistant United States Attorney (O'Donnell) (Amended Complaint, Eleventh Claims at 24), were dismissed with prejudice previously on the basis of absolute prosecutorial immunity. (Docket No. 9, Decision and Order, at 11.) Plaintiffs amended complaint again alleges that these defendants violated his constitutional rights under § 1983 (and *Bivens* ) and the Fourth–Sixth, Eighth and Fourteenth Amendments (Amended Complaint, at 12–13) and, as such, said claims must be dismissed because Hochul and O'Donnell are entitled to absolute immunity. To the extent plaintiff is requesting the Court to reconsider its prior Decision and Order dismissing the claims against these two defendants, it is denied.

### D. Appointment of Counsel

Plaintiff again seeks the appointment of counsel. (Docket Nos. 11–12.) Because the Court finds that the amended complaint must be dismissed this motion is moot. The Court notes, however, that it had denied a prior motion for counsel on the basis that a more fully developed record would be necessary before the Court could determine whether plaintiffs chances of success warranted the appointment of counsel. (Docket No. 9, Decision and Order, at 1, n. 1 (citing *Hendricks v. Coughlin,* 114 F.3d 390, 392 (2d Cir.1997) (when determining whether to appoint counsel, the Court must first look to the "likelihood of merit" of the underlying dispute)). Because the Court has determined that the amended complaint must be dismissed there is no basis upon which the Court could appoint counsel.

### E. Motion for Reconsideration

Plaintiff appears to seek reconsideration of the Court's prior Decision and Order which, as noted, dismissed certain claims in the complaint with prejudice and dismissed the remaining claims without prejudice and with leave to amend. The Court has reviewed plaintiff's motion and finds that it provides no basis for the Court to reconsider its prior Decision and Order.

Reconsideration of a prior decision is generally justified in any one of the following three circumstances: (1) an intervening change in controlling law; (2) new evidence; or (3) the need to correct a clear error of law or to prevent manifest injustice. *See Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992); *see also Amerisure Ins. Co. v. Laserage Tech. Corp.,* 1998 WL 310750, \*1 (W.D.N.Y. Feb.12, 1998) (citing *United States v. Adegbite,* 877 F.2d 174, 178 (2d Cir.1989)).

Motions for reconsideration are not, however, to be used as a means to reargue matters already disposed of by prior rulings or to put forward additional arguments that could have been raised before the decision. *See Duane v. Spaulding and Rogers Mfg. Inc.,* 1994 WL 494651, \*1 (N.D.N.Y. Aug.10, 1994). After all, a "motion for reconsideration is not a device intended to give an unhappy litigant one additional chance to sway the judge." *Nossek v. Bd. of Ed. of Duanesburg Cent. Sch. Dist.,* 1994 WL 688298, \*1 (N.D.N.Y. Nov.10, 1994). Plaintiff's motion is simply a means to reargue the Court's prior Decision and Order and provides no basis for the relief requested. Accordingly, plaintiff's motion for reconsideration is denied.

**F. Motion to Seal**

**\*9** Plaintiff appears to want the motion for reconsideration to be filed under seal because United States Attorney Hochul has "apparently ... taken exception to the filing of [the] complaint [and] as a result, [plaintiff] faces criminal charges for the pursuing [his] complaint...." (Docket No. 11, Notice of Motion, ¶ 6.) Plaintiff does not elaborate on what criminal charges or additional criminal charges he faces as a result of the filing of a complaint against Hochul and the dozens of others sued initially, nor does he provide any other basis for sealing the motion for reconsideration. The Court notes, however, that on August 6, 2014, a Second Superseding Indictment was filed against plaintiff which included charges of "Retaliating Against a Witness," in violation of 18 U.S.C. § 1513(e). (*United States v. Smith,* 13–CR–0084A(Sr), Docket No. 69, Second Superseding Indictment, Counts 69–71.) Even assuming these Counts are related directly to the filing of the complaint in this action, it provides no basis for sealing the motion for reconsideration. The basis of the new criminal charges is a matter best left for the criminal action. Accordingly, plaintiff's motion to seal the motion for reconsideration is denied.

### CONCLUSION

For the reasons discussed above, the amended complaint is dismissed with prejudice pursuant to 28 U.S.C. §§ 1915(e)(2)(B) (ii)-(iii) and 1915A, and plaintiffs motions for appointment of counsel, reconsideration and to seal motion for reconsideration are denied. Plaintiff is forewarned that his right to pursue further relief in federal court at public expense will be greatly curtailed if he has three actions or appeals dismissed under the provisions of 28 U.S.C. §§ 1915(e)(2)(B) and 1915A. *See* 28 U.S.C. § 1915(g).

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a) (3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

### ORDER

IT HEREBY IS ORDERED, that the amended complaint is dismissed with prejudice;

FURTHER, that plaintiff's motions for appointment of counsel (Docket No. 12), reconsideration and to seal motion for reconsideration (Docket No. 11) are denied.

FURTHER, that leave to appeal to the Court of Appeals as a poor person is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1432644

---

Footnotes

1   The Court notes that plaintiff appears to claim that the defendants violated a number of his constitutional rights under the Fourth–Sixth, Eighth and Fourteenth Amendments to the United States Constitution. "Section 1983 provides a private right of action against any person who, acting under color of *state* law, causes another person to be subjected to the deprivation of rights under the Constitution or federal law." *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) (citing 42 U.S.C. § 1983) (emphasis added). "To prevail on such a claim, section 1983 requires that the plaintiff prove, inter alia, that the defendant caused the deprivation of his or her rights." *Taylor v. Brentwood Union Free School Dist.,* 143 F.3d 679, 686 (2d Cir.1998) (emphasis added) (citation omitted). For those defendants alleged to have acted under color of *federal* law, plaintiff may bring alleged violations of his constitutional rights under *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 398, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Federal courts typically analogize claims under § 1983 with *Bivens* actions. *See, e.g., Butz v. Economou,* 438 U.S. 478, 498–501, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978).

2   As noted in the Court's prior order reviewing the initial complaint, (Docket No. 9, Decision and Order, at 10), claims brought against persons acting under color of *federal* law are construed as claims brought under *Bivens,* 403 U.S. at 398. "A *Bivens* action is the nonstatutory federal counterpart of a suit brought pursuant to 42 U.S.C. § 1983 and is aimed

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1432644

at federal rather than state officials." *Shaw v. Lopez,* 2004 WL 1396698, at *2 (D.Conn., June 17, 2004) (citing *Ellis v. Blum,* 643 F.2d 68, 84 (2d Cir.1981); *Chin v. Bowen,* 655 F.Supp. 1415, 1417 (S.D.N.Y.), *aff'd,* 833 F.2d 21, 24 (2d Cir.1987) (citations omitted)).

3   To the extent plaintiff is suing Colley and Weeks (and the other federal officials or employees sued herein) in their official capacities, such claims must be dismissed because they are, in effect, claims against the United States which has not waived its sovereign immunity for claims for damages arising from actions of federal employees in their official capacities. *See, e.g., F.D.I.C. v. Meyer,* 510 U.S. 471, 485–86, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)

4   Because plaintiff alleges that the petition led to his arrest and detention, the Court presumes that he was found guilty of the violations alleged by the petition and thus there was probable cause for the petition. *See Petius,* 2011 WL 4458963, at *6 (Report and Recommendation) (finding of guilt on the violations alleged established probable cause for the petition for a warrant (citing *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (a conviction is "conclusive evidence" that probable cause existed for an arrest .)

5   Their continues to be disagreement in the district courts in the Second Circuit regarding whether after *Ashcoft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2011), the five factors for establishing personal involvement of a supervisor in actions under § 1983 or *Bivens* still apply. *See, e.g., Rodriguez v. Federal Bureau of Prisons,* 2012 WL 6965109, at *9, n. 11 (N.D.N.Y., Nov.30, 2012).

---

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**2010 WL 624081**
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jason R. WHITE, Plaintiff,
v.
Brian FISCHER, Commissioner, Dept.
of Correctional Services; Theresa A.
Knapp–David, Director, Classification and
Movement; and R. Woods, Superintendent,
Upstate Correctional Facility, Defendants.

No. 9:09–CV–240.
|
Feb. 18, 2010.

**Attorneys and Law Firms**

Jason R. White, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the State
of New York, Brian J. O'Donnell, Esq., Asst. Attorney
General, of Counsel, Albany, NY, for Defendants.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

 **\*1** Plaintiff, Jason R. White, commenced this civil rights
action in February 2009, pursuant to 42 U.S.C. § 1983.
By Report–Recommendation dated January 25, 2009, the
Honorable David E. Peebles, United States Magistrate
Judge, recommended that defendant's motion to dismiss
(Dkt. No. 10) be granted, and that plaintiff's complaint
in this action be dismissed without leave to replead. No
objections to the Report–Recommendation have been
filed.

Based upon a careful review of the entire file and
the recommendations of Magistrate Judge Peebles, the
Report–Recommendation is accepted and adopted in all
respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

1. Defendant's motion to dismiss (Dkt. No. 10) is
GRANTED;

2. Plaintiff's complaint in this action is DISMISSED
without leave to replead; and

3. The Clerk is directed to file judgment accordingly and
close the file.

IT IS SO ORDERED.

JASON R. WHITE,

Plaintiff,

-v.-

BRIAN FISCHER, THERESA A. KNAPP–DAVID,
and R. WOODS,

Defendants.

### *REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Jason R. White, a New York State prison
inmate who is proceeding *pro se* and *in forma pauperis,*
has commenced this action pursuant to 42 U.S.C. §
1983, alleging deprivation of his civil rights. In his
complaint, plaintiff asserts that his transfer into special
housing unit ("SHU") disciplinary confinement at the
Upstate Correctional Facility, to serve what was originally
intended to be a three-month disciplinary sentence of less
restrictive keeplock confinement imposed while at another
facility, represented a deprivation of a liberty interest
without the requisite procedural due process. As relief
for the violation, plaintiff's complaint seeks an award of
compensatory damages in the amount of $25,000.

In response to plaintiff's complaint, defendants have
moved seeking its dismissal for failure to state a cause
of action upon which relief may be granted. In their
motion, defendants argue that plaintiff's allegations do
not demonstrate the existence of a meritorious due process
claim since, at best, it implicates a failure of prison officials
to comply with governing regulations regarding transfers
into an SHU unit, a matter not of constitutional concern,
noting further that plaintiff has no constitutional right
to be designated to a particular correctional facility or

to a desired security classification. Defendants also seek dismissal of plaintiff's claims against them based upon lack of personal involvement, and additionally assert their entitlement to qualified immunity from suit as a basis for their dismissal motion.

For the reasons set forth below, I find that White's complaint fails to set forth a plausible due process violation and that defendant Fischer is also entitled to dismissal of the claims against him based upon the lack of allegations showing of his personal involvement in the conduct allegedly giving rise to plaintiff's claims. I further recommend a finding that, even if plaintiff were able to plead a cognizable due process cause of action, defendants Knapp–David and Woods nonetheless should be granted qualified immunity from suit in this instance.

I. *BACKGROUND* [1]

 **\*2**  Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1). At the times relevant to his claims plaintiff was designated first to the Auburn Correctional Facility ("Auburn"), located in Auburn, New York, and later to the Upstate Correctional Facility ("Upstate"), located in Malone, New York. *Id.,* § 6.

On March 28, 2007, while confined at Auburn, plaintiff was found guilty following a Tier I II disciplinary hearing of engaging in violent conduct and refusing a direct order, in violation of disciplinary rules 104.11 and 106.10, respectively. [2] *See* Plaintiff's Memorandum (Dkt. No. 1–1) Exh. A. [3] As a result of that determination plaintiff was sentenced to serve three months of keeplock confinement, with a corresponding loss of package, commissary, and telephone privileges. *See id.*

On April 11, 2007, while serving his keeplock sentence at Auburn, White was processed out of that facility and, following completion of an inter-prison transfer process which included a stop at another facility, was transferred into Upstate on or about April 13, 2007. Complaint (Dkt. No. 1) § 6. At Upstate, plaintiff was assigned to a two-person cell in the facility's SHU to serve the balance of his disciplinary confinement sentence. [4] *Id.*

On April 23, 2007 plaintiff filed a grievance with prison authorities, arguing that his transfer into the SHU

at Upstate was not authorized by DOCS directives. Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1–1) Exh. C. The grievance was denied by the facility's Inmate Grievance Review Committee ("IGRC"). Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1–1) Exh. D. Plaintiff appealed the denial to defendant Woods, the Superintendent at Upstate, who upheld the IGRC's unfavorable determination by decision dated May 15, 2007. Complaint (Dkt. No. 1) § 6 at p. 4B. Plaintiff's Memorandum (Dkt. No. 1–1) Exh. D. Plaintiff's further appeal of the matter to the DOCS Central Office Review Committee ("CORC") was likewise unsuccessful. *Id.* Exh. E.

Also on April 23, 2007, plaintiff sent a letter to the DOCS Commissioner Brian Fischer, complaining of the SHU designation. Plaintiff's Memorandum (Dkt. No. 1–1) Exh. F. That letter was referred by Commissioner Fischer to defendant Theresa A. Knapp–David, the DOCS Director of Classification and Movement. Complaint (Dkt. No. 1) § 6 at pp. 4B–4C. In response, defendant Knapp–David wrote to the plaintiff on May 7, 2007, advising that his SHU assignment was in accordance with established DOCS procedures. Plaintiff's Memorandum at (Dkt. No. 1.1) Exh. G.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on February 27, 2009, and was thereafter granted leave to proceed *in forma pauperis.* Dkt. Nos. 1, 4. Named as defendants in plaintiff's complaint are Commissioner Fischer; Director Knapp–David; and Upstate Superintendent R. Woods. Complaint (Dkt. No. 1) § 3. Plaintiff's complaint asserts a single cause of action for deprivation of procedural due process. *Id.,* § 7.

 **\*3**  Following service, in lieu of answering plaintiff's complaint, defendants filed a motion to dismiss asserting a variety of grounds for the relief sought. Dkt. No. 10. In their motion defendants argue, *inter alia,* that plaintiff's complaint 1) does not implicate a cognizable due process violation, 2) plaintiff's complaint fails to establish their personal involvement in the deprivation alleged; and 3) in any event they are entitled to qualified immunity. [5] Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 13, which is now fully briefed and ripe for determination, and has been referred to me for the

issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

### III. *DISCUSSION*

#### A. *Dismissal Motion Standard*
A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* ––– U.S. ––––, ––––, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* –––U.S. ––––, 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570 127 S.Ct. at 1974). When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)).

#### B. *Procedural Due Process*
**\*4** In their motion, defendants assert that because plaintiff's due process claim rests on alleged violations of DOCS regulations, his complaint in fact fails to assert a cognizable due process claim.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 260 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). Inmates' liberty interests may arise out of the Due Process Clause of the Fourteenth Amendment, or state statute or regulation. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908 (1989)).

Recognizing that lawful imprisonment necessarily restricts the rights and privileges of inmates, the Supreme Court has narrowly circumscribed the scope of liberty interests arising out of the Due Process clause to protect only the most basic liberty interests of prisoners. *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 869 (1983). Accordingly, the Due Process Clause does not guard against every change in the conditions of confinement having a substantial adverse impact on inmates, but only those conditions or restraints that "exceed[ ] the sentence in ... an unexpected manner." *Arce,* 139 F.3d at 333 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300 (1995)).

In this instance plaintiff does not claim that he was denied procedural due process in connection with the disciplinary hearing that led to the imposition of a three-month period of keeplock confinement as a sanction. Instead, he argues that his due process rights were abridged after the sanction was imposed when, in violation of DOCS Directive No. 4933, [6] he was transferred from keeplock confinement at Auburn to an SHU cell at Upstate, and as a result required to endure a more restrictive confinement. Unfortunately for plaintiff, neither the Due Process Clause nor state statute or regulation give rise to a liberty interest in these circumstances.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Preliminarily, it is well recognized that an inmate has no constitutional right to be incarcerated at a particular correctional facility, "and transfers among facilities do not need to be proceeded by any particular due process procedure." *Halloway v. Goord,* No. 9:03–CV01524, 2007 WL 2789499, at * 5 (N.D.N.Y. Sept. 24, 2007) (Kahn, J. and Treece, J.) [7] (citing *Wilkinson v. Austin,* 545 U.S. 209, 221–22 (2005)) (other citation omitted); *see also, Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir.2009) (per curiam); *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). As a result, the constitution did not present any impediment to plaintiff's transfer to Upstate.

**\*5** Additionally, it is equally well established, as defendants now argue, that state regulations, including DOCS Directives, do not ordinarily confer constitutional rights sufficient to give rise to a due process claim. *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009). A state can, however, by statute or regulation confer a liberty interest which cannot be abridged without due process. *Black v. Lansberg,* No. 9:06–CV–1243, 2009 WL 3181111, at *3 (Sept. 29, 2009) (Suddaby, J., adopting Report and Recommendation of Lowe, M.J.). Nonetheless, contrary to plaintiff's contention, DOCS Directive No. 4933 does not give rise to a cognizable liberty interest.

It should be noted that on at least four separate occasions, addressing the same issues raised by the plaintiff in this case, this court has held that an inmate's transfer from keeplock to SHU after being sentenced to serve time in keeplock does not implicate a cognizable liberty interest. *McEachin v. Goord,* No. 9:06–CV–1192, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J. and Treece, M.J.) (dismissing complaint alleging that plaintiff was unlawfully transferred from keeplock to SHU while serving disciplinary sentence); *Halloway,* 2007 WL 2789499 (granting summary judgment dismissing claim that plaintiff should have received hearing before transfer to Upstate after sentenced to keeplock at Elmira Correctional Facility); *Carlisle v. Goord,* No. 9:03–CV–296, 2007 WL 2769566, at *2 n. 1 (N.D.N.Y. Sept. 21, 2007) (Scullin, S.J., adopting Report and Recommendation of Lowe, M.J.) (granting summary judgment finding that "an inmate has no liberty interest in not having his sentence of keeplock confinement at one prison converted to a sentence of SHU confinement at another facility without receiving a hearing regarding

the conversion."); and, *Chavis v. Kienert,* 9:03–CV–0039, 2005 WL 2452150, at *9–10 (N.D.N.Y. Sept. 30, 2005) (Scullin, C.J.) (finding that transfer from keeplock at Coxsackie Correctional Facility to SHU at Upstate did not implicate a liberty interest). *See also, Holmes v. Grant,* No. 03–Civ. 3426, 2006 WL 851753, at *18–19 (S.D.N.Y. mar. 31, 2006 (dismissing claim plaintiff's claim that disciplinary sentence was improperly converted from keeplock sentence to SHU). These decisions are premised upon the court's conclusion that a transfer from keeplock in one facility to SHU in another does not implicate a constitutionally protected liberty interest and that "New York has not created, by regulation or statute, any liberty interest in remaining in one particular prison[,]" noting that "the DOCS ... possesses sole discretion to determine 'where a [state] inmate will be housed.' " *Halloway,* 2007 WL 2789499, at *5 (quoting *Grullon v. Reid,* No. 97 CIV. 7616, 1999 WL 436457, at *10 (S.D.N.Y. Jun. 24, 1999)) (other citations omitted). These cases are indistinguishable from the case presently before the court.

**\*6** Moreover, contrary to the interpretation offered by the plaintiff, the court has read section 301.6 of DOCS Directive No. 4933 as "explicitly permitt[ing] keeplock sentences to be served in SHU and subject to the same restrictions and amenities ...." *McEachin,* 2008 WL 1788440, at *4; *see also, Halloway,* 2007 WL 2789499, at * 5 ("[N]ot only do New York State Regulations permit keeplock sentences to be served in SHU, but further contemplate that assignments to SHU will be subject to the same ... limitations.") and *Holmes,* 2006 WL 851753, at * 19 ("Section 301.6 ... relat[es] to keeplock admissions and authorizes placement of inmates in SHU 'at a medium or minimum security correctional facility or *Upstate Correctional Facility* ... for confinement pursuant to disposition of a disciplinary (Tier II) or superintendent's (Tier II hearing.' ") (emphasis in original).

In view of the foregoing, it is clear that plaintiff's transfer from Auburn, where he was keeplocked, to SHU confinement at Upstate does not implicate a liberty interest arising out of either Due Process Clause, or state statute or regulation. According to plaintiff's complaint, he was sentenced to keeplock after a Tier III disciplinary hearing; he does not allege that he was denied due process in connection with that hearing. The Tier II I hearing that he was provided was all that was required by the constitution before he was sentenced to disciplinary confinement. *Holmes,* 2006 WL 851753, at *19. Plaintiff

was entitled to no further procedure at the time of transfer to Upstate, and therefore cannot show that he was deprived of a protected liberty interest without due process of law.[8] *Id.* Accordingly, I recommend that plaintiff's complaint be dismissed for failure to state a cause of action.

### C. Personal Involvement

In their motion, defendants also challenge the sufficiency of plaintiff's allegations regarding their personal involvement in the constitutional deprivations alleged. Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Two of the three defendants, Brian Fischer and Robert Woods, appear to be named as defendants in their supervisory capacities, based solely upon their positions as the DOCS Commissioner and the Superintendent at Upstate, respectively. As supervisors, neither of those individuals can be liable for damages under section 1983 solely by virtue of their respective positions as supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v.. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the

wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937.; *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

### 1. Commissioner Fischer

**\*7** Aside from allegations centering upon his role as the DOCS Commissioner, which are clearly insufficient in and of themselves to establish his liability, plaintiff's claims against defendant Fischer appear to revolve around the letter written by him to the Commissioner on or about April 23, 2007, complaining of his SHU confinement at Upstate. That letter, it appears from the limited materials now before the court, was referred to defendant Knapp–David for response. It is well established that when the Commissioner receives a letter and forwards it on to another individual for investigation and a response, his or her involvement in the constitutional violation cannot be predicated solely upon those circumstances. *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997); *Rivera v. Fischer,* No. 08–CV–6505L, 2009 WL 2981876, at *2 (W.D.N.Y. Sept. 18, 2009). I therefore recommend dismissal of plaintiff's claims against Commissioner Fischer on the basis of lack of his personal involvement.

### 2. Superintendent Woods

Plaintiff's claims against Superintendent Woods stand on slightly different footing. It is alleged that Superintendent Woods processed and affirmed the determination of the Upstate IGRC denying plaintiff's grievance regarding the relevant occurrences. His review of plaintiff's grievance arguably placed Superintendent Woods on notice of a constitutional violation, which was ongoing, at a time when he was potentially positioned to end the violation. On that basis I conclude that plaintiff has sufficiently alleged Superintendent Woods' personal involvement in the violation alleged to withstand defendants' dismissal motion. *See Charles v. New York State Dept. of Corr. Services,* No. 9:07–CV–1274, 2009 WL 890548, at *5–9 (N.D.N.Y. Mar. 21, 2009) (Hurd, J. and DiBianco, M.J .).

### 3. Director Knapp–David

Plaintiff's complaint alleges that in her position as the DOCS Director of Classification and Movement, defendant Knapp–David would have reviewed and approved his transfer from Auburn into Upstate. That allegation is buttressed by both her position with the DOCS and the fact that plaintiff's letter regarding the matter was referred to defendant Knapp–David for response explaining why the transfer was proper under DOCS regulations. On this basis, I conclude that plaintiff has stated a plausible claim against defendant Knapp–David and her personal involvement in the constitutional deprivations alleged.

### D. Qualified Immunity

In their motion, defendants also assert entitlement to qualified immunity from suit. Qualified immunity shields government officials performing discretionary functions from liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738 (1982) (citations omitted). "In assessing an officer's eligibility for the shield, 'the appropriate question is the objective inquiry whether a reasonable officer could have believed that [his actions were] lawful, in light of clearly established law and the information the officer[ ] possessed." *Kelsey v. County of Schoharie,* 567 F.3d 54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of qualified immunity seeks to strike a balance between the need to hold government officials accountable for irresponsible conduct and the need to protect them from "harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815 (2009).

**\*8** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[9] *Kelsey,* 567 F.3d at 61, "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[10] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently concluded in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."[11] *Pearson,* 555 U.S. ——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

> (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*9** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v.. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Applying the *Saucier* two-step inquiry here, I have already determined that plaintiff has failed to state a plausible constitutional violation. Moreover, even if plaintiff were able to distinguish the existing precedent in this district and allege a protected liberty interest that required that plaintiff be provided with additional due process before his transfer to Upstate, I conclude that any such right was far from a clearly established and that a reasonable person in the circumstances of defendant Woods and defendant Knapp–David would not have appreciated that the transfer of plaintiff into SHU confinement at Upstate represented a potential deprivation of plaintiff's procedural due process rights beyond those addressed by the hearing officer. Accordingly, as an additional basis for dismissal, I recommend that both defendants Woods and Knapp–David be granted qualified immunity from suit.

## IV. *SUMMARY AND RECOMMENDATION*
At the heart of plaintiff's complaint in this action is his contention that his due process rights and DOCS regulations were violated when he was transferred from keeplock confinement at Auburn into an SHU cell at Upstate. Since such a claim, it is well established in

this district, is not constitutionally cognizable, White has therefore failed to state a claim upon which relief can be granted. While plaintiff has failed to establish personal involvement on the part of Commissioner Fischer in an alleged deprivation and the claims against him should be dismissed on this additional basis, plaintiff has sufficiently alleged personal involvement on the part of defendant Knapp–David and R. Woods. Nonetheless, I find that those two defendants are entitled to qualified immunity from suit, providing an additional basis for dismissal of plaintiff's claims against them. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 10) be GRANTED, and that plaintiff's complaint in this action be DISMISSED, without leave to replead; and it is further

ORDERED that pending a final determination on defendants' dismissal motion, discovery in this action be and hereby is STAYED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*10** It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

## All Citations

Not Reported in F.Supp.2d, 2010 WL 624081

---

Footnotes

1   In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. See *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)); see also *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964). I have also considered the exhibits attached to plaintiff's memorandum, which accompanied his complaint, to the extent that they are consistent with the allegations of his complaint. See *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

2   The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings concern the

most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

3    Plaintiff filed what he labeled as a "memorandum of law", with exhibits attached, in conjunction with his complaint. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his ... memorandum." *Rivera v. Selsky,* No. 9:05–CV–0967, 2007 WL 956998, at *1 n. 2 (N.D.N.Y. Jan. 5, 2007) (quoting *Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov. 17, 1997)).

4    Upstate is a maximum security prison comprised exclusively of SHU cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

5    Defendant's also seek a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure staying discovery in this matter pending final determination of their dismissal motion. Discerning no basis to conclude that plaintiff would be unduly prejudiced by such a stay, that application will be granted.

6    Section 301.6(a) of DOCS Directive No. 4933 permits an inmate confined in a medium or minimum security facility, or at Upstate, to be admitted into an SHU for various reasons, which can include confinement pursuant to a Tier II or III hearing disposition. Plaintiff asserts that because he was transferred from Auburn, a maximum security facility, into an SHU unit, that section does not apply. Interestingly, a prior version of DOCS Directive No. 4933 provided, in relevant part, that

[a]n inmate who is assigned to keeplock status and who is transferred to a maximum security facility shall not be assigned to the special housing unit at the receiving facility. Such inmate shall be assigned to keeplock within general population and shall have the same rights and responsibilities as other keeplock inmate in that facility.

*Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998) (quoting prior version of 7 NYCRR § 301.6(h)).

7    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

8    Plaintiff alleges a litany of differences between the conditions experienced while in keeplock at Auburn and those in SHU at Upstate asserting, for example, that with regard to visits, he was required to travel to and from them in handcuffs, had to remain in handcuffs if he needed to use the restroom, and was not permitted to take photographs, and also that he did not have the same opportunities for social interaction with other prisoners and had to sleep with a light on. Plaintiff's Memorandum (Dkt.1–1) at pp. 11–12. As a matter of law, these alleged conditions can hardly be characterized as "exceed[ing] his sentence in an unexpected manner" or as imposing an "atypical and substantial hardship upon the [plaintiff] in relation to the ordinary incidents of prison life". *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300. "[T]" fact that 'life in one prison is much more disagreeable than another does not itself signify that a Fourteenth Amendment liberty interest is implicated...." *Halloway,* 2007 WL 2789499, at *7 (quoting *Meachum v. Fano,* 427 U.S. 215, 225 (1976). Moreover, even if a liberty interest were alleged, plaintiff was afforded all the process he was due, by way of a disciplinary proceeding, before the alleged deprivation. *Carlisle,* 2007 WL 2769566, at *3.

9    If no constitutional right would have been violated were the allegations established, no further inquiry regarding qualified immunity is necessary. *Kelsey,* 567 F.3d at 61 (quoting *Saucier* ).

10    In *Okin,* the Second Circuit clarified that the "'objectively reasonable' inquiry is part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433 n. 11 (citation omitted).

11    Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. ——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

---

End of Document                                                © 2017 Thomson Reuters. No claim to original U.S. Government Works.